STATE OF NORTH CAROLINA, ex rel. UTILITIES COMMISSION; RUFUS L. EDMISTEN, Attorney General; PUBLIC STAFF; HENRY J. TRUETT; TOWN OF BRYSON CITY; SWAIN COUNTY BOARD OF COUNTY COMMISSIONERS; CHEROKEE, GRAHAM AND JACKSON COUNTIES, THE TOWNS OF ANDREWS, DILLSBORO, ROBBINSVILLE, AND SYLVA; THE TRIBAL COUNCIL OF THE EASTERN BAND OF CHEROKEE INDIANS; MURIEL MANEY; AND DEROL CRISP v. NANTAHALA POWER AND LIGHT COMPANY; ALUMINUM COMPANY OF AMERICA; AND TAPOCO, INC.

No. 227A83

(Filed 3 July 1985)

1. **Electricity § 3; Utilities Commission § 36— electric rates—affiliated utilities— treatment as integrated system—authority of Utilities Commission**

    The Utilities Commission has the authority, in the first instance, to determine for itself the relevant criteria to apply to the factual question of whether to treat Nantahala Power Company and Tapoco, Inc. as an integrated system for rate making purposes, and its determination will not be disturbed on appeal where supported by substantial evidence.

2. **Electricity § 3; Utilities Commission § 15— Tapoco as public utility**

    The Utilities Commission correctly determined that Tapoco, Inc. is a public utility in North Carolina subject to its regulatory authority and jurisdiction.

3. **Appeal and Error § 2— unanimous decision of Court of Appeals—scope of review**

    Pursuant to Rule 16(a) of the Rules of Appellate Procedure, the scope of review in the Supreme Court from an unanimous decision of the Court of Appeals is limited to consideration of the questions properly presented in the new briefs required by Rule 14(d)(1) and 15(g)(2) to be filed in the Supreme Court. Questions properly presented for review in the Court of Appeals but not presented and discussed in the new briefs to the Supreme Court are deemed abandoned under Rule 28(a).

4. **Electricity § 3; Utilities Commission § 36— electric rates—roll-in methodology for Nantahala—no preemption by federal license**

    The Utilities Commission's order implementing a roll-in of the properties, revenues and expenses of Tapoco with those of Nantahala for the purpose of setting Nantahala's retail rates in no way contravened the terms and conditions of Tapoco's federal license to operate hydroelectric plants in North Carolina and Tennessee, and the Commission was not, therefore, preempted from implementing the roll-in by virtue of Part I of the Federal Power Act and the Supremacy Clause, Art. VI, cl. 2, of the U.S. Constitution.

5. **Electricity § 3; Utilities Commission § 36— electric rates—affiliated utilities— treatment as integrated system—sufficient evidence**

    There was plenary evidence in the record to support a determination by the Utilities Commission that Nantahala and Tapoco constitute a single, in-

tegrated electric system and should be treated as such for the purposes of calculating Nantahala's retail rate base and costs of service.

**6. Electricity § 3; Utilities Commission § 15— Alcoa as public utility**

The evidence supported a determination by the Utilities Commission that Alcoa, the owner of all of the outstanding stock of Nantahala Power Company, is a North Carolina public utility under G.S. 62-3(23)c by virtue of the effect Alcoa's "affiliation" with Nantahala has had upon Nantahala's rates.

**7. Electricity § 3; Utilities Commission § 36— electric rates—roll-in methodology for Nantahala—no preemption by Federal Power Act and Supremacy Clause**

The Utilities Commission was not preempted from implementing a roll-in methodology for determining Nantahala's rates by virtue of the Supremacy Clause, Art. VI, cl. 2, of the U.S. Constitution and the Federal Energy Regulatory Commission's exclusive jurisdiction under Part II of the Federal Power Act over certain wholesale power transactions and agreements between and among Nantahala, Tapoco, Alcoa and TVA. The "filed rate" doctrine did not require the Utilities Commission, in determining the proper costs to Nantahala's retail customers for the service provided to them, to use demand and energy factors based upon the proportion of entitlements allocated to Nantahala alone under such agreements. Nor did the Utilities Commission's order conflict with specific FERC actions taken with respect to such agreements.

**8. Electricity § 3; Utilities Commission § 21— jurisdiction over intrastate and interstate rates**

The Federal Energy Regulatory Commission is prohibited from regulating intrastate retail rates charged to ultimate consumers, and the states are prohibited from regulating interstate wholesale rates charged to local distributing companies.

**9. Electricity § 3; Utilities Commission § 21— wholesale interstate electric rates —no authority by Utilities Commission**

The N.C. Utilities Commission was preempted from directly or indirectly regulating the wholesale rate structure created by certain interstate power agreements between and among Nantahala, Tapoco, Alcoa and TVA or inquiring into the reasonableness of those FERC-filed wholesale rate schedules when it acted in fixing Nantahala's retail rates.

**10. Utilities Commission § 38— electric rates—operating expenses considered**

When the provisions of G.S. 62-133(b)(1), (b)(3) and (c) are read *in pari materia*, the only operating expenses which the Utilities Commission may consider in setting intrastate rates for North Carolina public utilities are those incurred in the provision of service to the utility's North Carolina consumers. Accordingly, jurisdiction cost allocation is a necessary step in any general rate case involving a public utility or utility system whose separate companies are operated as a single enterprise serving both jurisdictional (intrastate retail) and non-jurisdictional consumers.

**11. Utilities Commission § 24— fixing "reasonable and just" rates—balancing of shareholder and consumer interests**

The fixing of "reasonable and just" rates involves a balancing of shareholder and consumer interests. The Utilities Commission must therefore set rates which will protect both the right of the public utility to earn a fair rate of return for its shareholders and ensure its financial integrity while also protecting the right of the utility's intrastate customers to pay a retail rate which reasonably and fairly reflects the cost of service rendered on their behalf.

**12. Utilities Commission § 38— operating expenses—questions of fact**

The fundamental question as to whether certain expenditures are to be included in the operating expenses a utility is entitled to collect from its customers is one of fact to be ascertained by the regulatory authority.

**13. Electricity § 3; Utilities Commission § 36— electric rates—power costs paid to affiliate**

Ordinarily, the Utilities Commission may, in a proper case, refuse to allow a utility to include in its reasonable operating expenses the full price it actually paid for power as a result of its contractual power supply arrangements, especially where the operating expense is one incurred through a contract between or including the utility company and its affiliated companies. In such cases, the burden of persuasion on the issue of reasonableness always rests with the utility, and charges arising out of intercompany relationships between affiliated companies should be scrutinized with care and may be properly refused or disallowed in the absence of a showing of their reasonableness.

**14. Electricity § 3; Utilities Commission § 36— electric rates—transactions with affiliated companies—filed rate doctrine**

The Utilities Commission's otherwise plenary authority to investigate transactions between a public utility and its affiliated companies, and to disallow operating expenses found to be imprudently incurred or allocated under such agreements, is limited by prior federal approval of the rate or price in question under the "filed rate" doctrine. Thus, neither the state public service commission nor the courts can unilaterally establish a different rate for wholesale electric power sold in interstate commerce because they are of the opinion that an FERC-filed or approved rate is unfair or unreasonable.

**15. Electricity § 3; Utilities Commission § 36— Nantahala's retail rates—interstate power supply arrangements—benefits to Alcoa—costs to be borne by Alcoa**

Insofar as the Utilities Commission determined that Alcoa, as corporate parent and private industrial customer of Nantahala Power Company, had benefited at the expense of Nantahala's public load from interstate corporate and power supply arrangements it imposed upon its subsidiaries, it was within its regulatory authority to decide that the costs associated with those benefits would not be borne by Nantahala's public consumers in the form of higher retail rates but would be borne by Nantahala's customer and sole shareholder, Alcoa.

**16. Electricity § 3; Utilities Commission § 36— electric rates—demand and energy factors—failure to use entitlements under interstate agreements—filed rate doctrine**

The "filed rate" doctrine did not require the Utilities Commission, in determining the proper costs to Nantahala's retail customers for the service provided to them, to use demand and energy factors based upon the proportion of entitlements allocated to Nantahala alone under certain interstate wholesale power agreements between and among Nantahala, Tapoco, Alcoa and TVA.

**17. Electricity § 3; Utilities Commission § 36— Alcoa's dominance of Nantahala— roll-in methodology—effect of FERC actions**

The Federal Energy Regulatory Commission's analysis of the corporate structure of Alcoa, Nantahala and Tapoco and various intercorporate power transactions and agreements, and its finding that the evidence before it did not support the conclusion that Alcoa had used the separate corporate identities of Nantahala and Tapoco to frustrate the purposes of the Federal Power Act, did not preempt the N.C. Utilities Commission from determining that the evidence before it supported the conclusion that Alcoa had dominated Nantahala in such a manner as to require relief for Nantahala's retail customers under N.C. law. Nor did the Federal Energy Regulatory Commission's having declined to order a roll-in of Nantahala and Tapoco for rate making purposes preempt the Utilities Commission from implementing such a rate making methodology under its discretionary authority in setting intrastate retail rates.

**18. Electricity § 3; Utilities Commission § 36— electric rates—roll-in methodology —no undue burden on interstate commerce**

The Utilities Commission's adoption of a roll-in of the properties, revenues and expenses of Tapoco with those of Nantahala for the purpose of setting Nantahala's retail rates did not afford N.C. customers a "first call" on the energy output of the combined system and the economic benefits of Tapoco's lower-cost production so as to place an undue burden on interstate commerce in violation of the Commerce Clause, Art. I, § 8, cl. 3, of the U.S. Constitution.

**19. Electricity § 3; Utilities Commission § 36— electric rates—roll-in methodology —no confiscation of Nantahala's properties**

The Utilities Commission's implementation of a roll-in methodology for setting Nantahala's retail rates, with its resulting reduction in retail rates and refund obligation to Nantahala's retail customers, does not impermissibly impair Nantahala's ability to earn a proper rate of return on its investment and does not amount to a confiscation of its properties in violation of the due process clause of the Fourteenth Amendment to the U.S. Constitution and Art. I, § 19 of the N.C. Constitution.

**20. Electricity § 3; Utilities Commission § 36— requiring refund to Nantahala's customers by Alcoa—authority of Utilities Commission**

The Utilities Commission acted within its regulatory and rate making authority in imposing the obligation upon Nantahala's parent Alcoa to pay any portion of a refund obligation to Nantahala's retail customers which Nantahala is financially unable to pay. Once the Utilities Commission determined that

Alcoa was a statutory public utility under G.S. 62-3(23)c, it could rely upon the doctrine of "piercing the corporate veil" between Nantahala and its parent, Alcoa, to hold Alcoa financially responsible for Nantahala's refund obligation to the extent its affiliation had adversely affected Nantahala's rates as necessary or incident to the proper discharge of its regulatory duties under G.S. 62-30.

21. **Electricity § 3; Utilities Commission § 36— electric rates—piercing the corporate veil—fraud not required**

The Utilities Commission was not required to find fraud in order to pierce the corporate veil between Nantahala and its parent, Alcoa.

22. **Electricity § 3; Utilities Commission § 36— Nantahala's retail rates—piercing the corporate veil—effect of prior actions by regulatory agencies**

Prior investigation and regulation of the activities of Alcoa and Nantahala by state and federal regulatory agencies did not prohibit or preempt the N.C. Utilities Commission from piercing the corporate veil between Alcoa and its wholly-owned subsidiary Nantahala to hold Alcoa financially responsible for Nantahala's refund obligation to its retail customers.

23. **Electricity § 3; Utilities Commission § 36— refund to Nantahala's customers—responsibility of Alcoa**

There was no merit to Alcoa's contention that it could not be required to pay refunds based upon Nantahala's overcollections prior to 30 October 1980, the date on which the Utilities Commission found Alcoa to be a public utility.

24. **Electricity § 3; Utilities Commission § 36— refund to Nantahala's customers—responsibility of Alcoa—no confiscation of Alcoa's property**

The Utilities Commission's imposition of an obligation upon Alcoa to pay any portion of a refund obligation to Nantahala's retail customers which Nantahala is financially unable to pay does not amount to a confiscation of Alcoa's property.

25. **Electricity § 3; Utilities Commission § 21— period of refund of excessive rates—no retroactive rate making**

When, upon appellate review and further action by the Utilities Commission, rates approved for Nantahala by the Utilities Commission in 1977 were determined to be excessive, the Utilities Commission properly ordered Nantahala to refund all excessive rates collected since the 1977 order, not just overcollections which were subject to an undertaking for refund after 6 March 1979 when the Court of Appeals vacated the 1977 order. Furthermore, the Commission's refund order did not amount to retroactive rate making since the rates ultimately fixed and the refund were not collectible for past service but for service in the locked-in docket period.

26. **Electricity § 3; Utilities Commission § 21— amount of refund to utility's customers**

The Utilities Commission properly ordered Nantahala to refund excess revenue measured by rates determined by a roll-in methodology in this proceeding rather than by what would have been collected under Nantahala's prior rate schedule.

**27. Electricity § 3; Utilities Commission § 56— electric rates—order based on independent findings**

In this rate case in which the Utilities Commission implemented a roll-in methodology for determining Nantahala's rates and held Nantahala's parent corporation Alcoa financially responsible for refunds to Nantahala's customers, all parties received a full and fair hearing at all stages of the original and remanded proceedings, and the Commission's order was, in all respects, based upon fully independent and well substantiated findings of fact and conclusions of law and not on observations made by the N.C. Supreme Court in remanding the proceeding to the Commission.

Justice VAUGHN did not participate in the consideration or decision of this case.

APPEAL by respondents pursuant to N.C.G.S. § 7A-30(3) from the decision of the Court of Appeals, reported at 65 N.C. App. 198, 309 S.E. 2d 473 (1983), affirming the order of the North Carolina Utilities Commission entered 2 September 1981, Docket No. E-13, Sub 29 (Remanded) reducing retail electric utility rates and requiring a refund by respondents Nantahala Power and Light Company ("Nantahala") and its parent corporation, Aluminum Company of America ("Alcoa") to Nantahala's retail ratepayers for the four-year period of 1977-1981. Heard in the Supreme Court 12 April 1984.

This matter was initiated by Nantahala on 3 November 1976 by the filing of an application with the North Carolina Utilities Commission ("Commission") by Nantahala to establish new rates so as to increase its charges to North Carolina retail customers by $1,830,791. The Commission declared the matter to be a general rate case pursuant to N.C.G.S. § 62-137 and ordered an investigation and hearing. Various parties representing the interests of Nantahala's retail ratepayers intervened and moved that Alcoa and its wholly-owned subsidiary, Tapoco, Inc. ("Tapoco") be joined as parties and that the rate base of Nantahala be computed on a "rolled-in" basis to include the properties, revenues and expenses of Tapoco, as if the two were operating as one utility for the purpose of fixing and establishing a reasonable level of retail rates for Nantahala. These motions were disallowed by the Commission.

On 14 June 1977 the Commission issued an order in Docket No. E-13, Sub 29, permitting Nantahala to put into effect revised rates so as to produce $1,598,918 in additional gross revenues.

The order was not stayed and Nantahala implemented the approved rates at that time. The Court of Appeals reversed, held Tapoco to be a North Carolina public utility, vacated the order authorizing the rate increase and remanded the case to the Commission for the purpose of making Tapoco a party and considering "whether the people of North Carolina would benefit by the use of the roll-in method of rate making involving Nantahala and Tapoco." *Utilities Comm. v. Edmisten, Attorney General*, 40 N.C. App. 109, 120, 252 S.E. 2d 516, 522 (1979).

Nantahala sought and obtained from this Court a stay of the Court of Appeals' decision pending further review. Upon Nantahala's appeal from the Court of Appeals, this Court affirmed in part, reversed in part, and remanded the matter to the Commission for further hearings. *Utilities Comm. v. Edmisten, Attorney General*, 299 N.C. 432, 263 S.E. 2d 583 (1980) (*"Edmisten"*).

In *Edmisten* we assumed, without deciding, that Tapoco was a North Carolina public utility subject to the regulatory authority of the Commission, found that there was ample evidence to support a finding that Nantahala and Tapoco operate as a single unified public utility system, held that the Commission erred in giving only minimal consideration to the evidence suggesting the propriety of roll-in, and indicated that the roll-in device or methodology for rate making computation "seems especially appropriate in a case such as this where one physically integrated system, interconnected in such a way that all power available to the system can be used to enhance its overall reliability and supply its requirements as a whole, is presided over by two corporate entities." 299 N.C. at 442, 263 S.E. 2d at 591. In addition, this Court held that Alcoa and Tapoco could be brought in as parties, with a *de novo* right to contest the Commission's jurisdiction; permitted the increased rates to remain in effect, conditioned upon Nantahala's guarantee that it would refund to its customers any excess charges, should the increased rates originally approved by the Commission ultimately be determined to be excessive; and remanded the matter to the Commission with directions to "obtain and consider information and data showing what Nantahala's cost of service to its customers would be if this [roll-in] method of rate making were used and whether Nantahala's customers would benefit thereby." 299 N.C. at 443, 263 S.E. 2d at 591. Thereafter, Nantahala executed an Undertaking to Refund, agreeing to re-

fund any overcollections to its customers should the rates approved by the order of 14 June 1977 be determined excessive.

Upon remand to the Commission and after *de novo* proceedings, Alcoa and Tapoco were held to be North Carolina public utilities and both were made parties respondent to the proceeding. Prior to the remanded rate hearings, the intervenors moved that Alcoa and Tapoco be required to join the execution of Nantahala's undertaking, or, in the alternative, to guarantee Nantahala's ability to make the refund. The Commission deferred its ruling on this motion until a later date.

The case was heard before a panel of the Commission during the months of March, April and May of 1981, and both the intervenors and the respondents presented evidence concerning the propriety of a roll-in, for accounting purposes, of Nantahala's and Tapoco's accounting data in setting Nantahala's retail rates. The panel determined that Nantahala's retail customers would benefit by a roll-in methodology treating Nantahala and Tapoco as a unified system and adopted the roll-in cost allocation formula proposed by the intervenors. On 2 September 1981 the panel ordered a reduction in Nantahala's rates from the level previously approved by the Commission's order of 14 June 1977, in the amount of $2,035,000 annually and, in addition, modified certain purchased power adjustment costs. The panel, consistent with the rate reduction, also ordered Nantahala to refund the excess rates it had been collecting under the 1977 order from its retail customers and directed that Alcoa would be responsible for refunding such portions of the total refund obligation as Nantahala itself is financially unable to refund.

The respondent companies appealed to the Full Commission. After additional hearings, the Commission affirmed and adopted the panel's order in all respects on 28 January 1982. On 16 August 1982, the Commission, after requesting and rejecting several refund plans submitted by Nantahala and Alcoa, ordered the two companies to commence making refunds by monthly installments in October 1982. The Commission left it to the companies to determine the proportion of the refund obligation each would pay, with the provision that any division of financial responsibility not affect Nantahala's ability to continue service to its customers.

The Commission's order was stayed pending appeal to the Court of Appeals. Thereafter, all relevant orders of the Commission were affirmed by the Court of Appeals in *State ex rel. Utilities Comm. v. Nantahala Power & Light Co.*, 65 N.C. App. 198, 309 S.E. 2d 473 (1983). The respondents appeal pursuant to former N.C.G.S. § 7A-30(3), which permitted an appeal of right of any general rate case from the Court of Appeals to this Court in cases decided prior to 1 July 1983. *See* 1983 N.C. Session Laws, Ch. 526, Sec. 10.

*Hunton & Williams, by Robert C. Howison, Jr., and Edward S. Finley, Jr., Attorneys for defendant-appellant Nantahala Power and Light Company.*

*LeBoeuf, Lamb, Leiby & MacRae, by Ronald D. Jones and David R. Poe, Attorneys for respondent-appellants Aluminum Company of America and Tapoco, Inc.*

*Rufus L. Edmisten, Attorney General, by Richard L. Griffin, Assistant Attorney General, Attorney for Using and Consuming Public.*

*Robert Gruber, Executive Director, by James D. Little, Staff Attorney, The Public Staff, Attorneys for Using and Consuming Public.*

*Crisp, Davis, Schwentker & Page, by William T. Crisp and Robert W. Schwentker, Attorneys for Henry J. Truett; Counties of Cherokee, Graham, Swain, Jackson; Towns of Andrews, Dillsboro, Robbinsville, Bryson City, Sylva; and the Tribal Council of the Eastern Band of the Cherokee Indians.*

*Joseph A. Pachnowski, Attorney for the County of Swain and the Town of Bryson City.*

*Western North Carolina Legal Services, by Larry Nestler, Attorney for Derol Crisp.*

*McKeever, Edwards, Davis & Hays, by Fred H. Moody, Jr., Attorney for County of Swain.*

*Charles L. Lewis, Assistant Attorney General, Attorney for State of Tennessee and Tennessee Department of Economic and Community Development, Amici Curiae.*

*Mayer & Magie, by Roderic G. Magie, and Spiegel & McDiar-
mid, by James N. Horwood, Cynthia S. Bogorad, and P. Daniel
Bruner, Attorneys for the Town of Highlands, Amicus Curiae.*

MEYER, Justice.

TABLE OF CONTENTS

Preliminary Matters

I

A. Procedural Background

B. Historical Development of the Unified Nantahala-Tapoco
System

C. Factual Predicates of the Roll-In

1. Public Utility Status of Tapoco

2. Nantahala and Tapoco as a Unified System

3. Public Utility Status of Alcoa

D. Mechanics of the Roll-In in the Allocation of System Costs

II

A. Federal Preemption

1. Federal Power Act; "Filed Rate" Doctrine

2. Federal Regulatory Actions

B. Interference with Interstate Commerce

C. Rate Reduction and Refund Obligation

1. Nantahala's Constitutional Challenges

a. Reduced Rates as Confiscatory

b. Refund Obligation as Confiscatory

2. Alcoa's Challenges; Liability

a. Statutory Powers of the Commission

b. Legal and Factual Basis for Alcoa's Refund Liability

c. Preemptive Effect of Federal Regulation

d. Refund Required

   1. Temporal Extent

   2. Confiscation

3. Nantahala's Non-Constitutional Challenges

   a. Temporal Extent of Refund Obligation

   b. Measure of Refund Obligation

D. Independent Findings of the Commission

### III

Conclusion and Holding

This appeal raises substantial questions under the federal constitution and the North Carolina statutory provisions governing intrastate electric power rates charged by a public utility to its retail customers. The most important question presented is whether the North Carolina Utilities Commission is preempted from implementing a roll-in methodology for setting Nantahala's retail rates by virtue of the Supremacy Clause of the United States Constitution, art. VI, cl. 2 and the Federal Energy Regulatory Commission's ("FERC") exclusive jurisdiction over certain interstate wholesale power transactions and agreements[1] between and among, Nantahala, Tapoco, Alcoa and the Tennessee Valley Authority ("TVA"). For the reasons set forth more fully below, we find no statutory or constitutional infirmity in the order of the North Carolina Utilities Commission issued in Docket No. E-13, Sub 29 (Remanded), and therefore affirm the decision of the Court of Appeals upholding the retail rate reduction and refund obligation to Nantahala's public utility customers.

In Part I of this opinion we will undertake to review (a) the procedural history of this case, (b) the historical development of Nantahala and Tapoco as a single, unified hydroelectric generating and distribution system, (c) the factual predicate to the Commission's decision to implement a roll-in rate making method-

---

1. Part II of the Federal Power Act, 16 U.S.C. §§ 824-824k extends federal regulatory power to the transmission and sale of electric energy at wholesale in interstate commerce, while reserving to the various states the authority to regulate intrastate transmission and sale of electric energy at retail.

ology, and (d) the mechanics of the roll-in in the allocation of costs for the unified system. In the course of this review, we shall address such factual and legal issues raised by the companies as are relevant to the Commission action under discussion. In Part II, we will address the major constitutional and statutory challenges to the Commission's order lodged by the respondent companies. Briefly stated, these challenges concern (a) federal preemption; (b) interference with interstate commerce; (c) the measure, extent and liability for the rate reduction and refund obligation; and (d) the independence of the factual findings of the Commission.

I.

A.

This appeal represents the culmination of a process begun in 1976, with Nantahala's application for permission to increase its retail rates and a revision of its purchased power adjustment clause (PPAC) applicable to those rates. The initial order entered by the Commission on 14 June 1977 in Docket No. E-13, Sub 29, approving certain annual increases in Nantahala's rates and a PPAC adjustment was ultimately reversed on appeal by this Court in *Edmisten*, 299 N.C. 432, 263 S.E. 2d 583. The basis for reversal was the Commission's failure as a matter of law to give more than minimal consideration to material facts of record concerning the propriety of treating Nantahala and its affiliate Tapoco, both wholly owned subsidiaries of Alcoa, as a single unified electric utility and rolling together their properties and costs for purposes of determining just and reasonable retail electric rates for Nantahala's North Carolina customers. 299 N.C. at 437, 263 S.E. 2d at 587-88. The case was remanded with directions to the Commission to obtain and consider information and data showing what Nantahala's cost of service to its customers would be if the roll-in method of rate making were used and whether Nantahala's customers would benefit thereby. *Id.* at 443, 263 S.E. 2d at 591.

Upon remand, the Commission, in preliminary hearing, determined that it had jurisdiction over Nantahala's parent corporation, Alcoa, and its affiliate, Tapoco, and joined them as parties in Docket No. E-13, Sub 29 (Remanded). A panel of the Full Commission then held hearings and received evidence from both the intervening customers of Nantahala and from the respondent com-

panies on the question of roll-in. In addition to the evidence received during Nantahala's initial rate increase hearings in 1977 regarding Nantahala's costs and the relevant test year (1975) data, both parties presented additional testimony and data concerning Nantahala's rolled-in costs of service to its retail customers. The companies presented one allocation methodology for apportioning the combined revenues, expenses and investment of the rolled-in system between the system's North Carolina retail operations and non-jurisdictional Tennessee industrial operations, and the intervenors presented another.

Briefly stated, the basic dispute between the intervenors and the companies as to *which* jurisdictional cost allocation methodology to use involves the question of whether the rolled-in power costs are to be allocated to Nantahala's retail customers on the basis of its actual contribution and use of hydroelectric generation and capacity in the unified system or upon the proportion of return power entitlements it receives under the wholesale agreements between and among the companies themselves and the Tennessee Valley Authority ("TVA"). The intervenors contend that the former allocation formula is just and appropriate for setting Nantahala's retail rates. The companies maintain that the latter is mandated under the federal and state division of, respectively, wholesale and retail rate making authority, because the contracts at issue are federally filed and approved wholesale rates which must be given effect by state public service commissions in setting retail rates.

The wholesale power coordination and exchange agreements primarily at issue are (1) the New Fontana Agreement ("NFA"), a 1962 power exchange agreement among the three companies and TVA, whereby Nantahala and Tapoco subject all of their large plant electrical generation to TVA control and turn over that generation directly to TVA, in exchange for annual return power entitlements for the two subsidiaries to divide between themselves; and (2) the 1971 Nantahala-Tapoco Apportionment Agreement, a contract between the two subsidiaries, whereby the demand and energy return power entitlements received under the NFA are divided between them, with Nantahala receiving no more than a fixed amount of power and energy, and Tapoco receiving the re-

mainder.[2] These, and other contractual arrangements affecting Nantahala's costs of service will be discussed more fully below.

The Commission, in view of the evidence presented by all the parties upon remand, found and concluded that (1) Nantahala and Tapoco are North Carolina public utilities subject to its rate making jurisdiction; (2) Alcoa, by virtue of its parental domination of Nantahala, was itself a statutory North Carolina public utility pursuant to N.C.G.S. § 62-3(23)c; (3) the Nantahala-Tapoco electric generation and distribution system constitutes a single, integrated electric system, operated as such and coordinated with the TVA system; (4) use of an appropriately performed roll-in of Nantahala and Tapoco would be beneficial to Nantahala's customers because its allocated cost of power under the combined system is less than the cost of power for Nantahala as a stand-alone system, such that a roll-in will result in a significant reduction in the cost of providing public utility electric service to the single system's retail customers; (5) significant detriments and inequities to Nantahala arise out of both the NFA and the 1971 Apportionment Agreement, which result in concealed benefits flowing to Alcoa through its subsidiary Tapoco, and render use of the companies' cost allocation formula based on the demand and energy entitlements under those contracts inappropriate for determining the costs fairly attributable to the North Carolina public load in the combined system; (6) the cost allocation methods and procedures proposed by the intervenors, based upon the generational capabilities and needs of Nantahala, are proper for use in the allocation of its demand and energy related costs and should be adopted for use in setting Nantahala's retail rates in the subject proceeding; and (7) Alcoa had so dominated Nantahala in certain contracts and transactions involving Nantahala, Tapoco and others that Nantahala had been left "but an empty shell,

---

2. In practice, the NFA and its predecessor, the original Fontana Agreement ("OFA"), operated as "sales" to TVA of electric power for resale under Part II of the Federal Power Act, 16 U.S.C. §§ 824-824k, by Alcoa's subsidiary-public utilities (Nantahala and Tapoco), with TVA making payments in kind to the Alcoa "system" as a whole. In turn, TVA's "payments" of return power have been divided amongst the system members as they themselves have designated. The various agreements are, accordingly, treated as tariffs or rate schedules by FERC and are subject to regulation under Part II of the Act to assure that the terms and conditions are just and reasonable and not unduly discriminatory, despite the fact that no dollars actually change hands as rate payments.

unable to act in its own self-interest, let alone in the interest of its public utility customers in North Carolina," so as to render Alcoa responsible for such portions of any refund obligation placed upon Nantahala as Nantahala itself is unable to make.

The Commission adopted the intervenors' roll-in methodology, which resulted in lowered rates and required a refund obligation to be placed upon Nantahala and Alcoa. Essentially, the roll-in method adopted treats Nantahala and Tapoco as a single integrated system for accounting purposes. That is, (a) the assets, properties, plants and working capital requirements of the two companies were joined in one unified rate base; (b) the joint revenues and expenses of the single system were totalled; and (c) the combined system was assigned the rate of return previously approved by the Commission for Nantahala alone in the Sub 29 proceeding. From these three elements, the combined system revenue requirement (expenses + rate base × rate of return) was derived.

The combined system cost of service was then allocated between the public load customers in North Carolina and the industrial load customer (Alcoa) in Tennessee, using generally accepted jurisdictional allocation factors commonly employed by the Commission in setting North Carolina retail rates for other companies, such as Duke Power or Carolina Power & Light, which operate in more than one state. Rates for Nantahala's public load customers could be reduced because the cost of service per kwh for the combined Nantahala-Tapoco system is less than for Nantahala treated as a stand-alone electric system.

In its final order entered 28 January 1982, the Commission overruled the exceptions taken by the companies to the panel's order implementing roll-in and made supplementary conclusions of law on certain "federal questions" arising by virtue of the panel's rejection of the companies' proposed jurisdictional cost allocation methodology. The Commission rejected, inter alia, the companies' arguments (1) that the panel's order is precluded by exclusive federal licensing of interstate hydroelectric power facilities under Part I of the Federal Power Act, 16 U.S.C. §§ 791a-823a; (2) that the order intrudes upon the authority vested in FERC by Part II of the Federal Power Act, 16 U.S.C. §§ 824-824k, by failing to accept the costs of filed rates under the

NFA and the 1971 Apportionment Agreement; and (3) that the order imposes an impermissible burden on interstate commerce.

The companies, in their individual briefs, challenge the Commission's order on a number of state and federal grounds. Tapoco's sole contention relates to its "involuntary joinder" as a party on the grounds that the Commission is without statutory authority to affect Tapoco's rates and service to its Tennessee customer, Alcoa, and is preempted from doing so by virtue of the fact that Tapoco's four hydroelectric plants are licensed by, and under the exclusive regulatory jurisdiction of, FERC under Part I of the Federal Power Act, 16 U.S.C. §§ 791a-823a. Nantahala's and Alcoa's objections may be broken down into four categories: (1) challenges to the order implementing the roll-in arising under the Supremacy Clause of the United States Constitution, art. VI, cl. 2 and Part II of the Federal Power Act, 16 U.S.C. §§ 824-824k; (2) claims that the order contravenes the Commerce Clause of the United States Constitution, art. I, sec. 8, cl. 3, by placing an impermissible burden on interstate commerce; (3) challenges to the constitutionality, measure and extent of the rate reduction and refund obligation as well as to the Commission's jurisdiction to hold Alcoa liable for its subsidiary's refund obligation; and (4) challenges to the order issued on remand based upon the alleged failure of the Commission to make independent findings of fact as to the propriety of the roll-in methodology for determining Nantahala's rates and its jurisdiction over Nantahala's parent, Alcoa.

In our earlier decision reversing the Commission's 1977 approval of the rate increase requested by Nantahala in Docket No. E-13, Sub 29, we briefly reviewed the history of the three companies and the basic contracts affecting Nantahala's costs of service. *Edmisten*, 299 N.C. at 434-39, 263 S.E. 2d at 586-89. That review was undertaken with an eye toward (1) elucidating the material facts of record accorded only minimal consideration by the Commission in assessing the factors bearing upon the determination of reasonable retail rates for Nantahala and (2) delineating the legal significance of evidence indicating that Nantahala had structured its economic affairs and physical operations so as to afford an unfair preference to its parent corporation to the detriment of its North Carolina public utility customers. *Id.* The complex factual predicate of the Commission's order implementing roll-in and the rather intricate corporate and contractual rela-

tionships between and among the companies and TVA renders a more extended treatment of the subject necessary in order to place the issues raised by the parties to the present appeal in their proper perspective.[3]

### B.

As we noted in *Edmisten*, the factual background of the case is not generally disputed by the parties. In the early part of the century, Alcoa came to the sparsely populated southwestern North Carolina mountains to tap the resources of the mountain streams for low-cost electric power to operate an aluminum reduction plant in neighboring Alcoa, Tennessee. As its source of hydroelectric power, Alcoa acquired the Tallassee Power Company ("Tallassee") (later Carolina Aluminum Company and now Yadkin, Inc.), an electric generating company incorporated in North Carolina and granted the power of eminent domain by legislative act in 1905.[4] Tallassee owned several undeveloped and developed hydroelectric sites along the Little Tennessee River in North Carolina, including two hydroelectric generating facilities at Santeetlah and Cheoah. Tallassee, under the name Carolina Aluminum, was recognized as a North Carolina public utility as early as 1934 in *Manufacturing Co. v. Aluminum Co.*, 207 N.C. 52, 175 S.E. 698 (1934).

By the 1920's, Alcoa, through its subsidiaries, had acquired a substantial number of hydroelectric sites along the Little Tennessee River: Santeetlah, Cheoah, Nantahala, Glenville (now Thorpe), Needmore, Fontana and several smaller sites in North Carolina and Chilhowee and Calderwood in Tennessee. Development of the sites was primarily for the purpose of producing and transmitting electricity to the Alcoa, Tennessee aluminum reduction plant, which requires enormous amounts of low-cost electricity.

---

3. For the purposes of this historical review, we have relied upon the entire record before the Commission in the Sub 29 (Remanded) proceeding. In addition, in an effort to present a complete picture of the regulatory history of the companies involved, we have, where necessary, taken judicial notice of various prior opinions of this Court, as well as certain prior decisions and orders of the Federal Power Commission and its successor, the Federal Energy Regulatory Commission.

4. *See* Chapter 122 of the private laws enacted by the General Assembly of North Carolina at its regular session in the year 1905.

In 1929 Alcoa created and incorporated Nantahala as another of its wholly owned subsidiaries in North Carolina. Nantahala is a North Carolina public utility with the right of eminent domain, serving a six county franchised territory in the western part of the State. Nantahala's customer mix consists of residential, commercial, industrial and wholesale customers. In time, Tallassee sold its undeveloped North Carolina sites to Nantahala, including the Fontana site later developed by TVA. By 1939, Nantahala owned sites for power development in six western counties of North Carolina.

Between 1929 and 1941, Nantahala undertook token public service through several small, run-of-the-river hydroelectric generating plants acquired from municipalities in its service area and completed acquisition of several sites from Tallassee. In 1941 Nantahala obtained a certificate from the Department of War to develop the large-scale Nantahala and Glenville (now Thorpe) projects on the upper reaches of the Little Tennessee watershed. Nantahala's stated justification for the development of these sizeable projects was the huge electric need of Alcoa's aluminum smelting works in Tennessee, which were then producing aluminum to sell to the federal government for war materials. In its application, Nantahala repeatedly referred to the developments as part of "the Alcoa power system" or "the system."

Prior to 1941, both Nantahala and TVA were interested in developing the massive Fontana site on the Little Tennessee River in North Carolina. Nantahala proposed to construct a large hydroelectric project with storage capacity. The proposed project, known as the Fontana project, was to generate electricity both for aluminum production and for use by the public. Following a determination by FERC's predecessor, the Federal Power Commission ("FPC") that a license was required from that agency under Part I of the Federal Power Act before Nantahala could construct, thereby subjecting the proposed project and Nantahala to a limited-term license under Section 6 of the Act and to the agency's ongoing jurisdiction, Nantahala abandoned its proposal. *See Nantahala Power and Light Co.,* 2 F.P.C. 833 (1940), *petition for discontinuance denied,* 2 F.P.C. 388 (1941).[5] TVA, which had al-

---

5. Nantahala, upon learning that the project would not be exempt under federal law and that at most, the FPC would grant a 50-year license permitting

ready obtained some acreage in the reservoir site, eventually prevailed upon Alcoa to have the Fontana site transferred to TVA for development. At that time, Alcoa was already purchasing some of the power requirements for its Tennessee aluminum production facilities from TVA. The conveyance was part of the first power coordination and exchange agreement of relevance between Alcoa and TVA, entered into in 1941, which had become known over the years as the Original Fontana Agreement ("OFA").

The 1941 Agreement is a twenty-year (but annually renewable thereafter) contract between Alcoa and TVA, pursuant to which Alcoa agreed to cause Nantahala (not a party to the agree-

---

recapture, withdrew its declaration of intention. As to the companies' regard for the public's interests in this project, the Federal Power Commission stated:

"Notwithstanding the public interest, Alcoa, through its subsidiary, in effect demonstrated that in its national defense effort it was unwilling to accept the reasonable limitations on unearned increment in the value of its power project provided by Congress in the Federal Power Act.

*"The Fontana situation is not the only instance in which Alcoa and its subsidiaries have shown complete unwillingness to accept provisions of Federal law, regardless of the consequences to the national defense or to the public which they serve. . . .*

"Neither the Federal Power Act nor the licenses issued thereunder contain provisions onerous to the operation of a project utilizing the waters of streams subject to Federal control. The provisions of the Act and the license are, in fact, designed wholly to protect the public interest in the use of waters which belong to the Nation. Many other persons and corporations, both public utilities and industrial concerns, have sought and accepted licenses. *The refusal of Alcoa's subsidiary to construct the Fontana project, when required to obtain a license, indicates that not even the urgent demands of national defense can alter its apparent determination never willingly to submit any of its hydro projects to the duly enacted requirements of Federal law. . . .*

"Their attempted withdrawal is inconsistent with their contention regarding their interest in national defense and with their planned 25-year program of construction.

*"In our opinion Alcoa and the company have not dealt frankly in this matter, but have in the past undertaken and are now attempting to evade the plain provisions of the law."* (Emphasis added.)

*Nantahala Power and Light Company*, 2 F.P.C. 388, 390-91 (1941). An incidental effect of the subsequent conveyance to TVA of the Fontana site was the removal or elimination of the FPC's licensing authority over the Fontana project. *See* 16 U.S.C. § 831y-1. However, as is evident from the various agreements, the conveyance did not sever Alcoa's link with the project.

ment) to transfer the Fontana Dam site to TVA. The property so transferred was valued at approximately $3.5 million.[6] The transfer was effectuated by Alcoa's repurchase of the Fontana site from Nantahala for $1.9 million, or approximately $128 per acre. Nantahala had purchased the property from Tallassee at a cost of $112 per acre in 1929.

Under the terms of the OFA, the Fontana project, when completed by TVA, was to be operated together with other TVA generating plants owned by Alcoa's subsidiaries. The agreement refers to Alcoa as the "Company," and the "Company's plants" as including Nantahala's generating plants as well as the other plants now owned by Tapoco. The agreement called for the Alcoa system companies to convey the output from their generating plants to TVA in return for power and energy entitlements. The level and amount of power entitlements were dependent upon the level of generation which TVA controlled. In exchange for the companies' relinquishment of their control over stream flow and production from their plants (then operating or under construction) at Santeetlah, Cheoah, Calderwood, Nantahala and Glenville (Thorpe), TVA provided compensation power of 11,000 kw to the Alcoa system. Alcoa purchased Nantahala's portion of this compensation power for an annual payment of $89,200.

Although the OFA did not itself specify how the entitlements returned to the Alcoa system by TVA were to be divided among the system's member companies, the companies apparently would receive back as much or as little capacity and energy as each generated proportionately through its individually owned projects. In October 1954 Nantahala and Alcoa entered into a contract which called for Nantahala, when it had excess power, to make the excess available for Alcoa's use at its Tennessee facilities, and conversely, called for Alcoa to provide the power for Nantahala to meet its public load when Nantahala alone could not meet its public service obligation. *See Tapoco, Inc., Initial Decision*, 30 F.E.R.C. ¶ 63,050, at p. 65,273-74 (1985). Throughout the period of these contracts, Nantahala's capacity and energy production were far in excess of the demands of its then existing public service load. Nantahala's excess entitlements under OFA were then sold to Alcoa at "dump" prices. *See Utilities Commission v. Member-*

6. *Edmisten*, 299 N.C. at 435, 263 S.E. 2d at 586.

*ship Corp.*, 260 N.C. 59, 131 S.E. 2d 865 (1963). There is no indication that the 1954 Alcoa-Nantahala contract was ever filed with the FPC as a tariff or rate schedule under Part II of the Federal Power Act. *See* 30 F.E.R.C. ¶ 63,050 at p. 65,275.

Moreover, when the OFA was signed in 1941, none of the Alcoa system plants subject to it had a license from the FPC under Part I of the Federal Power Act. The agreement itself was never filed with the FPC as a tariff or rate schedule during the twenty years that it remained in effect. As a consequence, the FPC never ruled upon the lawfulness of the agreement as a rate schedule while it was in effect. 30 F.E.R.C. ¶ 63,050 at p. 65,274.

In fact, it would appear from the contemporaneous decisions of the FPC that the federal agency only considered the operative terms of the OFA in an effort to determine whether it had licensing jurisdiction over three of the Alcoa system plants[7] which were subject to it—Calderwood, Santeetlah and Cheoah. At the time of the OFA's execution, Calderwood was owned by Alcoa subsidiary, the Knoxville Power Company (later Tapoco), and Santeetlah and Cheoah were owned by Alcoa subsidiary, the Carolina Aluminum Company. In 1941, the FPC instituted proceedings directing Alcoa and its subsidiaries to show cause why they should not be required to apply for licenses under Part I of the Federal Power Act for the continued operation and maintenance of the three plants. *In re Aluminum Co. of America*, 13 F.P.C. 14 (1954). Ultimate resolution of the matter was delayed by the pressures of the war emergency until March 1954. By that time, the respondent companies argued that the three plants were exempt from FPC jurisdiction because they were operated by TVA under the OFA.

The only actual discussion of the OFA comes in the FPC's discussion and rejection of the companies' arguments *in avoidance* of the agency's jurisdiction.

*The Projects are Operated by Respondents.*—Under date of August 14, 1941, Alcoa and TVA entered into an agreement

---

7. All references in the opinion to "the Alcoa system" or the "Alcoa power system" or like phrases, refer exclusively to the subsidiary *operating* utilities which provide or provided the generation and transmission of electricity to their parent company Alcoa.

(the Fontana Agreement) by the terms of which Alcoa transferred to the United States its interest, and those of its wholly-owned subsidiary, in the lands from the then proposed Fontana project and agreed upon a plan for "the coordinated operation of power facilities" of the Alcoa system and the TVA system. . . .

The Fontana Agreement provides for the coordinated operation of power facilities of the two systems under the direction of TVA. Respondents contend that under this arrangement TVA "operates" the Calderwood, Cheoah, and Santeetlah projects within the meaning of the exemption provision of the last paragraph of Section 26(a) of the TVA Act (16 U.S.C. 831-Y-1). (Footnotes omitted.)

13 FPC at 21. The FPC went on to reject the exemption arguments advanced by Alcoa and its subsidiaries, finding that the Fontana Agreement "does not undertake to place the operation of Respondents' projects in TVA," but merely coordinates such operations as the companies themselves actually perform with the power facilities in the TVA system, "for the mutual benefit of Alcoa and TVA." *Id.* at 22. Consequently, the operating companies were ordered to file license applications under the Federal Power Act for the continued operation and maintenance of the three plants. *Id.* at 32. Thus, the OFA was not presented to the FPC by Alcoa and its subsidiaries for the purpose of affirmative regulation, but as part of an effort to preclude such federal oversight over the system's plants and power transactions.

During the period of the OFA's duration, a number of significant events occurred within the Alcoa system. As we have seen, in March 1954, thirteen years after the signing of the OFA, the FPC rejected the arguments of the Alcoa system and ruled that Cheoah and Santeetlah, among other plants subject to the OFA, required a license under the Federal Power Act. *In re Aluminum Company of America*, 13 F.P.C. 14.[8] In October of that year (1954),

---

8. Nantahala's hydroelectric generating plants subject to the various Fontana agreements were not required by the FPC to be licensed by that agency until the mid-1960's. *See Nantahala Power and Light Co.*, 36 F.P.C. 119 (1966), *reh'g denied*, 36 F.P.C. 581 (1966), *aff'd on review, Nantahala Power and Light Co. v. FPC*, 384 F. 2d 200 (4th Cir. 1967), *cert. denied*, 390 U.S. 945, 19 L.Ed. 2d 1134 (1968).

the wholly-owned subsidiary of Alcoa which was originally incorporated in Tennessee as the Knoxville Power Company, underwent a change of name to Tapoco, Inc. Within two weeks of its name change, Tapoco was domesticated as a North Carolina corporation.

As of October 1954, Tapoco owned two hydroelectric sites along the Little Tennessee River at Calderwood and Chilhowee in Tennessee. Tapoco, as well as acting as the power supplier to Alcoa's Tennessee aluminum smelting and fabricating facility, had at that time a public service load in Tennessee.

Another noteworthy event of October 1954 was the filing of a joint application by Tapoco and its affiliate, Carolina Aluminum Company, to the FPC for a license to operate the "Tallassee project" along the Little Tennessee River in North Carolina and Tennessee. The project entailed the continued operation of the Cheoah and Santeetlah plants in North Carolina, and another existing plant in Tennessee at Calderwood (also subject to the OFA) and the construction of another hydroelectric generation plant at Chilhowee, Tennessee. The FPC's licensing order of March 1955 indicates that in their joint application, the companies stated that the energy from the Tallassee project "is and will continue to be delivered to the Tennessee Valley Authority, which in turn delivers an equivalent amount of energy to the Aluminum Company of America at Alcoa, Tennessee, pursuant to the provisions of the Fontana agreement and the supplemental agreement thereto, dated August 14, 1941 and October 13, 1954, respectively." *Tapoco, Inc. and Carolina Aluminum Co.*, 14 FPC 610, 612 (1955). The licensing order continued by noting that the joint application states that after the exchange of energy between TVA and the Alcoa system pursuant to the Fontana agreement, *"[a]ll the energy is used for aluminum production except for* a small portion used for lighting in operators' villages." *Id.* at 612-13. (Emphasis added.) By June 1955, Tapoco had become the sole licensee of the four plants. *See Carolina Aluminum Co. and Tapoco, Inc.*, 14 F.P.C. 828 (1955); *Carolina Aluminum Co., Tapoco, Inc. & Nantahala Power and Light Co.*, 14 F.P.C. 829 (1955). Thereafter, Carolina Aluminum changed its name to its present name of Yadkin, Inc. The company now operates only the hydro facilities, not at issue here, which serve Alcoa's North Carolina, Badin works.

Conspicuous in its absence from the 1955 licensing order is any reference to the fact that TVA return power entitlements were also used to service Tapoco's public utility load in Tennessee and Nantahala's public utility load which, by the early 1950's, had increased to 10,000 customers, both residential and industrial, in a six-county area in North Carolina. *See Utilities Commission v. Mead Corp.*, 238 N.C. 451, 78 S.E. 2d 290 (1953). In addition, the licensing order fails to refer to the FPC's own earlier recognition that under the Fontana exchange and coordination agreements with TVA, Nantahala's larger plants were being operated together with Tapoco's plants as part of what the FPC termed " 'the coordinated operation of power facilities' of the Alcoa system and the TVA system." *In re Aluminum Company of America,* 13 F.P.C. at 21.

At about the same time that the federal license application was under consideration, Tapoco, Carolina Aluminum Company and Nantahala jointly filed for a certificate of public convenience and necessity with the North Carolina Utilities Commission in February 1955, to permit Tapoco to acquire, operate and control certain public utility properties belonging to Nantahala and Carolina Aluminum Company, including the Cheoah and Santeetlah plants and certain transmission lines. In the order granting the certificate, the Commission directed that Tapoco supply to Nantahala the power to satisfy Nantahala's public service load in the two villages of Santeetlah and Tapoco in Graham County. At that time, the two villages had a total population of about 300 people. This certificate is still in effect and Tapoco has never appeared before the Commission to abandon it, or have its terms modified. At the present time, the Village of Tapoco is still in existence and under the terms of the certificate and allocations made pursuant to the Fontana agreements, Tapoco still supplies power to Nantahala, which in turn serves the Village of Tapoco.

In the same month that Tapoco received its certificate of public convenience and necessity from the North Carolina Utilities Commission, it received from the State of Tennessee a certificate of public convenience and necessity to construct and operate the Chilhowee facility. Later in that year (1955), Tapoco contracted to sell its electric distribution system for the City of Alcoa, Tennessee to that municipality. The "City of Alcoa Resolution" which authorized the purchase indicates that the City

planned to look to TVA to supply it with the electric power previously supplied by Tapoco. Thus, Tapoco freed itself of its Tennessee public load and from that point onward, none of the power made available by TVA through the Fontana agreement had to be used to satisfy a Tennessee public load. As a result, Tapoco's share of the TVA return power could be devoted almost exclusively to Alcoa's aluminum production facilities. Notwithstanding the substantial generating capacity of Tapoco's facilities, which is three to four times as great as Nantahala's, Alcoa has historically needed to purchase additional power from TVA to supplement the combined output of its subsidiary power companies. To illustrate, during the test year 1975, Tapoco sold 1,365,499,000 kwh to Alcoa, yet, Alcoa purchased an additional 1,784,833,000 kwh from TVA.

During the period from 1950-1955, Nantahala expanded its facilities to provide additional power to Alcoa to enable it to meet the nation's increased aluminum needs during the Korean War. The major components of Nantahala's East Fork project, the Cedar Cliff, Bear Creek and Tennessee Creek dams and reservoirs were completed between 1952 and 1955. That year, 1955, marked the last year in which Nantahala added hydroelectric generating facilities subject to the coordination and exchange agreement with TVA. No additional generating capacity has been added to the Nantahala system whatsoever since 1957, despite clear indications that Nantahala's public service load was growing.

In this regard, we note that in 1941, Nantahala's public service load was only 25,984,275 kwh. By 1955, this load had increased to 115,735,461 kwh and by 1960, it stood at 172,451,768 kwh. *Utilities Commission v. Membership Corp.*, 260 N.C. 59, 66, 131 S.E. 2d 865, 870. During this same period, from 1941-1960, the relative volume of Nantahala's out-of-state sales to its parent Alcoa consistently outstripped its intrastate public service sales. For example, in 1943, approximately 95 percent of Nantahala's electric generation was sold to Alcoa (320,776,268 kwh), with its public service load receiving the remaining 5 percent (16,493,930 kwh). *Id.*

This imbalance of power consumption between Nantahala's parent and its public load, coupled with Nantahala's assigned role

in "the coordinated operation of power facilities of the Alcoa system and the TVA system,"[9] was observed to adversely affect Nantahala's intrastate rates as early as 1953. In an early Nantahala commercial rate case, *Utilities Commission v. Mead Corp.*, 238 N.C. 451, 78 S.E. 2d 290, Nantahala had sought to increase its rates to all industrial customers other than Alcoa, thus placing the burden of the increase upon the particular group of customers. The undisputed facts were to the effect that Nantahala had been selling more than 80% of its total generation of electric power to Alcoa at a price which was less than the cost of producing and distributing it. The evidence further showed that Nantahala derived the greater part of its revenue from customers other than Alcoa, who consumed only 18% of its power and who were charged approximately twice as much per kilowatt hour as Alcoa was charged. Additionally, it appeared that Nantahala had been earning a return of approximately 6.5% from the revenue collected from its non-Alcoa customers; whereas inclusion of the service and rate paid by Alcoa showed the company to be operating at a loss.

Nantahala sought to justify the differential in rates charged its parent and its public customers by asserting that the vast portion of its generation sold to Alcoa was "secondary" power, while its other commercial customers were supplied with "primary" or dependable power. The Commission approved the increase, finding no unlawful discrimination in this rate structure. On appeal to the Superior Court, the order of the Commission was reversed. This Court, in affirming the judgment of the Superior Court, stated that Alcoa was not entitled to a return on its investment in Nantahala in the form of a preferential rate to the extent it would work to the disadvantage of its subsidiary's other customers. 238 N.C. at 464, 78 S.E. 2d at 300. After noting that the question of "primary" and "secondary" power "was to a large extent the mere application of different labels to that which is essentially the same," *id.* at 465, 78 S.E. 2d at 300, the Court held that the actual differences in service and expense "were in no way comparable to the difference in rates which was so glaring as to compel the inference that it was unreasonable and therefore unlawful." *Id.*

---

9. *Cf. In re Aluminum Company of America*, 13 F.P.C. at 21.

Justice Barnhill, in a separate concurrence, commented upon one telling aspect of Nantahala's unique posture as a public utility whose largest customer was its parent-aluminum producer:

Corporations must operate on a profit motive basis. Not so with petitioner. Financed as it is, it can afford—indeed it proposes—to operate at an apparent loss. By so doing it can evade the payment of its fair portion of State and Federal taxes.

238 N.C. at 467, 78 S.E. 2d at 301 (Barnhill, J., concurring).

Beginning in 1960, Alcoa and TVA began re-negotiation of the operational terms of the Original Fontana Agreement which were due to expire at the end of 1962. At the same time, Nantahala and Duke Power Company ("Duke") were engaged in separate negotiations to sell the assets constituting Nantahala's distribution system to Duke, with Nantahala retaining its major generating facilities and transmission lines. The sale would have enabled Nantahala to abandon its North Carolina public service load and to sell all of its generation (or the entitlements therefrom) to Alcoa, just as Tapoco had done. The 1961 Nantahala-Duke sale proposal received initial approval by both the North Carolina Utilities Commission and the Superior Court prior to the negotiation of the final provisions of the NFA in 1962. *See Utilities Commission v. Membership Corp.*, 260 N.C. 59, 131 S.E. 2d 865.

The New Fontana Agreement ("NFA"), dated 27 December 1962, modified and partially superseded the OFA. In essence, however, the NFA contained the same mechanics of power coordination and exchange as the original Fontana Agreement, except that the amount of power TVA was to make available to the Alcoa system under the NFA was fixed in advance by the agreement without regard to water conditions, rather than being calculated on the basis of amount actually generated by the Alcoa system's plants. As it did under the OFA, Alcoa again warranted that it was backing up or securing the performance of its subsidiaries in carrying out the coordination and exchange agreements with TVA.

In contrast to the OFA, which was negotiated and executed by Alcoa and TVA alone, Nantahala and Tapoco were signatory

parties to the NFA, although Nantahala was not a participant in the negotiations. Nantahala's failure to participate is not surprising in view of the Company's pending attempt to sell its distribution system to Duke, and so divest itself of its North Carolina public load. Later in 1963, this Court reversed the Commission's approval of the sale and ordered the case remanded for further consideration because the Commission had failed to make findings of fact with respect to essential aspects of the case and applied too lenient a standard for approval of abandonment of a public service franchise. *Utilities Commission v. Membership Corp.*, 260 N.C. at 68-69, 131 S.E. 2d at 871-72. The Court's discussion of Nantahala's stated reasons for abandoning its public load indicates the company's awareness that its generating capacity would be insufficient to meet its anticipated future requirements. In the wake of the decision, the attempt to sell Nantahala's distribution system to Duke was abandoned.

Under the NFA (still in effect during the test year 1975), TVA dispatched the operations of Tapoco's four plants and eight of Nantahala's largest plants, and received all of the electrical output of these plants. In return, the NFA provided that Nantahala and Tapoco together would receive an annual average of 218,300 kw, part of which was subject to some curtailment and interruption, to be divided between the companies as they saw fit.

The NFA also provided that it was to remain in effect for twenty years — until the end of December 1982. When the agreement took effect in January 1963 it was not on file with the FPC as a tariff or rate schedule and therefore was not examined at its inception for its lawfulness. *See* 30 F.E.R.C. ¶ 63,050 at p. 65,276. It was not until 1966 that the NFA was filed with the FPC as a tariff or rate schedule under Part II of the Federal Power Act, in response to that agency's request that the companies do so. Both Tapoco and Nantahala (concurring in Tapoco's filing) stated that the filing was "under protest" — that is, undertaken subject to the right to contest the FPC's authority to regulate the operations under the NFA. Moreover, its terms were not formally scrutinized by the federal authorities until after three of Nantahala's wholesale customers filed a complaint raising the matter in 1978. *See Nantahala Power and Light Co. v. FERC*, 727 F. 2d 1342 (4th Cir. 1984).

The NFA, like the OFA, failed to specify how the power made available to the Alcoa system by TVA was to be divided among the members of the system. On the same day that the NFA became effective, 1 January 1963, Alcoa and Nantahala entered into a subordinate allocation agreement establishing Nantahala's share of the return power entitlements.

The 1963 Alcoa-Nantahala Apportionment Agreement provided that Nantahala was to receive, as its share of NFA entitlements each month, a variable of the larger of one-twelfth of its annual primary energy capability of 360 million kwh or its actual generation. A 1960 Ebasco Study, undertaken for Nantahala by independent experts, had established the average annual generation of Nantahala's plants subject to the NFA at 424 million kwh annually. Thus, under the 1963 Agreement, Nantahala was guaranteed its primary generation and was to benefit from additional generation. Moreover, the agreement provided that Alcoa was to pay Nantahala the sum of $89,200 annually as compensation for allowing TVA to operate Nantahala's projects. Significantly, the 1963 Agreement fixed no capacity or demand limitation upon Nantahala's use of the energy returned. However, unlike the 1954 Alcoa-Nantahala contract which was subordinate to the OFA, the 1963 contract did not impose an obligation upon Alcoa to satisfy any deficiency when Nantahala did not have sufficient power to meet its public load. It appears that the 1963 allocation agreement was never filed with the FPC. *See* 30 F.E.R.C. ¶ 63,050 at p. 65,277; *Nantahala Power and Light Co., Initial Decision*, 15 F.E.R.C. ¶ 63,014, at p. 65,035 (1981).

Between 1963 and 1971 the North Carolina public load, although growing, still remained below Nantahala's primary generation and Nantahala did not need all of its entitlements of 360 million kwh; Alcoa utilized the remainder under its separate agreement with Nantahala. However, by 1971, Nantahala's public load had grown to the point where the utility no longer had excess energy under the NFA to sell to its parent Alcoa. Moreover, by 1971, Nantahala recognized the need to obtain a supplemental source of power to meet the anticipated needs of its public service load in North Carolina. TVA, to whom Nantahala was already interconnected, was chosen as the source of this supplemental power; however, TVA required a formal agreement between Nantahala and Tapoco apportioning their NFA entitlements before it

would negotiate a supplemental power contract with Nantahala. Accordingly, in 1971 Alcoa conducted an apportionment study to measure the energy and capacity contributions of Nantahala and Tapoco. Pursuant to the study made by Alcoa's power consultant, George Popovich, Nantahala executed an apportionment agreement with Tapoco and then entered into an additional purchase contract with TVA.

The 1971 Nantahala-Tapoco Apportionment Agreement (the "1971 Apportionment Agreement") called for Nantahala to fix a limitation on its share of energy from TVA at 360 million kwh annually (i.e., only its primary energy capability). Tapoco was to receive the remainder of the power made available by TVA under the NFA. The 1971 Agreement contained no provision for Nantahala to receive the $89,200 previously provided for under the 1963 Alcoa-Nantahala allocation agreement in compensation for Nantahala allowing TVA to control its facilities.

Simultaneously with the execution of this 1971 Apportionment Agreement, Nantahala entered into a contract with TVA to purchase additional power from that agency. By this agreement, in addition to paying TVA's charge for all energy consumed in excess of 360 million kwh per year, Nantahala was required to pay a charge for the demand of its system above 54,300 kw at any instant. This latter figure represents the capacity limitation assigned to Nantahala under the 1971 Apportionment Agreement with Tapoco.

The 1971 Apportionment Agreement was not filed with the FPC as a tariff or rate schedule for almost ten years, until 1980. *See* 30 F.E.R.C. ¶ 65,030 at p. 65,277; 15 F.E.R.C. ¶ 63,014 at p. 65,035. As had been true of the NFA itself, at the time the agreement became operational, and for the bulk of its life, its terms were not scrutinized by the federal authorities for their lawfulness.[10]

---

10. We find it noteworthy, as did the Administrative Law Judge in the most recent Nantahala case before the F.E.R.C., that 1982 marked the first time in the forty years since the Alcoa-TVA coordination and exchange agreements had begun, that the Alcoa system had given notice to the F.E.R.C. that it was planning to terminate one of these agreements as well as a separate contract between members of the system and seeking approval in advance for the new agreements which were to supersede the expiring contracts. 30 F.E.R.C. ¶ 63,050, at p. 65,280.

Since the inception of the 1971 Apportionment Agreement, Nantahala has not had available to it for sale, through its portion of return power entitlements, enough electricity to meet its North Carolina public service load. During the 1975 test year, Nantahala generated about 560 million kwh. Despite the fact that its public service load was only slightly in excess of 450 million kwh, Nantahala was constrained to purchase an additional 81,265,370 kwh of electricity from TVA at a cost of $1,500,000, due to the allocational limitations of the NFA and 1971 Apportionment Agreement. 1971 also marked the final year in which Alcoa purchased power from Nantahala, looking instead to Tapoco and TVA to fulfill its energy requirements.

The intervenor's evidence shows that subsequent to that time, Nantahala could have used on its system all of the capabilities it contributed to the TVA system under the NFA and failed to receive back in entitlements of comparable worth. The quantity of power Nantahala purchases from TVA is determined by the magnitude of the shortfall resulting when the hour-by-hour load on the Nantahala system exceeds the level of TVA return entitlements set under the NFA and apportioned to Nantahala under the 1971 Apportionment Agreement. Since 1971, when the annual level of Nantahala's load first exceeded its entitlements, the purchased power costs have become a major operating expense for Nantahala.[11] Thus, Nantahala's contractual arrangements with its affiliates and TVA have dramatically influenced Nantahala's costs in providing service to its public load.

## C.

There is apparently no dispute between the parties as to the Commission's authority to implement a roll-in of Nantahala's and Tapoco's properties and financial data for rate making purposes without regard to the separate corporate entities of these utilities, once it has properly determined that these corporate affiliates in fact constitute a single, unified "utility enterprise" or system. The propriety of the separation or rolling-in of properties

---

11. The "fuel" for Nantahala's hydroelectric generating units is water with no fuel cost. The fuel used by TVA to produce the power it sells to Nantahala is a mix of relatively costly nuclear and fossil fuel. TVA's generation mix contains only a modest increment of hydroelectric generation.

State ex rel. Utilities Comm. v. Nantahala Power & Light Co.

of affiliated corporations for rate making purposes, being merely a step in the determination of costs properly allocable to the various classes of service rendered by a utility, is widely recognized as dependent upon the particular characteristics of the system or systems in question, and upon the facts and circumstances of each case. *See, e.g., Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 89 L.Ed. 1206 (1944); *Central Kansas Power Co. v. State Corporation Commission*, 221 Kan. 505, 561 P. 2d 779 (1977); *Georgia Power Co.*, 52 F.P.C. 1343 (1974). *See generally*, Annot., 16 A.L.R. 4th 454 (1982).

Moreover, as FERC itself has expressly recognized, "the question of whether to treat various entities as an integrated system for rate making purposes is not a purely factual question, but also rests on criteria which each rate making authority may deem relevant." *Nantahala Power and Light Co.*, Opinion No. 139-A, 20 F.E.R.C. ¶ 61,430, p. 61,869 (1982). Accordingly, in the parallel FERC wholesale rate case in which Nantahala's wholesale customers advocated the implementation of a roll-in, FERC, while adverting to the fact that the North Carolina Utilities Commission had, "based on a similar record, reached a different conclusion concerning rolled-in costing," *id.*, declined to order a roll-in for determining Nantahala's wholesale costs of service. The Fourth Circuit Court of Appeals, in affirming FERC's determination, stated that "[a] decision to order roll-in is essentially a matter of Commission discretion" which would not be overturned on appeal where supported by substantial evidence. *Nantahala Power and Light Co. v. FERC*, 727 F. 2d 1342, 1346 (1984).

[1] Therefore, it is clear that the North Carolina Utilities Commission has the authority, in the first instance, to determine for itself the relevant criteria to apply to the factual question of whether to treat Nantahala and Tapoco as an integrated system for rate making purposes and its determination will not be disturbed on appeal where supported by substantial evidence. The companies do not contend that the Commission decision is unsupported by substantial evidence; they merely argue that the Commission *ignored* evidence[12] tending to show that Nantahala and Tapoco are separate electric utility companies.

12. We will address this point more fully in Part II, D *infra*.

The Commission's decision of whether to implement a roll-in is based upon a factual predicate consisting of three basic propositions: (1) Tapoco is a North Carolina public utility, subject to the Commission's rate making authority; (2) Nantahala's and Tapoco's hydroelectric facilities constitute a unified, single system, operating under conditions rendering a roll-in appropriate; and (3) Alcoa is a statutory North Carolina public utility, subject to the imposition of a refund obligation in the exercise of the Commission's general rate making jurisdiction. In the record before us, we find plenary evidence in support of the Commission's determination that Nantahala and Tapoco constitute a single, integrated electric system and should be treated as such for the purposes of calculating Nantahala's retail rate base and costs of service.

Upon remand, the Commission held a separate *de novo* hearing on the question of its jurisdiction with respect to Tapoco and Alcoa. Based upon the testimony and exhibits presented at the *de novo* hearing and matters judicially noticed, the Commission, in an order entered 3 October 1980, found and concluded that both Tapoco and Alcoa were subject to its regulatory authority under Chapter 62 of the North Carolina General Statutes.

1.

[2] With respect to Tapoco, the Commission made certain findings of fact regarding its development and acquisition of hydroelectric facilities clothed with public service obligations in North Carolina, most notably, the facilities at Santeetlah and Cheoah. Specifically, the Commission found that Tapoco is a domesticated North Carolina corporation organized to produce and sell electricity; that Tapoco's articles of incorporation provide that one of its purposes is to provide power to the public and those articles authorize Tapoco to exercise the power of eminent domain; that Tapoco has a North Carolina certificate of convenience and necessity to operate the Cheoah and Santeetlah facilities, obtained when it purchased these facilities and certain transmission lines (owned by Nantahala) from its public utility affiliates, Carolina Aluminum Company and Nantahala; that this certificate is subject to the condition that Tapoco provide Nantahala with the power needed to serve the Villages of Tapoco and Santeetlah; that Tapoco's certificate of convenience and necessity

is still active, Tapoco never having petitioned to have its certificate abandoned; that Tapoco has the responsibility to make available a tap point on its station service transformer at the Cheoah power house for Nantahala's use in providing electricity for serving its customers in the Village of Tapoco; and that Nantahala is presently providing service to the Village of Tapoco and charging its customers there for the electricity provided on the basis of rates approved by the Commission. The Commission also made findings with respect to the electricity Tapoco delivers to TVA and Alcoa by virtue of the various intra- and intercorporate agreements discussed above.

The Commission then based its conclusion that Tapoco is a public utility in North Carolina and subject to its jurisdiction on three grounds:

1. It is a public utility within the meaning of G.S. § 62-3 (23)a.[13]

2. It is a public utility for rate-making purposes within the meaning of G.S. 62-3(23)b.[14]

3. It is a public utility by virtue of having obtained a certificate of public convenience and necessity some twenty-

13. N.C.G.S. § 62-3(23)a provides in pertinent part as follows:

"(23) a. 'Public utility' means a person, whether organized under the laws of this State or under the laws of any other state or country, now or hereafter owning or operating in this State equipment or facilities for:

"1. Producing, generating, transmitting, delivering or furnishing electricity, piped gas, steam or any other like agency for the production of light, heat or power to or for the public for compensation; . . . ."

14. N.C.G.S. § 62-3(23)b provides:

"(23) b. The term 'public utility' shall for rate making purposes include any person producing, generating or furnishing any of the foregoing services to another person for distribution to or for the public for compensation."

N.C.G.S. § 62-3(21) provides:

" 'Person' means a corporation, individual, co-partnership, company, association, or any combination of individuals or organizations doing business as a unit, and includes any trustee, receiver, assignee, lessee, or personal representative thereof."

five years ago, and having operated under that certificate since that time.[15]

Although Tapoco assigned error to the Commission's finding that it is a North Carolina public utility and argued in its brief to the Court of Appeals that the portions of the Commission's order which declare Tapoco to be a "public utility" under North Carolina law should be vacated and reversed, in its new brief to this Court, Tapoco does not challenge the Court of Appeals' affirmation of the Commission's determination that Tapoco is a statutory public utility. Rather, Tapoco presents a single and somewhat confused argument that the Commission "abused its regulatory authority by asserting jurisdiction over Tapoco when it did not and could not regulate Tapoco's rates and service."

Tapoco first argues to this Court, as it did to the Court of Appeals, that the Commission could not "divert" power from the Tennessee industrial load (Alcoa) served by Tapoco's four hydroelectric projects because these projects were licensed by FERC in 1955 to serve that load *exclusively* and the Commission is without authority to impose a state law limitation on the terms and conditions of Tapoco's federal license. Tapoco relies on *First Iowa Hydro-Electric Cooperative v. FPC*, 328 U.S. 152, 90 L.Ed. 1143, *reh'g denied*, 328 U.S. 879, 90 L.Ed. 1647 (1946) and *Town of Springfield v. Vermont Environmental Board*, 521 F. Supp. 243 (D. Vt. 1981) to support its "diversion" argument.

---

15. N.C.G.S. § 62-110 provides:

"No public utility shall hereafter begin the construction or operation of any public utility plant or system or acquire ownership or control thereof, either directly or indirectly, without first obtaining from the Commission a certificate that public convenience and necessity requires, or will require, such construction, acquisition, or operation: Provided, that this section shall not apply to construction into territory contiguous to that already occupied and not receiving similar service from another public utility, nor to construction in the ordinary conduct of business."

In *Utilities Commission v. Telegraph Co.*, 267 N.C. 257, 148 S.E. 2d 100 (1966), we observed that it would be both arbitrary and in excess of the statutory authority of the Commission to grant a certificate of public convenience and necessity to conduct a business which is not a public utility. None of the respondent companies contends that the Commission acted in excess of its statutory authority in granting Tapoco its certificate of convenience and necessity in 1955.

The other portion of Tapoco's argument to this Court, however, was not presented to either the Commission or the Court of Appeals and was not made the basis of Tapoco's assignments of error. That argument, presented now for the first time in this appeal, is that Tapoco has been "misjoined" and should be dismissed as a party to this proceeding because the Commission *did not* grant relief with regard to Tapoco's rates in the Sub 29 (Remanded) proceeding. Accordingly, Tapoco now contends that it was "misjoined" as a party respondent and that under Rule 21 of the North Carolina Rules of Civil Procedure it should be "dismissed forthwith from the instant proceeding," and be awarded the costs of this appeal.

[3] We first note that pursuant to Rule 16(a) of the North Carolina Rules of Appellate Procedure, the scope of our review from a unanimous decision of the Court of Appeals is limited to consideration of the questions properly presented in the new briefs required by Rule 14(d)(1) and 15(g)(2) to be filed in this Court. Rule 16(a) further provides that a party who was an appellant in the Court of Appeals, and is either an appellant or an appellee in the Supreme Court, may present in his brief any question which he has properly presented for review to the Court of Appeals. However, questions properly presented for review in the Court of Appeals but *not* presented and discussed in the new briefs to this Court are deemed abandoned under Rule 28(a). Therefore, Tapoco is deemed to have abandoned and waived further review of the question of its public utility status under North Carolina Law.[16]

A corollary to the rule that this Court's scope of review is limited to questions properly presented to the Court of Appeals is the rule that a party may not present for the first time in its brief to this Court, a question raising issues of law not set out in the assignments of error contained in the record on appeal. App. R. 10. Consequently, the question of "misjoinder" under Rule 21 of the Rules of Civil Procedure, appearing as it has for the first time in Tapoco's new brief filed in this Court, has not been prop-

---

16. We have, however, under Rule 2 of the Rules of Appellate Procedure, reviewed the Commission's findings and conclusions in the course of our review of the questions properly preserved, find them to be supported by substantial evidence and affirm the Commission's determination as to Tapoco's public utility status on each of the three grounds specified in its orders entered in the Sub 29 (Remanded) proceedings.

erly presented for review and we need not address it in the course of our discussion.

[4] The only questions that Tapoco has correctly preserved for further review are, therefore, whether the Commission is preempted from implementing a roll-in methodology for setting Nantahala's retail rates by virtue of the fact that Tapoco's four hydroelectric plants are under federal license and whether the Commission's order places an indirect burden on interstate commerce by diverting the economic benefits of Tapoco's inexpensive hydroelectric power from its Tennessee industrial customer, Alcoa, to Nantahala's North Carolina public service customers. Inasmuch as Tapoco has merely joined in the brief of Alcoa on the latter point, we will discuss the Commerce Clause issues adverted to by Tapoco in the section of this opinion addressing Alcoa's constitutional argument. With respect to Tapoco's licensing argument, we have little trouble in concluding that the Commission's order has in no way contravened the terms and conditions of Tapoco's federal license.

Under Part I of the Federal Power Act, 16 U.S.C. §§ 791a-823a, the Federal Power Commission (and now the FERC) has exclusive jurisdiction to license the construction and operation of hydroelectric projects on navigable rivers within the United States, and to fix the terms and conditions of any such license. Tapoco's argument that the issuance of its 1955 federal license to construct and operate the four plants of the "Tallassee Project" preempts the Commission from implementing a roll-in is based upon Tapoco's assertion that the plants were licensed by the FPC for "the express purpose of supplying power to Alcoa's Tennessee Operations." We find nothing in the licensing order to indicate that the FPC intended to reserve all of the hydroelectric production from (or economic benefit of) the four Tapoco dams for Alcoa's exclusive use. In its brief, Tapoco places great reliance upon the underscored language contained in a portion of the 1955 licensing order:

> [T]he energy being developed by the constructed developments of the project and the energy to be developed by the proposed development is and will continue to be delivered to the Tennessee Valley Authority, which in turn delivers an equivalent amount of energy to the Aluminum Company of

America at Alcoa, Tennessee. . . . All the energy is used for aluminum production except for a small portion used for lighting in operators' villages. . . .

\* \* \*

[T]he project is best adapted to a comprehensive plan for the improvement and utilization of waterpower development, and for other beneficial public uses, including recreational purposes.

Deleted from the quoted portion of the licensing order, however, is the revealing opening phrase: "According to the joint application . . . ." It is therefore obvious that the language relied upon by Tapoco, rather than constituting an edict by the FPC that all of the energy produced by the developments comprising the "Tallassee Project," now solely owned by Tapoco, be dedicated to the permanent and exclusive use of Alcoa's private industrial operations, merely contains a restatement by the FPC of the assertions made by Tapoco and Carolina Aluminum Company in their joint licensing application. The order itself contains no express or implied directive from the FPC that the energy produced by these hydro projects be reserved for the sole and exclusive use of Alcoa in its Tennessee aluminum plants, either in the section containing FPC's findings of fact or in its decretal paragraphs.

Moreover, 16 U.S.C. § 802(b) requires that, prior to the issuance of a hydroelectric license, a licensee must submit evidence of compliance with state law "with respect to the right to engage in the business of developing, transmitting, and distributing power. . . ." Cf. N.C.G.S. § 62-3(23)a(1). At the time of application, on 25 October 1954, Carolina Aluminum was a North Carolina public utility carrying a public service load in this state and Tapoco was a Tennessee public utility carrying a public service load in that state. On 23 February 1955, before the license was granted by the FPC, Tapoco, which had earlier domesticated in North Carolina, was issued a certificate of convenience and necessity by the North Carolina Utilities Commission to own and operate the Santeetlah and Cheoah facilities. That certificate expressly noted that Tapoco had an obligation to serve the public with electric energy from the projects. When the federal license was issued, it also noted that Tapoco had an obligation to serve the public with electric energy from the projects.

In the 1955 licensing order, the FPC found as a fact that Tapoco and Carolina Aluminum each had submitted satisfactory evidence of compliance with the requirements of all applicable laws for its respective state insofar as necessary to effect the purposes of a joint license for the project, to the extent of the ownership and operation of the project by each applicant. The evidence submitted by joint applicant Carolina Aluminum included its compliance with North Carolina requirements. When, shortly thereafter, the FPC authorized transfer of Cheoah and Santeetlah from Carolina Aluminum and to Tapoco only, it noted that Tapoco had "submitted evidence of compliance with the requirements of all applicable state laws of Tennessee and North Carolina. . . ." 14 F.P.C. at 828.

On the basis of the foregoing, in its final order filed 28 January 1982 the Commission concluded, and we agree, that "[t]o the extent that the federal licenses for Tapoco's dams speak toward dedication of the electric energy, such dedication would of necessity include the using and consuming public of North Carolina." We therefore reject Tapoco's argument as to the preemptive effect of the federal license on the Commission's authority to implement a roll-in methodology in determining Nantahala's retail rates.[17] In any event, as will be discussed *infra*, the roll-in itself does not effectuate a diversion of Tapoco's actual energy production to the North Carolina public load; it merely accomplishes for bookkeeping purposes what is an accomplished fact in the organization and operation of the two companies: the allocation of the combined costs of production for the unified Nantahala-Tapoco system as between the jurisdictional North Carolina retail public load and the nonjurisdictional Alcoa industrial load.

---

17. We note in passing that the Administrative Law Judge presiding over the latest Nantahala wholesale rate case came to the identical conclusion regarding the intent and effect of the 1955 FPC licensing order. 30 F.E.R.C. ¶ 63,050, at p. 65,290-91. After observing that the FPC had apparently been given insufficient information about the features and consequences of the Alcoa system's coordination and exchange agreements with TVA, and the fact that Nantahala's steadily increasing public load was also serviced under the Original Fontana Agreement, the ALJ concluded that under these circumstances, "with the licensing order silent on such critical points, there is no reasonable basis to conclude that the Commission [FPC] intended to reserve for Alcoa's use alone all of the Tapoco power." *Id.* at 65,291.

2.

[5]   The Commission also made findings of fact, amply supported by the evidence of record, as to the existence of a single, unified hydroelectric generating and transmission system consisting of the combined facilities of Nantahala and Tapoco and wholly owned by Alcoa. The evidence in support of these findings may be summarized as follows:

Nantahala and Tapoco are both wholly owned subsidiaries of a single corporate parent, Alcoa. Nearly all of the facilities of Nantahala and Tapoco are situated on the Little Tennessee River and its tributaries. The two power companies are located in contiguous areas in western North Carolina, with portions of Tapoco's physical plant intruding into Nantahala's service area. The Nantahala and Tapoco electric facilities are physically interconnected with each other, with one generation and one distribution connection at Tapoco's Santeetlah facility; power can be dispatched and transmitted from the facilities of one to the facilities of the other. Standing between the two companies' Little Tennessee generation sites is the Fontana project; Nantahala's hydro developments are all located upstream of the Fontana dam, while Tapoco's are all downstream, thus poised to receive the downstream benefits of the Fontana project. Nantahala's eleven developments are smaller and relatively more expensive than Tapoco's four larger developments. The combined resources of the two provide relatively low-cost power and energy under the coordination and exchange agreements with TVA.

The Original and New Fontana Agreements treat the facilities of Nantahala and Tapoco without discrimination and make them an integrated part of, and subject them as a unit to coordination by TVA. By the terms of these agreements, TVA receives the output of all of the hydro resources of both Nantahala and Tapoco, except for three small plants of Nantahala. In addition, the agreements call for Tapoco and Nantahala to turn over to TVA control of production and stream flow. Accordingly, TVA determines for Tapoco and Nantahala, as a single entity, both electric generation and stream flow and operates them as an integrated system and a coordinate part of TVA's own system. In turn, Tapoco and Nantahala jointly receive back from TVA certain entitlements of power which they divide between themselves

by the 1971 Apportionment Agreement. Coordination was regarded as an efficient and economical method to maximize production of electricity from the various plants and to enhance the overall reliability of the pool of power available to the combined system. It is evident from the terms of the Fontana agreements that Alcoa and TVA intended the Fontana project, once it was completed, to be operated together with other TVA generating plants in coordination with certain plants of the combined Nantahala-Tapoco system.

The intervenors' expert engineering witness, David A. Springs, testified at the remanded hearings that it is a "false and arbitrary assumption that NP&L [Nantahala] and Tapoco operate as isolated systems when in fact they do not." When witness Springs was asked whether the Nantahala and Tapoco facilities should be operated as a separate and independent system, he replied: "No, by coordinating them as one with TVA, the outputs of the generating resources are maximized." Springs added that, from an engineering standpoint, the Nantahala and Tapoco facilities should be operated as one utility. With regard to the question of whether Nantahala was designed to operate as part of an integrated system as opposed to operating as a stand-alone company, Springs stated, "NP&L could not have been designed the way it was to ever operate as an isolated system."

Not only was Nantahala designed to operate as an integral part of a larger utility enterprise, but its projects were developed and put into service in accordance with Alcoa's aluminum production needs rather than scheduled in accordance with the size of its public load. The greater portion of Nantahala's capacity, the Glenville (Thorpe) and Nantahala projects, were added in the early 1940's before there was a significant public load in need of their output. Conversely, since the mid-1950's no significant capacity has been added to the Nantahala system, despite clear signs that its public load would place increasingly greater demands upon its facilities. This pattern of development reflects the increased electric power demands of Alcoa on the combined system during the Second World War and Korean War, and its generally decreased and levelized demand in the post-war period.

Springs also testified to the propriety of using a roll-in methodology in determining the appropriate rate base and allocation of

cost responsibility for the customers served by Nantahala's facilities. Springs' conclusion, adopted by the Commission, that a roll-in is mandated in the case of Nantahala and Tapoco, is based upon his analysis of actual company cost responsibilities under the current and historical operating and contractual conditions tying the Nantahala and Tapoco facilities into a single, unified electric system. As Springs explained, cost-of-service rate making is simply a function of rationally assigning to various classes of customers cost responsibility for the facilities available for and used in their service. In cases where facilities are jointly used by two or more groups of customers under circumstances where, for example, a stand-alone method of costing fails to identify appropriate customer loads or where actual customer cost responsibility is distorted by unreasonable power pool agreements a roll-in methodology is appropriate for rate making purposes.[18]

In the case of Nantahala, Springs testified that actual customer cost responsibility for the facilities available for that service cannot be accurately computed on the basis of the percentage of return power entitlements it receives from TVA separate and apart from the total pool of power available to Nantahala and Tapoco as a combined system, because these entitlements reflect neither the generating facilities actually available for Nantahala's retail service, nor the actual use of those generating facilities by those customers. As the intervenors' witness explained:

> A cost-of-service study, whether it be rolled-in or single company, is simply a means of assigning to customer groups the appropriate cost responsibility for the demands the customers place upon the resources of the utility . . . a rolled-in cost-of-service approach [is appropriate] for NP&L and Tapoco, because it is impossible to separate out the functional relationship between the generating resources operated by these companies and the load they each serve.
>
> In a normal utility operation, the ownership of generating resources by particular operating companies reflects the identification of resources to customer loads. In the normal course of development, a utility company will develop the resources in the geographic area, which the customers

---

18. *See, e.g., Georgia Power Co.*, 52 F.P.C. 1343.

would look to in order to serve their loads. Usually, companies will integrate their resources into a combined system, such as the Southern Company system, and experts might legitimately disagree as to whether it is more appropriate to measure customer demands for service on an individual company basis or a system-wide basis. This is because system-wide needs and the needs of customers of individual companies both impact [sic] the development, planning and operation of power supply resources. *However, in the case of NP&L and Tapoco, I find no significant pattern of power supply development, planning or operation on any basis other than a combined basis.* (Emphasis added.)

In short, it is apparent that the evidence of record overwhelmingly supports the Commission's finding and conclusion that "the Nantahala and Tapoco electric facilities constitute a single, integrated electric system and are operated as such by, and as a coordinated part of, the TVA system," and its further conclusion that, "for purposes of setting Nantahala's rates in this proceeding, the Nantahala and Tapoco systems should be treated as one entity with respect to all matters affecting the determination of Nantahala's reasonable cost of service applicable to its North Carolina retail operations."

3.

[6] Finally, with respect to Alcoa's status as a North Carolina public utility, the Commission correctly noted that despite the fact that Alcoa would not be a statutory public utility under the definitions contained in N.C.G.S. § 62-3(23)a and (23)b, it is a public utility under the definition contained in N.C.G.S. § 62-3(23)c, which provides:

The term "public utility" shall include all persons affiliated through stock ownership with a public utility doing business in this State as parent corporation or subsidiary corporation as defined in G.S. 55-2 to such an extent that the Commission shall find that such affiliation has an effect on the rates or service of such public utility.

N.C.G.S. § 55-2(9), in turn, provides as follows:

"Parent corporation" means a corporation which is a dominant shareholder, as herein defined. A corporation through

which, by virtue of its shareholdings alone, a parent corpora-
tion has power to exercise the control which makes the latter
a parent corporation is itself a parent corporation. A parent
corporation with respect to which another corporation is a
parent corporation is a "subsidiary corporation."

Finally, N.C.G.S. § 55-2(6) states:

"Dominant shareholder" means a shareholder of a particular
corporation, domestic or foreign, who by virtue of his share-
holdings has legal power, either directly or indirectly or
through another corporation or series of other corporations,
domestic or foreign, to elect a majority of the directors of the
said particular corporation.

Applying these statutory definitions to the respondent cor-
porations, the Commission concluded that (1) Alcoa, as the owner
of all of the outstanding stock of Nantahala, a North Carolina
public utility as defined by N.C.G.S. § 62-3(23)a, is a parent cor-
poration of Nantahala within the meaning of N.C.G.S. § 62-3(23)c,
and is itself a public utility under that section, and (2) that Alcoa's
affiliation with Nantahala has had an effect on Nantahala's rates,
as evidenced by the terms and results of the New Fontana and
1971 Apportionment Agreements.

We have reviewed the record with regard to these matters
and find that the evidence fully supports the Commission's deter-
mination that Alcoa is a North Carolina public utility under
N.C.G.S. § 62-3(23)c, by virtue of the effect Alcoa's "affiliation"
with Nantahala has had upon Nantahala's rates. The historical
and current operating conditions tying Tapoco and Nantahala
together clearly show that Nantahala is part of a single utility
enterprise, created by Alcoa as part of a plan to secure for itself,
through the separate corporate entities of its public utility sub-
sidiaries, the large quantities of low-cost power it requires for its
aluminum smelting and fabricating operations. Alcoa's unified
development of the Little Tennessee River through its subsidiary
power companies resulted in the assigning of the system's least
expensive utility resources to its exclusive service, through
Tapoco, while relegating the relatively expensive portion of those
resources to the system's public service load through Nantahala.
This development, in turn, has had an enormous impact on the
rates Nantahala charged to its retail customers.

Indeed, nearly every major document charting Nantahala's development contains self-referential language describing Nantahala and (later) Tapoco's projects as parts of "the Alcoa power system," that is, the Alcoa power generating and distribution system. For example, in its 1940 application to the Department of War for a national defense certificate of necessity to build its largest hydroelectric facilities, Nantahala stated that the justification for its intended developments at Glenville (Thorpe), Nantahala and Fontana were the enormous electric needs of Alcoa. The application described "the system" which these developments were to be added to as follows:

At the present time, Alcoa receives power from three dams located on tributary waters of the Tennessee River at Calderwood, Tennessee, and Tapoco, North Carolina (Cheoah and Santeetlah developments). . . .

. . . The new developments will be upstream from the present developments. It is contemplated that they will store water during winter months, and will be used in the dry season to produce additional power and also to make available additional water for the developments downstream. The estimated total addition to *the Alcoa power system* is 51,500 k.w., part of which will be produced at the new developments and part from additional water released for use downstream.

The Glenville project will have installed generating capacity of 21,500 k.w. and will add 17,500 k.w. to *the system*. This power will be used as soon as available for the Alcoa pot line scheduled for January 1941.

The Nantahala project will have installed generating capacity of 42,200 k.w. and will add an estimated 34,000 k.w. *to the system*. It will be completed about August, 1942 and will thereafter supply power for one of two Alcoa pot lines planned for January, 1942. (Emphasis added.)

Similarly, both the Original and New Fontana Agreements, by which Alcoa caused its subsidiaries' hydroelectric facilities to be coordinated in operation with the TVA system, contain references to Alcoa as the "Company" and to the "Company plants" as facilities owned by Nantahala and Tapoco. Article III of the New Fontana Agreement, entitled "Operation of Company's Hydroelectric System," states in part:

### 1.  Definitions

For purposes of this agreement, "Company's plants" or "Company's hydroelectric plants" shall mean the following hydroelectric generating plants (and associated diversion dams) which are owned by Nantahala and Tapoco.

\*    \*    \*

[There follows a list of eight of Nantahala's plants and four of Tapoco's plants.]

The words "transmission facilities of Company," "Company's transmission facilities," and words of similar import shall mean the transmission facilities of Tapoco [and] Nantahala.
. . .

In like manner, Article II of the New Fontana Agreement describes the division of rights, benefits and obligations under that contract in terms of a single, integrated system, with Alcoa ultimately guaranteeing the performance of all obligations of the system members thereunder.

Wherever this agreement provides an obligation or right on the part of Company to generate, sell, or transmit electric power and energy or an obligation or right on the part of Company to own or operate facilities for the generation, sale or transmission of electric power or energy, such obligation or right shall be performed and discharged or enjoyed as the case may be by Nantahala or Tapoco. However, Alcoa warrants and represents to TVA that it will secure the performance of all of the obligations of Company under this agreement.

Of course, Alcoa's involvement in the development, design and operation of the hydroelectric resources of Nantahala and Tapoco is by no means limited to the role of guarantor described above. Perhaps the most succinct and telling account of this role and its purpose is found in the historical study of "the Alcoa story," published in 1952, and entitled *Alcoa: An American Enterprise*. The book, written by Charles C. Carr, who was for many years Director of Public Relations for the company, is a self-professed objective account of Alcoa's history as gleaned from

Alcoa records and files.[19] In the chapter concerning "Water Power," the author explained that in the aluminum business, which requires vast amounts of electricity to produce the metal, electricity is a commodity; an essential part of the cost of every pound of metal along with labor, raw materials, capital investment and the wearing out of equipment.

As early as 1893, Alcoa selected water power as the one source of cheap electric energy best suited to aluminum production. Actuated by the search for low-cost hydroelectric power from its earliest days, Alcoa formed a number of water and power companies in various parts of this country and Canada. When these proved insufficient for Alcoa's growing needs, "Alcoa looked elsewhere for power and located it, about 1909, in the mountains of Tennessee-North Carolina." Carr, *Alcoa: An American Enterprise*, at 93. As Carr observed, "[t]he story of Alcoa's power projects in North Carolina would make a chapter by itself." *Id.* at 95.

> Spurred on by necessity, Mr. Davis and his associates started to acquire riparian properties along the Little Tennessee River and its tributaries in 1910. Studies and plans that contemplated the *unified development of the entire river and its tributaries above Chilhowee, Tennessee, were undertaken.* The assurance of adequate power from that swift-flowing mountain river and its tributaries, *to be developed as needed,* gave Mr. Davis the vision of what is today this country's largest aluminum plant, at Alcoa, Tennessee. On March 6, 1914, the first pot lines of an aluminum reduction works started operating at this location.

> The Tallassee Power Company in North Carolina was acquired in 1914 and operated under that name until 1931 when it was changed to the Carolina Aluminum Company. *The Nantahala Power & Light Company was organized as a public utility on July 23, 1929, to develop as needed the power sites which had been owned by the Carolina Aluminum Company*

---

19. *See* Carr, *Alcoa: An American Enterprise*, "A Note of Explanation," at v-vi (1952). Aluminum Company of America holds the copyright to this publication in its name and portions of the book relevant to this discussion are included as an exhibit in the record before the Commission and on appeal. The intervenors' witness David A. Springs refers to the book in his testimony and the Commission referred to the book in its order.

*on the upper reaches of the Little Tennessee and its tributaries, the Nantahala and Tuckasegee Rivers.*

*The Nantahala Power & Light Company, a wholly-owned Alcoa subsidiary, is essentially a utility company serving many western North Carolina communities with electricity to* light their homes and to run their motors for commercial, farm and household use. *Its long time President was the late J.E.S. Thorpe, an Alcoa veteran of thirty years' service and well-known utility operator in the Southeast. Mr. Thorpe, who had served as head of Nantahala Power & Light Company for twenty-one years at the time of his death in 1950, was recently honored in a lasting manner by the Directors of Alcoa. The name of a mountain power development, originally known as the Glenville project, was changed to the Thorpe Development.*

*Although its first duty is to serve the communities in its territories, Nantahala Power & Light Company has in its domain such large hydro projects as Glenville and Nantahala, which augment the supply of power in the North Carolina mountains available for aluminum-making.*

\* \* \*

Harnessing the swift-flowing Little Tennessee and its tributaries in their rush through the Great Smokey Mountains is a saga in which many Alcoa veterans have played a part. . . . (Emphasis added.)

*Id.* at 93-95.

Finally the author discusses what he considers to be the unusual degree of cooperation achieved between "Government" (TVA) and "private industry" (Alcoa) in developing the "fountainhead of the power projects on the Little Tennessee," the Fontana project. According to Carr, Alcoa had purchased nearly all the necessary land in the Fontana basin for development purposes, had found it necessary to become a purchaser of TVA power to supplement its own sources and then, in 1941, "to the surprise of many people who could see 'no good in TVA,' *Alcoa gave to the Governmental authority, without monetary fee, its site at Fontana, where most of the necessary land had been acquired, parcel by parcel, over many years.*" *Id.* at 97. With this

grant, went roadway relocations and engineering data Alcoa had assembled for the construction of the great dam and power project at the Fontana, North Carolina site.

> In return, TVA agreed to build Fontana, the great storage reservoir which would regulate the flow of water at Alcoa's hydro projects and Cheoah and Calderwood, as well as at TVA's downstream projects. Alcoa was influenced in its decision by the Water Power Act of 1920 [predecessor to the Federal Power Act], which would have required the Company to obtain from the Federal Power Commission a license to build Fontana. This license would have given the Government the right to "recapture" the project after fifty years.
>
> *A second part of the Fontana agreement gave TVA the right to control the impounding and release of water to all of Alcoa's hydroelectric developments on the Little Tennessee and to use this generating capacity as an integral part of the TVA power system. In return for this, Alcoa received from TVA approximately the number of kilowatt hours generated at Alcoa plants during a calendar year, and in addition 11,000 KW of primary power without cost. The first part of the Alcoa-TVA agreement, wherein the Fontana project regulates the flow of water at Cheoah and Calderwood, is in perpetuity. The second part, recited in this paragraph, can be cancelled by either party on three years' notice after January 1, 1952.*
>
> \*    \*    \*
>
> *This agreement made possible the integrated operation of the water powers of Alcoa and TVA, including the Fontana project.* Its result was the maximum production of electric energy from the available water power, not only on the Little Tennessee River but also throughout the entire Tennessee Valley, which is served by the great Tennessee River and all its tributaries. (Emphasis added.)

*Id.* at 97-99.

Although Nantahala and Tapoco were operating under the New Fontana Agreement and the 1971 Apportionment Agreement during the test year relevant to this proceeding, these agreements were negotiated in the context of the prior Fontana

and apportionment agreements and the operating conditions established thereby. As we have seen, under the OFA, Alcoa (Tapoco) received the benefit of downstream storage derived from TVA's construction of the Fontana project, with no further capital investment by Alcoa. TVA released *in perpetuity* its right to claim downstream benefits against Alcoa in exchange for the transfer of title to the Fontana site. Alcoa caused Nantahala, a public utility with the power of eminent domain, to transfer its title to the Fontana site and its rights to develop that project to TVA, despite the fact that Nantahala was not permitted to be a signatory party of the OFA. Nantahala was not positioned to receive any portion of the downstream storage benefits because it owns no facilities downstream of the Fontana Dam, while Tapoco, and through it Alcoa, was positioned to receive all the downstream benefits because all of Tapoco's projects are downstream of the Fontana site. In addition, Alcoa gave up to TVA a large portion of the dependable capacity from the hydro projects owned by Nantahala and Tapoco.

The New Fontana Agreement, essentially an amendment to the OFA, was signed at the end of 1962, after approximately two years of negotiations between TVA and Alcoa. The 1962 Agreement essentially expanded the coordination of the two systems by fixing the availability of capacity and energy returned from TVA without regard to stream flow conditions. However, in the bargain, dependable hydro capacity was traded away in exchange for improvements in the availability of energy for aluminum production. This produced a significant increase in the degree of availability of secondary energy to Alcoa. This energy, subject to prolonged periods of interruption, is unsuited to the needs of a public load, which requires peaking capacity to meet fluctuating customer demands. As it had done with the OFA, Alcoa, now through its employee George Popovich, represented its own interests and those of Tapoco and Nantahala in the negotiations with TVA over the NFA's terms and conditions. Nantahala itself had no direct participation in the negotiations. Significantly, the Alcoa negotiation paper, entitled "NOTES ON MEETING WITH TVA — MARCH 2, 1962," refers to the pending transfer case and rate case then before the Commission as the "Nantahala problems."

It is evident that prior to this Court's action in *Utilities Commission v. Membership Corp.*, 260 N.C. 59, 131 S.E. 2d 865, Alcoa

personnel had believed that the sale to Duke was to be approved. Thus, an Alcoa memorandum entitled *"RE: FONTANA AGREE- MENT"* dated 23 August 1960, concludes as follows:

> *One final note, the entire TVA proposal is based upon the sale of the Nantahala Power Company.* TVA proposed that if the sale was not complete at the time this new proposed contract becomes effective, they would increase the power available to us under the purchase contract to whatever amount is necessary for us to handle the Nantahala loads. . . . This would be done on a temporary basis and would be reduced concurrent with the transfer of the Nantahala properties to Duke. (Emphasis added.)

The final Alcoa memorandum after completion of all negotiations for the NFA, dated 6 November 1962, reflects the continuing intention on the part of Alcoa to accomplish the transfer of Nantahala's distribution system and public service load to Duke. However, no revisions were thereafter made to the NFA or to the purchase and apportionment agreements subordinate to it to take into account the growing public load serviced by Nantahala. In addition, the Commission found that the NFA's structure rendered it necessary for Nantahala to enter into the subordinate 1963 Apportionment Agreement with Alcoa, five days after the signing of the NFA, in order to secure Nantahala's participation in the TVA return entitlements. This was done by means of a monetary supplement from Alcoa to Nantahala and a guarantee of a certain share of power entitlements from the TVA return.

The Commission concluded that the foregoing evidence clearly demonstrates that the NFA was tailored to meet Alcoa's aluminum production needs without consideration of Nantahala's public service needs and that this arrangement had a considerable impact on Nantahala's rates.

By the time the 1971 Apportionment Agreement was signed, the interconnected power supply structure had long been in place, and Nantahala found itself without sufficient power to service its public load, which had been growing at an annual rate of approximately 8.5 percent. Having added no additional generating capacity, since 1957, and having failed to enter into other power supply contracts tailored to its public load requirements, Nantahala found itself in the position of having to make supplemental pur-

chases of power from TVA and passing those additional costs along to its public customers in the form of increased rates.

Again, it was an Alcoa employee, George Popovich, who conducted the 1971 apportionment study and devised the apportionment formula that was incorporated into the 1971 Agreement between Tapoco and Nantahala. Moreover, during the course of the negotiations "between" Nantahala and Tapoco over the division of return power entitlements, Popovich apparently represented the interests of *both* Nantahala and Tapoco at the "bargaining table." When questioned as to his role, Popovich conceded that he wore "both their hats" during these negotiations adding merely that in view of Nantahala's public utility responsibilities, "I think my Nantahala hat was bigger than my Tapoco hat." At this point, we note only that in its examination of the results of these contractual arrangements upon Nantahala's retail costs of service, the Commission came to precisely the opposite conclusion.

The net effect of Alcoa's "affiliation" with Nantahala is evidenced by a pattern of operation of Nantahala's power supply resources under the various Fontana and apportionment agreements largely inconsistent with and ultimately detrimental to, its ability to render service at just and reasonable rates to its retail customers. Further, as the Commission itself concluded, "Nantahala was not designed as, and is not in reality, a separate utility system but, rather, is a part of an integrated Alcoa system with Tapoco."

Moreover, Alcoa's involvement in the development of Nantahala's and Tapoco's North Carolina hydro resources does not stop with these contractual arrangements. Rather, as this Court noted in *Edmisten,* Alcoa's role also extends to "the ultimate operating and accounting policies of both utilities. The chief executive officers of both Nantahala and Tapoco report directly to an Alcoa vice president. Members of the board of directors of both utilities are employees of Alcoa." 299 N.C. at 435, 263 S.E. 2d at 586. Indeed, Nantahala's president, William M. Jontz, had his original employment conversations with Alcoa officials in Pittsburgh, Pennsylvania. Although his employment as president of

Nantahala began on 1 June 1976, he did not meet with the Nantahala Board of Directors until the latter part of July 1976.[20]

Similarly, the president of Tapoco is a direct employee of Alcoa serving in the dual status of power manager of Alcoa's Tennessee operations and president of the utility company. His sole office is located at Alcoa's south main plant at Alcoa, Tennessee. Furthermore, Alcoa owns 100 percent of the capital stock of Nantahala and Tapoco. The assistant controller of Alcoa, Robert D. Buchanan, testified that he has the "general responsibility for the financial accounting for Alcoa and its subsidiaries, and as such ha[s] responsibility for the books and records and financial policies of Tapoco and Nantahala."

The foregoing evidence manifestly demonstrates the substantial and detrimental impact Alcoa's "affiliation" has had upon Nantahala's rates and service to its North Carolina public utility customers, and fully supports the Commission's conclusion that Alcoa is a North Carolina public utility under the provisions of N.C.G.S. § 62-3(23)c.

In summary, the evidence of record gathered at the remanded hearings before the Commission in this general rate case establishes beyond question three basic propositions: (1) Tapoco is a North Carolina public utility; (2) the hydroelectric facilities of Nantahala and Tapoco constitute a unified, single system, operating under conditions rendering a roll-in rate making methodology appropriate; and (3) Alcoa is a statutory North Carolina public utility to the extent that its affiliation with Nantahala has affected Nantahala's rates.

---

20. Significantly, Nantahala's employment contract with its president describes the "major general objectives" of such employment to include both the company's management *and* the development of plans "for the possible sale or other disposition" of Nantahala, said goals to be accomplished "so that there is little or no adverse impact on the operations and assets of Nantahala's parent company [Alcoa] and its subsidiaries in North Carolina, including, but not limited to, . . . Tapoco, Inc. and Yadkin, Inc. . . . ." Under the section governing base salary, the contract provides for achievement awards based upon the president's performance with respect to these objectives, "To be determined annually by the three-member [Alcoa] group among the Board of Directors of Nantahala. . . . ." Finally, under provisions entitled "Nondisclosure," the president is not to engage in any act which would, *inter alia*, tend to prejudice the business of "Nantahala *or* of Nantahala's parent company [Alcoa] and its subsidiaries . . . Tapoco, Inc. and Yadkin, Inc.

## D.

The Commission, after finding that Nantahala and Tapoco are a single, integrated electric system, joined the assets, properties, plants and working capital requirements of both companies into a unified rate base, totaled joint revenues and operating expenses, and assigned the combined system the rate of return approved for Nantahala alone in the 1977 proceedings. From these elements, a combined system revenue requirement was derived. These aspects of the Commission's order are not challenged by the companies. However, the controversy between the intervenors and the companies over the proper cost allocation methodology to be used in apportioning the combined revenues, expenses and investment of the unified system between the retail customers in North Carolina and the non-jurisdictional Alcoa industrial load in Tennessee lies at the heart of this appeal.

Generally speaking, the allocation methodology proposed by the companies through their expert witness Herbert J. Vander Veen assigns customer cost by utilizing the entitlements of the New Fontana Agreement and the 1971 Apportionment Agreement; whereas the allocation methodology proposed by the intervenors through their expert witness David Springs, and adopted by the Commission, is grounded upon the assignment of cost responsibility to the public load and to Alcoa on the basis of which load actually used the capability available from the generating facilities of the combined system. The jurisdictional allocation factors utilized by the Commission are generally accepted factors commonly employed by the Commission in setting intrastate retail rates for other public utilities serving in more than one jurisdiction. The unique problem posed by this case lies in the fact that Nantahala's available power supply was contractually reshaped by the quantity and design of the entitlements returned by TVA under the NFA and allocated to Nantahala under the 1971 Apportionment Agreement. In effect, the companies treated Nantahala as part of a unified system when dealing with Nantahala's contribution to the pool of power turned over to TVA and with respect to TVA's dispatch of Nantahala's facilities, but not when determining Nantahala's share of the entitlements returned to the Alcoa system. Thus, Nantahala's share was computed *as if* Nantahala were a stand-alone company. In the process, Nantahala

received little or no value in return for certain contributions it made to the integrated system.

The Commission, in rejecting the companies' proposed allocation methodology, reasoned that it would be unjust to Nantahala's retail rate payers to allocate demand and energy related costs on the basis of TVA return entitlements because the terms of the NFA had been structured to meet Alcoa's industrial needs and not Nantahala's public service needs. Moreover, the combination of the NFA and the 1971 Apportionment Agreement forced Nantahala to purchase costly additional power irrespective of its production capacity. The companies argue that the Commission was constrained by the doctrine of federal preemption to utilize the NFA demand and energy entitlements in determining Nantahala's demand and energy related costs because the NFA and 1971 Apportionment Agreement are FERC-filed wholesale rate schedules, the reasonableness of which may not be reinvestigated by state public service commissions, and the economic results of which must be accepted in setting retail rates. Additionally, they argue that the manner in which the Commission allocated the rolled-in costs places an impermissible burden upon interstate commerce by affording North Carolina customers a "first call" on both the energy output of the combined system and the economic benefits of Tapoco's lower-cost production. A proper understanding of our conclusion in Part II, A and B, *infra*, that the Commission is neither preempted by the Federal Power Act and Supremacy Clause nor forbidden by the Commerce Clause of the United States Constitution from implementing the rolled-in rate making methodology developed in this case, necessitates a brief review of the Commission's findings with respect to the power supply agreements at issue.

Initially, it must be pointed out that the Commission's discussion of the NFA and 1971 Apportionment Agreement occurred in the context of addressing the impropriety of basing *cost allocations* on demand and energy entitlements as contained therein. The Commission was not concerned with the reasonableness of the power exchange agreements and associated system costs *per se*, but with the question of which load should be held responsible for which portion of these costs in its rates. Put another way, it is evident that the Commission's in-depth examination of the terms of these contracts was undertaken as part of its process in choos-

ing between the competing jurisdictional cost allocation methodologies presented by the parties and not in an effort to either reform the contracts or to alter the actual flow of return power thereunder.

In some twenty pages of its rate reduction order, the Commission exposed and "fleshed out" the extensive network of detriments and inequities to Nantahala and its customers embedded in the terms of the NFA and 1971 Apportionment Agreement. In essence, the Commission found that a disproportionate amount of the capacity and energy resources of the combined Nantahala-Tapoco system, perfectly usable by the load characteristics of the Nantahala public load, were traded away to reform the TVA return entitlements to fit the needs and characteristics of an aluminum smelting and fabrication operation. Because Nantahala is structured, operated and treated as an integral unit of the combined system, rather than as a stand-alone company, the detriments it incurs under the integrated system's power supply contracts result in concealed benefits flowing to Tapoco, and ultimately to its parent and customer, Alcoa. While "costs" charged to the combined system under these contracts might be considered objectively fair and reasonable from the wholesale perspective, the public customers of Nantahala were found to have fared badly when that utility was artificially separated out of the unified system for allocation purposes, and then forced to bear the added responsibility for costs of purchased power from TVA.

The Commission found a number of specific inequities in terms of cost responsibility to Nantahala and concealed benefits to Alcoa arising out of both the NFA and 1971 Apportionment Agreement, and divided its treatment of these agreements into separate discussions. Another portion of the order analyzes the manner in which the companies employed the data contained in the agreements in developing their cost allocation methodology. Finally, the order discusses the mechanics of the allocation adopted by the Commission from the proposal of the intervenors and utilized in fixing Nantahala's rates. We will use the subject headings corresponding to those portions of the order in our summary of the discussion contained therein.

## Concealed Benefits of the Apportionment Agreement

### (1)   Quantity of Nantahala's Production.

In 1962, Alcoa power consultant George Popovich determined that under the NFA, Nantahala should be apportioned annual energy entitlements guaranteed at minimum, to return to Nantahala an amount equivalent to its primary energy capability of 360 million kwh plus its actual production in excess of that amount, which was 79 million kwh of average energy; 66 million kwh when Nantahala's non-Fontana generation is taken out. Popovich's 1962 figures were derived from an independent engineering study made by Ebasco in 1960 for Nantahala, and accepted by Alcoa as the basis for Nantahala's entitlements under the 1963 Alcoa-Nantahala Apportionment Agreement. By that agreement, Nantahala received annually an average of 426 million kwh, of which 360 million kwh was guaranteed as a minimum. The 426 million kwh of return power was approximately the same amount as Nantahala contributed to TVA under the NFA. Yet despite these facts, when Popovich devised the 1971 Apportionment Agreement, Nantahala received only 360 million kwh annually. Thus, Nantahala was deprived of an average of 66 million kwh annually. The Commission concluded that this detriment to Nantahala constitutes a benefit to Tapoco that is passed on to Alcoa.

### (2)   Quantity of Nantahala's Peaking Capacity.

The 1960 Ebasco Study computed Nantahala's plant capacity, under the most adverse water conditions, at 85,400 kw. After deducting the three small plants excluded from the NFA, that capacity is 84,300 kw. Alcoa's acceptance of these computations is reflected in a number of internal documents cited by the Commission in its order. As was true of the energy entitlements, this study formed the basis of Nantahala's capacity entitlements in the 1963 Alcoa-Nantahala Agreement. Under it, Nantahala was permitted to use capacity without a pre-set limitation. Therefore, Nantahala was able to use actual capacity to the limits assigned by the 1960 Ebasco Study in meeting its customer demands. However, when Popovich conducted his study for the 1971 Apportionment Agreement, while accepting the most adverse water (*dependable*) capacity factor of 84,300 kw, he deducted 27,500 kw for the "largest unit out" to reach an *assigned* capacity of 54,300

kw. This deduction is for the Nantahala facility which forms up-wards of 50 percent of the entire Nantahala generation system of 11 dams. Thus, under the 1971 Apportionment Agreement, Nan-tahala was assigned a peaking capacity of 54,300 kw. The result of this limitation is that any time Nantahala has to provide a customer demand in excess of 54,300 kw, it must pay a monthly demand charge to TVA for all power over that limitation. If the limitation were set at Nantahala's capacity level determined by the "loss of load probability" method, the monthly demand charge would be only the amount between 81,800 kw and the excess cus-tomer demand over and above that amount. The Commission con-cluded that demand costs thereby imposed on Nantahala for use of capacity between its assigned capacity of 54,300 kw and its ac-tual capacity of 81,800 kw, would represent an expense to Nanta-hala and thus a savings to "its New Fontana Agreement sister, Tapoco," since the capacity constraints for the TVA return enti-tlements are jointly shared by them under the NFA.

The difference in amount between the capacity assigned to Nantahala under the 1971 Apportionment Agreement and what the Commission has determined its assured capacity to be results from the different methodologies employed by the companies and the intervenors in determining Nantahala's assured capacity. The intervenors' witness Springs testified that the proper reserve margin for Nantahala should be the margin used by TVA, which is "the loss of load probability" method. Use of this method would recognize that Nantahala is operated as part of the coordinated Alcoa-TVA system rather than as a stand-alone utility, and would result in a reserve requirement of about 3 percent. Using a 3 per-cent reserve in place of the "largest unit out" reserve, which, in this case is upwards of 50 percent, would establish a capacity under the most adverse water conditions of 81,800 kw as opposed to Popovich's calculation of 54,300 kw.

The Commission concluded that significant cost is shifted to Nantahala by the unfair and unwarranted limitation of its capaci-ty to 54,300 kw; conversely, that expense, in the form of demand charges paid to TVA, is a concealed benefit to Alcoa. The basis for the Commission's conclusion that the capacity limitation as-signed to Nantahala under the 1971 Apportionment Agreement was unwarranted lies in the Commission's rejection of the "larg-

est unit out" adjustment to actual capacity for reserves in computing Nantahala's assured capacity. The order states as follows:

> *If* Nantahala were a separate and independent system, a deduction of the "largest unit out" might be appropriate to determine assured capacity. *However, Nantahala is not and never has been a separate electric system—it was not so designed.* Nantahala's two largest facilities are Thorpe (previously Glenville), . . . and Nantahala, . . . . The Thorpe and Nantahala facilities comprise about 65% of Nantahala's entire system. At the time of their construction, *Alcoa obtained a certificate of necessity from the War Department and expressly argued and avowed that they were part of the Alcoa system. . . .*

> *Furthermore, for the past 40 years, both Nantahala and Tapoco have been operated as an integral part of the TVA electric system pursuant to the provisions of the Fontana and New Fontana Agreements. Moreover, when Alcoa negotiated these agreements with TVA, it did not bargain for return power from TVA as if Nantahala was an independent power system but rather the attributes of the Alcoa system were melded together, with the TVA system for evaluation purposes. . . .*

> *With Nantahala and Tapoco being thus integrated into and coordinated with the TVA system, it is not appropriate to determine Nantahala's assured capacity by configuring Nantahala as a single independent and isolated system and to use the "largest unit out" methodology.* Instead, Nantahala should be treated as part of the TVA system and the reserve margin used by TVA should be applied. TVA does not use a reserve of "largest unit out" but rather uses "the loss of load probability method." (Emphasis added.)

### (3)   Nantahala's Upstream Benefits.

Nantahala's projects are upstream of Tapoco's projects, with the exception of Santeetlah. As a consequence, water that is stored by Nantahala can be released to flow downstream and be used by Tapoco for production of electricity. Therefore, Nantahala's storage has a value to Tapoco which is undiminished by the fact that TVA's Fontana Project now lies between Nantahala

and Tapoco. A 1956 TVA study estimated the upstream storage benefits of the two major Nantahala projects to be a continuous relative contribution of 4,300 kw to Tapoco's downstream Calderwood and Cheoah projects. This is an equivalent of 37,668,000 kwh annually as an upstream benefit from Nantahala to Tapoco. However, under the 1971 Apportionment Agreement, Nantahala received no credit for this benefit to Tapoco, which was in turn passed on to Alcoa.

(4)  Nantahala's Entitlement for Operating Its Properties in Accordance with the Fontana Agreement.

By the 1941 Fontana Agreement, Nantahala, at the instance of Alcoa, gave to TVA the right, *in perpetuity*, to control the storage and flow of water from its several hydroelectric projects. The Commission found that Nantahala's giving up of rights unquestionably constituted a loss of considerable value for which Nantahala was entitled to compensation. With the 1963 Alcoa-Nantahala Apportionment Agreement, Alcoa agreed to continue to pay to Nantahala monies for Nantahala's loss of those operational rights. Moreover, the agreement clearly showed that TVA was continuing to pay value for those rights, which value is reflected in the TVA return entitlement of the New Fontana Agreement. This fact was also reflected in the Commission's own earlier findings with respect to the TVA return entitlement in the year 1963 in Docket No. E-13, Sub 13. Yet despite the fact that the NFA includes in the TVA return entitlement a reimbursement by TVA for the right to operate Nantahala's projects, for which Alcoa previously paid $89,200 annually to Nantahala, no credit was given to Nantahala for that entitlement under the 1971 Apportionment Agreement. In other words, Nantahala receives neither an energy credit nor a monetary payment for the right given up. The Commission concluded that since the TVA payment for the operational rights, which is paid with energy in the NFA rate entitlement, did not go to Nantahala, it inured to the benefit of Tapoco, which in turn passed this benefit to Alcoa.

(5)  Nantahala's Value to the TVA Interconnected System.

The Commission found that another failure of the 1971 Apportionment Agreement regarding Nantahala's participation is that the Popovich apportionment formula does not consider the

proper value to TVA of the fact that Nantahala, Tapoco and the TVA systems are interconnected.

> Interconnection is of c ᵔsiderable value to TVA completely aside from the fact that Nantahala's rate base includes in it certain assets devoted to the interconnection, which assets are entitled to earn a rate of return. Because Nantahala is not an isolated system, it should be receiving the usual benefits that accrue from coordinated operation. Yet, Nantahala does not receive the usual benefits of an interconnected and coordinated system.

Relying on Alcoa documents reflecting the path of its negotiations with TVA over the New Fontana Agreement, the Commission found that the integrated systems factor was recognized by Alcoa to be of great value to TVA, a recognition that Alcoa was able to capitalize on later in arriving at the final terms of the agreement. As indicated, some of the values of integration are the need for smaller reserves and the fact that TVA actually controls production of generation and storage waters. However, one of the larger benefits is the value in integration of Nantahala's projects that are upstream of TVA's Fontana Project. The Commission noted that in an integrated system such value is maximized; Nantahala's projects contributed upstream benefits not only to Tapoco's downstream projects, but also to TVA's downstream Fontana Project. In fact, the entire TVA Tennessee River system receives the benefit of the storage of all of these projects located on the Little Tennessee River. This is especially so given TVA's control of all of the Nantahala and Tapoco reservoirs under the terms of the Fontana Agreement. Based upon the results of a TVA study of combined downstream storage benefits, the Commission determined that Nantahala's annual upstream benefit to TVA is 70,956,000 kwh.

However, when the NFA bargain was struck, the TVA and the Alcoa systems agreed to cancel out their respective upstream benefits. The Commission observed that since Nantahala provided benefits upstream to both Tapoco and TVA, and TVA provided benefits upstream to Tapoco, it was Tapoco that gained by the mutual cancellation, to the detriment to Nantahala of the value of 70,956,000 kwh annually. The Commission further concluded that Nantahala should have received back an equivalent amount of

energy under the 1971 Apportionment Agreement from Tapoco. Because Nantahala received no such benefit under the Popovich apportionment formula, the Commission concluded that to Tapoco's benefit, Nantahala was deprived of one value of the interconnection with the TVA system. This concealed benefit flowing from Nantahala to Tapoco is, of course, passed on by Tapoco to Alcoa.

In summarizing its discussion of the detriments to Nantahala from the 1971 Apportionment Agreement, the Commission totalled the annual kilowatt-hours which Nantahala contributed in average production to the system and for which no credit was received in return and determined that Nantahala was deprived of a total value of 200,224,000 kwh annually. In addition to which, Nantahala received no credit for its peaking capacity over the 54,300 kw which was assigned to it, as a result of which Nantahala must pay additional demand charges to TVA when monthly demand exceeds assigned capacity. After quoting a portion of this Court's opinion in *Edmisten* regarding the terms of the 1971 Apportionment Agreement, the Commission concluded:

> Now that considerably more of the various detriments to Nantahala have been exposed and fleshed out, it is apparent that the 1971 Apportionment Agreement works an extensive injustice on Nantahala and its public rate payers, the gravity of which far exceeds even that envisioned by the Supreme Court.

### Concealed Benefits of the New Fontana Agreement

The Commission found the concealed benefits flowing from Nantahala to Alcoa by virtue of the NFA to be entirely different in nature from those which flow from Nantahala to Tapoco, and ultimately to Alcoa from the 1971 Apportionment Agreement. The basic inequity to Nantahala arising out of the NFA is that the energy entitlement returned to Nantahala and Tapoco from TVA is structured to meet Alcoa's demand for a certain amount of stable electricity for purposes of aluminum production rather than a demand for a public load. Consequently, the NFA returns to the system an average of 218,300 kw of energy at a high load factor with minimal peaking deviation, which is principally designed to service Alcoa's pot lines and other production electrical

requirements. Even the interruptible and curtailable energy entitlement returned to Nantahala-Tapoco is in increments of wattage that conform to the demands of a pot line so that, if power is interrupted or curtailed, Alcoa can respond by cutting out a particular pot line.

Nantahala, on the other hand, has a fluctuating demand for energy which has peaks and valleys. Its electrical requirement is for assured, but constantly variable amounts of energy. Nantahala needs peaking capacity and its generation projects possess peaking capacity, yet the NFA traded away that peaking capacity to TVA. The Commission agreed with the intervenors that the trade-off of Nantahala's own peaking capacity, at a time when Nantahala's load required such peaking capacity, thus forcing the utility to purchase capacity back at a higher price from TVA, was not the result of "enlightened, arm's-length bargaining" and that the detriment resulting to Nantahala from the design of the NFA entitlements flows to Alcoa as a benefit.

In fact, the intervenors' evidence demonstrated that Alcoa reaped enormous benefits through the trade in the improvement of the availability of Tapoco's secondary energy production *from* a level of 42 percent average curtailment *to* an average curtailment rate of only 8 percent. In addition, Tapoco's generation statistics reflect the benefits of coordination with the Fontana Project and other forms of integration with TVA. These figures are inconsistent with the isolated system model utilized as a basis for the 1971 Apportionment Study. Again, it was evident that the two operating subsidiaries were treated as a single system for purposes of bargaining with TVA over the value of their combined contribution to the TVA system, and were only separated out as if they were independent systems for the purposes of dividing the return entitlements between them.

The Commission noted that "Alcoa was in direct control of the [NFA] negotiations, and, unlike the Nantahala ratepayers, has had every ability to protect its own interests during the negotiations. Respondents cannot now be heard to claim that they are dissatisfied with the NFA so as to place the cost responsibility for the deficiencies of that agreement upon Nantahala's ratepayers." In explanation of the design of the NFA, the Commission observed that during the negotiation stage of the NFA, the par-

ties contemplated the sale of Nantahala's distribution system to Duke. The sale would have left Nantahala with its generation, but without a public service load, so that all of its NFA entitlements would be satisfactory for delivery to Alcoa irrespective of quantity and design; in no manner was the NFA structured to meet Nantahala's public service needs.

Next, in passing, the Commission rejected the remedy of regulatory reformation of the NFA to properly award to Nantahala its just entitlements as, of necessity, somewhat hypothetical at this stage of the case. Rather, for cost allocation purposes, the Commission concluded that the "roll-in technique avoids the need for complete identification of inequities and is nicely suited as a proper alternative to reformation of contracts." On the basis of its discussion of the various "detriments" to Nantahala resulting in "benefits" to Alcoa, both directly and through Tapoco, and "upon careful consideration of the entire evidence of record," the Commission concluded that it should reject the companies' proposed allocation methodology in that "said methodology in all material respects is based upon the New Fontana Agreement and the Tapoco-Nantahala Apportionment Agreement." Under a separate heading, the Commission discussed the manner in which the companies employed the data contained in the NFA and the Apportionment Agreement in greater detail to show why their allocation methodology was not proper for computing Nantahala's retail costs of service.

### The Mathematics of Allocation

In this portion of the order, the Commission described the competing allocation methodologies presented by the companies and the intervenors for determining Nantahala's demand and energy costs. In general, the method proposed by the companies' witness Vander Veen derived the demand and energy charges from the demand and energy entitlements allocated to Nantahala under the NFA and 1971 Apportionment Agreement.

Vander Veen's Nantahala-Tapoco roll-in cost of service study differs fundamentally from the study submitted by the intervenors' witness Springs in that Vander Veen includes the *entire* Alcoa load served by Tapoco *and* TVA for purposes of computing the Nantahala-Tapoco system's demand allocation factor. In other words, Vander Veen adjusted Tapoco's 1975 book figures to re-

flect a non-utility, 235 Mw direct power purchase by Alcoa from TVA pursuant to a separate, non-Fontana Alcoa-TVA purchase contract as if it were part of the Nantahala-Tapoco system's *generating* resources. With this non-utility addition to the system's power supply, Vander Veen performed a demand allocation which assumed that the system peak occurred at the hour of the Nantahala system peak in 1975, and that at that hour Tapoco had available to serve the Alcoa load both Tapoco's NFA entitlements and the full amount of the Alcoa purchase contract (as adjusted) of 235 Mw.

In addition, for demand cost allocation purposes, Vander Veen's method recognizes the distinction between firm and non-firm NFA entitlements. He used only the firm power available under the NFA to meet system demand, thus removing entirely the amount of capacity that can be curtailed and interrupted from the capacity available to serve system load. As the Commission found, the upshot of this technique is to render 90 Mw of actual return entitlements *valueless* for meeting the system demand at any time, whether or not power is actually curtailed, and even when there may be additional make-up demand. Another one-sixth (i.e., 15 Mw) of the 90 Mw interruptible power returned by TVA under the NFA was also taken out of Tapoco's demand allocation, so that a total of 105 Mw was removed for both the curtailable and interruptible power, and rendered valueless for cost allocation purposes. The effect on Nantahala's costs of Vander Veen's technique is to dramatically increase Nantahala's proportionate share of the demand charges even though both Nantahala and Tapoco take under the NFA and Tapoco takes three times as much power as Nantahala.

In contrast to the foregoing cost of service analysis, the intervenors' evidence showed, and the Commission accepted, that the non-utility direct industrial purchases that Alcoa makes from TVA are not properly considered a *utility* function of Tapoco, Nantahala or the combined utility system of both and so are not properly includable in the cost of service allocation. Furthermore, the demand credit Vander Veen assigns to Alcoa because of the interruption and curtailment features of the NFA is not supported by the actual features of the unified system. The Commission adopted the view taken by the intervenors' witness Springs

that use of only firm power available to meet system demand distorts rather than reflects customer cost responsibility.

> Although it is not unusual for an industrial customer to receive a credit for accepting interruptible power, the rationale for this is that the utility providing the service to that customer will save the cost of carrying reserves. The ability of a utility to provide such credits is limited by its need for reserves. There should be no credit for interruptions which do not result in cost savings to the supplying utility. Mr. Vander Veen's demand credit unfairly assigns to other customers the fixed costs necessary to generate the power traded to TVA for this curtailable and interruptible power. The fixed costs of investment, operation, and maintenance for these plants do not cease when TVA curtails delivery to Alcoa under the contractual arrangements.

The Commission accepted the intervenors' evidence that the return entitlements result from the investment, maintenance and operation costs necessary to make the hydroelectric generation of Nantahala and Tapoco available for TVA's demands. Ultimately, the companies' approach was found to unfairly burden the public customers by requiring them to bear costs properly assignable to Alcoa for the fixed costs necessary to generate the power traded to TVA. The Commission again described the reasons why the NFA trade-off distorted customer cost responsibility, and was therefore improper to use as a basis for computing Nantahala's demand and energy costs.

> In essence, the NFA is a trade-off of certain firm power and secondary power, available less than 50% of the time, for lesser amounts of firm and secondary power that are curtailable and interruptible but available more than 50% of the time, since any power available more than 50% of the time is usable by Alcoa in its aluminum smeltering [sic] operations. *The trade-off result, is a considerable improvement in the value of Tapoco's energy useable for Alcoa's aluminum production. The trade-off has no value to the public load. Alcoa (Tapoco) should, therefore, take full cost responsibility for the demand-related costs associated with the capacity traded off.*

In conclusion, the Commission stated that the companies' proposed demand allocation technique would result in a "gross ineq-

uity" to Nantahala and the public load customers, and that demand and energy charges should properly be based upon the capabilities and needs of Nantahala and Tapoco outside of the TVA return entitlements.

Next, the Commission discussed the intervenors' proposed cost allocation methodology and concluded that in view of "the entire evidence of record with respect to the assignment of cost," this method would be employed to determine Nantahala's demand and energy related costs. The data accepted by the Commission as representing the capabilities and needs of the Nantahala-Tapoco unified system appropriate for use in the allocation of demand related costs is as follows:

| | | |
|---|---|---|
| A. Dependable Capacity for NP&L Projects | 85.4 | Mw |
| B. Dependable Capacity of Tapoco Projects | 302.8 | Mw |
| C. Total (A + B) | 388.2 | Mw |
| D. Less Reserve at 3% | 11.3 | Mw |
| E. Net *Firm* Capacity Available to Meet the Load (C − D) | 376.9 | Mw |
| F. Purchase Power of NP&L from TVA | 50.4 | Mw |
| G. Losses on F above (assumed 5%) | 2.5 | Mw |
| H. Total Net *Firm* Capability Available at Generation to Meet the System Requirements of NP&L and Tapoco (E + F + G) | 429.8 | Mw |

Nantahala's peak load during the test year was 105,747 kw, which figure represents its maximum need during the year. Nantahala's demand responsibility for costing purposes was then calculated by dividing the total Nantahala-Tapoco system demand responsibility into Nantahala's maximum demand responsibility. Dividing 429,800 kw into 105,747 kw produces a Nantahala demand allocation of 24.60% of the system's demand responsibility. Using this allocation factor, the Commission assigned 24.60% of the Nantahala-Tapoco unified system demand costs to Nantahala and the balance to Tapoco (Alcoa).

While demand charge allocations must be computed based upon production capacity and capacity needs, energy charge allocations must be computed based upon the average energy available for the Nantahala-Tapoco unified system plus Nantahala's separate purchases from TVA. The data accepted by the Commission as appropriate for use in the allocation of energy related costs is as follows:

A. Average Energy Available from NP&L
   Projects (New Fontana Agreement
   Apportionment Study)                        391,500 Mwh

B. Average Energy Available from
   Tapoco's Projects (New Fontana
   Agreement Apportionment Study)            1,373,600 Mwh

C. Total Average Energy Available from
   NP&L and Tapoco's Projects (A + B)       1,765,100 Mwh

D. NP&L Purchase of Energy from TVA           81,265 Mwh

E. Losses on D above (assumed 5%)              4,063 Mwh

F. Total Average Energy Available to
   Meet System Load (C + D + E)             1,850,428 Mwh

Nantahala's energy requirement during the 1975 test year was 453,548 Mwh. Nantahala's energy responsibility for costing purposes was then calculated by dividing the total Nantahala-Tapoco system energy responsibility into Nantahala's energy responsibility. Dividing 1,850,428 Mwh into 453,548 Mwh produces a Nantahala energy responsibility of 24.51%. Using this allocation factor, the Commission assigned 24.51% of the Nantahala-Tapoco unified energy costs to Nantahala and the balance to Tapoco (Alcoa).

The methods, procedures and results of the intervenors' jurisdictional cost allocation methodology were adopted by the Commission in all material respects for determining Nantahala's retail costs of service. The practical effect of basing Nantahala's costs on actual combined system capabilities and needs was a decrease in the percentage of costs associated with the NFA and 1971 Apportionment Agreement recoverable from Nantahala's retail rate payers. The other "costs" actually incurred by the

unified system under the agreements were effectively allocated for rate making purposes to the systems' industrial customer, Alcoa, on whose behalf the Commission determined they were incurred.

To summarize, this matter was remanded for the purpose of determining whether a roll-in methodology was appropriate for Nantahala and Tapoco. Having determined that it was, and having identified those total system costs related to the supply of energy and those related to the demand for energy, the Commission was left with the task of allocating the appropriate demand and energy costs as between the North Carolina and Tennessee jurisdictional customers. The Commission then adopted the technique of cost allocation proposed by the intervenors' witness Springs, and allocated 24.60% of the combined demand costs and 24.51% of the combined energy costs to Nantahala's cost of service. These Nantahala percentages are calculated upon the relative contributions and needs of Nantahala as part of a combined system and not upon how Nantahala and Tapoco share in the New Fontana Agreement entitlements under the 1971 Apportionment Agreement. Although those contracts limit and rearrange the system's "energy" and "demand" availability, they do not allocate "cost of service" percentages between the retail consumers of the combined system's power. The roll-in and allocation of total system costs merely allowed the Commission to assign customer cost responsibility on the features of the actual system and not the system as reshaped by the New Fontana Agreement. The method does not ignore or alter the results of that agreement, it determines who is to bear the responsibility for the costs associated with the facilities and resources obligated thereunder. Having decided that Alcoa in negotiating the NFA effectuated a trade-off of dependable hydro capacity in return for improving the availability of energy for aluminum production, the Commission concluded that the aluminum production load should be assigned the responsibility for the investment costs and operation and maintenance expenses of the generating facilities for that traded capacity.

As the Commission stated in its order, one of the purposes for the roll-in method of rate making is to "cancel" or at least to "true up" the concealed benefits it found flowing to Alcoa under the power supply agreements. This is but another way of stating

that one purpose of the roll-in is to assign the appropriate cost responsibility for the respective customer demands upon the combined system's power supply resources. Obviously, use of the entitlements contained in these agreements, which do not reflect the investment costs and operation and maintenance expenses of the generating facilities upon which customer cost responsibility must be calculated, to then allocate costs would defeat the very purpose of the roll-in.

Moreover, as Nantahala itself recognizes in its brief, "the 1971 Apportionment Agreement is premised on the fact that Nantahala and Tapoco are separate entities and that the entitlements allocated to Nantahala *are deemed to arise* in exchange for Nantahala's generation just as the entitlements allocated to Tapoco *are deemed to arise* in exchange for Tapoco's generation." (Emphasis added.) The Commission, in rejecting the fiction that Nantahala and Tapoco were developed, designed and operated as separate corporate entities, also rejected the fiction that return entitlements *deemed to arise* in exchange for the value of the generation turned over to TVA can be used as accurate measures of the demand and energy related costs fairly attributable to Nantahala's provision of service to its retail rate payers.

It was the position of the intervenors' expert witness that the system-wide trade-off of costs and benefits under the NFA and 1971 Apportionment Agreement was detrimental to Nantahala's ability to provide service at just and reasonable rates to its public customers and unfairly shifted costs within the system to Nantahala which are properly attributable to Alcoa. Based upon substantial evidence of record, the Commission adopted this position and the roll-in technique proposed to measure and assign customer cost responsibility for the combined system's hydroelectric resources. The roll-in technique chosen by the Commission is fully supported by substantial evidence of record and is a determination which essentially rests within the discretion of the Commission in the exercise of its rate making function. As the United States Supreme Court has observed in reviewing a similar regulatory question, "judgment and discretion control both the separation of property and the allocation of costs when it is sought to reduce to its component parts a [utility] business which functions as an integrated whole." *Colorado Interstate Gas Co. v. FPC*, 324 U.S. at 591, 89 L.Ed. at 1217.

The companies do not argue, nor do we find, any error in judgment or abuse of discretion in the action of the Commission in the Sub 29 (Remanded) proceedings regarding the mechanics of the roll-in or the allocation formula utilized. Briefly stated, the principal arguments advanced by the companies are that the roll-in was impermissible under the doctrine of federal preemption because the two principal power supply contracts at issue are regulated by the FERC and that federal law prohibits the results obtained by the Commission under the roll-in as an undue burden on interstate commerce. We turn next to these and other remaining arguments of the companies concerning the order appealed from.

## II.

### A.

The New Fontana Agreement and its predecessor, the Original Fontana Agreement, effectuate power exchanges between Nantahala, Tapoco and TVA falling within the regulatory jurisdiction of the FERC under Part II of the Federal Power Act. Sections 205 and 206 of the Act, 16 U.S.C. §§ 824d and 824e, give FERC the authority to regulate wholesale rate schedules for the sale of electricity in interstate commerce. As we have seen, the OFA was never filed with FERC's predecessor, the FPC, as a tariff or rate schedule and the FPC never ruled upon the substantive terms of that agreement. The NFA was filed with the FPC "under protest" by Tapoco and Nantahala in response to the FPC's request that the companies do so. The NFA was formally designated "Tapoco Rate Schedule No. 3" and "Nantahala Rate Schedule No. 1" in 1966. No substantive review of its terms was undertaken by the FPC until Nantahala's wholesale customers raised the matter in 1978. The 1971 Apportionment Agreement, a contract affecting rates and charges under the Act, was not filed with the FPC until 1980, in conjunction with the foregoing complaint by Nantahala's customers. The contract was then designated as "Supplement 2 to Tapoco Schedule 3" and as a "Supplement to Nantahala Schedule No. 1." Again, substantive review of the operative effect of this agreement upon Nantahala's wholesale rates was not undertaken by FERC until 1980.

[7] Now, at the close of a forty-year period marked by an "apparent determination never willingly to submit any of its hydro

projects to the duly enacted requirements of Federal law," 2 F.P.C. at 390, Nantahala and Alcoa argue, in effect, that FERC's exclusive jurisdiction to regulate interstate wholesale power transactions and to set wholesale rates preempts the North Carolina Utilities Commission from implementing a jurisdictional cost allocation formula which fails to utilize the proportion of NFA demand and energy entitlements allocated to Nantahala under the 1971 Apportionment Agreement in determining Nantahala's retail costs of service. Before addressing the separate and specific contentions of the companies, we will briefly review the legal and regulatory framework under which these issues arise.

1.

The doctrine of preemption is based upon the Supremacy Clause of the United States Constitution. U.S. Const., art. VI, cl. 2. When Congress legislates in an area within the federal domain, it may, if it chooses, take for itself all regulatory authority over the subject, share the task with the states, or adopt as federal policy the state scheme of regulation. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 91 L.Ed. 1447 (1947). The question in each case is the intent of Congress. *Id.* As the United States Supreme Court recently observed, "[m]aintaining the proper balance between federal and state authority in the regulation of electric and other energy utilities has long been a serious challenge to both judicial and congressional wisdom. On the one hand, regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States. . . . On the other hand, the production and transmission of energy is an activity particularly likely to affect more than one State, and its effect on interstate commerce is often significant enough that uncontrolled regulation by the States can patently interfere with broader national interests." (Citations omitted.) *Arkansas Elec. Coop. Corp. v. Arkansas Public Serv. Comm.*, 461 U.S. 375, 377, 76 L.Ed. 2d 1, 6 (1983). The Federal Water Power Act, now Part I of the Federal Power Act, 16 U.S.C. §§ 791a-823a, was enacted by Congress under its Commerce Clause powers in 1920. *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340, 71 L.Ed. 2d 188, 196 (1982). The potential of water power as a source of electric energy led Congress to exercise its constitutional authority over navigable streams to regulate and encourage development of hydroelec-

tric power generation "to meet the needs of an expanding economy." *Id.* at 340, 71 L.Ed. 2d at 196, *quoting FPC v. Union Electric Co.*, 381 U.S. 90, 99, 14 L.Ed. 2d 239, 246 (1965).

Part II of the Federal Power Act, 16 U.S.C. §§ 824-824k, was enacted by Congress in 1935 as a "direct result" of the Supreme Court's holding in *Public Utilities Comm'n v. Attleboro Steam & Electric Co.*, 273 U.S. 83, 71 L.Ed. 54 (1927) that the states lacked power to regulate the rates governing interstate sales of electricity for resale. It delegated to the FPC, now the FERC, exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce, without regard to source of production. *New England Power Co. v. New Hampshire*, 455 U.S. 331, 71 L.Ed. 2d 188. This portion of the Act was intended to "fill the gap" created by *Attleboro* with the establishment of exclusive federal jurisdiction over such sales. *Id.*

> What Congress did was to adopt the test developed in the *Attleboro* line which denied state power to regulate a sale "at wholesale to local distributing companies" and allowed state regulation of a sale at "local retail rates to ultimate consumers."
>
> *      *      *
>
> . . . Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction making unnecessary . . . case-by-case analysis. This was done in the Power Act by making FPC jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States.

*FPC v. Southern Cal. Edison Co.*, 376 U.S. 205, 214, 215-16, 11 L.Ed. 2d 638, 646, *reh'g denied*, 377 U.S. 913, 12 L.Ed. 2d 183 (1964), *quoting Illinois Natural Gas Co. v. Central Illinois Pub. Serv. Co.*, 314 U.S. 498, 504, 86 L.Ed. 371, 375 (1942).

Exclusive federal jurisdiction in setting wholesale power rates was thought necessary because concurrent, conflicting state regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Chicago and N.W. Transp. Co. v. Kaylo Brick & Tile Co.*, 450 U.S. 311, 317, 67 L.Ed. 2d 258, 265 (1981). A state's independent assessment of

wholesale, *interstate* rates "could seriously impair the Federal Commission's authority to regulate a field over which Congress has given the Federal Power Commission [FERC] paramount and exclusive authority." *Northern Gas Co. v. Kansas Comm'n*, 372 U.S. 84, 92, 9 L.Ed. 2d 601, 608 (1963).

[8]  Thus, FERC is prohibited from regulating intrastate retail rates charged to ultimate consumers and the states are prohibited from regulating interstate wholesale rates charged to local distributing companies. The result is a blend of federal-state regulation, each body with exclusive authority in its respective field. *Narragansett Electric Co. v. Burke*, 119 R.I. 559, 381 A. 2d 1358 (1977), *cert. denied*, 435 U.S. 972, 56 L.Ed. 2d 63 (1978); *Public Serv. Co. of Colo. v. Public Utils. Comm'n of Colo.*, 644 P. 2d 933 (Colo. 1982).

[9]  Wholesale rates charged under the Federal Power Act must be "just and reasonable." 16 U.S.C. § 824d(a). Utilities regulated by the act are required to file rate schedules with the FERC, which has authority to investigate and modify new schedules. 16 U.S.C. § 624d(b) and (d). As a result of FERC's exclusive power to establish reasonable rates for utilities subject to its jurisdiction, a utility subject to FERC jurisdiction "can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the [FERC], and not even a court can authorize commerce in the commodity on other terms. [T]he right to a reasonable rate is the right to the rate which the [FERC] files or fixes. . . ." *Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251, 95 L.Ed. 912, 919 (1951). Thus, the North Carolina Utilities Commission is preempted from directly or indirectly regulating the wholesale rate structure created by the New Fontana and 1971 Apportionment Agreements or inquiring into the reasonableness of those FERC-filed wholesale rate schedules when it acts in fixing Nantahala's retail rates.

Nantahala and Alcoa present a number of overlapping and somewhat confused arguments regarding their contention that the doctrine of federal preemption stands as a bar to the Commission's order. It appears, however, that in essence both Nantahala and Alcoa argue that the Commission has directly interfered with FERC's exclusive and paramount jurisdiction over the NFA and 1971 Apportionment Agreement by reviewing the reasonableness

of these contracts and has indirectly intruded upon that jurisdiction by disregarding or altering the level of costs and expenses attributed to Nantahala as if it were a stand-alone company under these contracts. We disagree.

With respect to the former argument, it is clear that the Commission's examination of the NFA and 1971 Apportionment Agreement was not undertaken in an effort to either establish wholesale rates or to modify agreements filed with and approved by the FERC. In its order reducing rates the Commission expressly rejected the remedy of reforming these agreements to award Nantahala its just level of entitlements and nothing contained in the Commission's order purports to change or modify a single word of the several contracts or agreements involved, or the actual flow of power thereunder.

The companies rely heavily upon the holdings in *Attleboro* and *Southern California Edison* to challenge the authority of the Commission to implement the roll-in methodology proposed by the intervenors. We find that reliance to be misplaced. In each of those cases the dispositive fact under the doctrine of federal preemption was the state commission's specific modification of a contract establishing a wholesale rate. In the instant case, neither the contracts themselves nor the wholesale rates fixed thereunder were changed by the Commission in its order. The roll-in was used solely to determine the unified rate base, operating costs and revenues of Nantahala and Tapoco and to allocate jurisdictional costs of service in the process of fixing Nantahala's retail rates to its North Carolina consumers. *Attleboro* and *Southern California Edison* confirm, rather than deny, the propriety of state regulation of retail electric power rates.

Nor are we persuaded by the companies' arguments that the Commission has indirectly intruded upon the federal regulatory domain by disallowing or altering the interstate wholesale costs and expenses borne by Nantahala under the NFA and the 1971 Apportionment Agreement. Rather, we find the Commission's treatment of those wholesale costs to be well within the field of exclusive state rate making authority engendered by the "bright line" between state and federal regulatory jurisdiction under the Federal Power Act.

The Utilities Commission is the administrative agency charged with the duty of regulating the intrastate retail rates of public utilities within the State of North Carolina. N.C.G.S. § 62-32. Under N.C.G.S. Chapter 62, the Commission is authorized to conduct hearings to investigate the propriety of proposed rate changes and to make such orders with regard to the proposed rate as may be just and reasonable. In fixing rates under N.C.G.S. § 62-133, the Commission must fix such rates "as shall be fair to both the public utility and to the consumer." N.C.G.S. § 62-133(a). The basic theory of utility rate making pursuant to that statute is that rates should be fixed at a level which will recover the cost of service to which the rate is applied, plus a fair return to the utility. *Utilities Comm. v. Edmisten, Atty. General*, 291 N.C. 451, 232 S.E. 2d 184 (1977). This provision of Chapter 62 lays down the procedure by which the Commission is to fix rates "which will enable the utility 'by sound management' to pay all of its costs of operation, including maintenance, depreciation and taxes, and have left a fair return upon the fair value of its properties." *Utilities Comm. v. Telephone Co.*, 285 N.C. 671, 680-81, 208 S.E. 2d 681, 687 (1974). However, the primary purpose of Chapter 62 is to assure the public of adequate service at a reasonable charge; the provisions of this Chapter designed to assure the utility of adequate revenues are in the nature of corollaries to the basic proposition that the public is entitled to adequate service at reasonable rates. In addition such "corollaries" act as safeguards against arbitrary and unconstitutional administrative action. *Id.*

N.C.G.S. § 62-133 prescribes the formula which the Commission is required to follow in fixing rates for service to be charged by any public utility in pertinent part as follows:

(b) In fixing such rates, the Commission shall:

(1) Ascertain the reasonable original cost of the public utility's *property used and useful . . . in providing the service rendered to the public within* this State. . . .

                    *    *    *

(3) Ascertain such public utility's reasonable operating expenses, including actual investment currently consumed through reasonable actual depreciation. (Emphasis added.)

The fair value of the property described in paragraph (b)(1) is the rate base. Additionally, paragraph (c) of this statute allows the consideration of evidence of changes in costs, revenues, or the cost of the public utility's property used and useful "in providing the service rendered to the public within this State," within a reasonable time after the test period.

[10] Clearly, the statute limits the property upon which the North Carolina consumers are required to pay a return to the property used and useful in providing *intrastate* service. When the provisions of N.C.G.S. § 62-133(b)(1), (b)(3) and (c) are read *in pari materia, see Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 287 S.E. 2d 786 (1982), it is apparent that the only operating expenses which the Commission may consider in setting intrastate rates for North Carolina public utilities are those incurred in the provision of service to the utility's North Carolina consumers. *See, e.g., Utilities Comm. v. Edmisten, Attorney General*, 291 N.C. 424, 430, 230 S.E. 2d 647, 651 (1976) (systemwide cost of service study which significantly varied from results produced by a study based solely on North Carolina data would be incompetent since, "North Carolina rates may not be structured by external system usage"); *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 366, 189 S.E. 2d 705, 751 (1972) (" 'North Carolina users of telephones are not to be required to furnish revenue to maintain applicant's financial condition which other states refuse to provide' "); *Utilities Commission v. State of North Carolina*, 239 N.C. 333, 345-46, 80 S.E. 2d 133, 141 (1954) ("Strictly speaking what is the fair value of applicant's investment in its intrastate business in this State and what constitutes a fair return thereon are the primary questions before the Commission for decision"). Accordingly, jurisdictional cost allocation is a necessary step in any general rate case involving a public utility or utility system whose separate companies are operated as a single enterprise serving both jurisdictional (intrastate retail) and non-jurisdictional consumers. *See also Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 89 L.Ed. 1206.

[11] Additionally, in construing the provisions of N.C.G.S. § 62-133, the Commission must also consider section (d) of that statute, which provides that the "Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates." N.C.G.S. § 62-133(d) has been

construed as a device permitting the Commission to take action consistent with the overall command of the general rate statutes, but not specifically mentioned in those portions of the statute under consideration in a given case. *See, e.g., Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 287 S.E. 2d 786 (Commission correctly considered non-statutory material factor concerning depreciation expenses in determining what are reasonable and just rates pursuant to N.C.G.S. § 62-133(d) ). *See also Utilities Commission v. Public Staff*, 58 N.C. App. 453, 293 S.E. 2d 888 (1982), *modified and affirmed*, 309 N.C. 195, 306 S.E. 2d 435 (1983) (Commission must take other factors such as the efficiency of the company's operations into account in fixing its rates in a general rate case). In sum, the fixing of "reasonable and just" rates involves a balancing of shareholder and consumer interests. The Commission must therefore set rates which will protect both the right of the public utility to earn a fair rate of return for its shareholders and ensure its financial integrity, while also protecting the right of the utility's intrastate customers to pay a retail rate which reasonably and fairly reflects the cost of service rendered on their behalf.

[12, 13] The fundamental question as to whether certain expenditures are to be included in the operating expenses a utility is entitled to collect from its customers is one of fact to be ascertained by the regulating authority. *See generally*, 1 Priest, *Principles of Public Utility Regulation* 45 (1969). "If properly incurred, they must be allowed as part of the composition of the rates. Otherwise, the so-called allowance of a return upon the investment, being an amount over and above expenses, would be a farce." *Mississippi River Fuel Corp. v. FPC*, 163 F. 2d 433, 437 (1947). *Accord Narragansett Electric Co. v. Burke*, 119 R.I. 559, 381 A. 2d 1358. As a corollary to the foregoing proposition, it is also true that ordinarily, the Commission may, in a proper case, refuse to allow the utility to include in its reasonable operating expenses, the full price it actually paid for power as a result of its contractual power supply arrangements. *Utilities Comm. v. Intervenor Residents*, 305 N.C. 62, 286 S.E. 2d 770 (1982). This is especially so where the operating expense being investigated by the Commission is one incurred through a contract between or including the utility company and its affiliated companies, including parent corporations and subsidiaries of parent corporations. *Id.* In such

cases the burden of persuasion on the issue of reasonableness always rests with the utility; charges arising out of intercompany relationships between affiliated companies should be scrutinized with care and may be properly refused or disallowed in the absence of a showing of their reasonableness. *Id.*; *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705.

[14] A major operating expense which the Commission must necessarily consider in arriving at reasonable and just rates for Nantahala is the "cost" of power Nantahala incurs under the power supply agreements with its affiliates and TVA. However, the Commission's otherwise plenary authority to investigate transactions between a public utility and its affiliated companies, and to disallow operating expenses found to be imprudently incurred or allocated under such agreements, is limited by prior federal approval of the rate or price in question under the "filed rate" doctrine of *Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 95 L.Ed. 912. There, the United States Supreme Court stated:

> We hold that the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable.

*Id.* at 251-52, 95 L.Ed. at 919. Thus, neither the state public service commission nor the courts can unilaterally establish a different rate for wholesale electric power sold in interstate commerce because they are of the opinion that the FERC-filed or approved rate is unfair or unreasonable. *See Public Serv. Co. of Colo. v. Public Utils. Comm'n of Colo.*, 644 P. 2d 933.

Those state courts which have considered the question have uniformly agreed that a utility's costs based upon a FERC-filed rate must be treated as a reasonably incurred operating expense for the purposes of setting an appropriate retail rate. *Narragansett Electric Co. v. Burke*, 119 R.I. 559, 381 A. 2d 1358; *Public Serv. Co. of Colo. v. Public Utils. Comm'n of Colo.*, 644 P. 2d 933; *United Gas Corp. v. Mississippi Pub. Serv. Comm'n*, 240 Miss. 405, 127 So. 2d 404 (1961); *City of Chicago v. Illinois Commerce Comm'n*, 13 Ill. 2d 607, 150 N.E. 2d 776 (1958); *Citizen Gas Users Ass'n v. Public Util. Comm'n*, 165 Ohio St. 536, 138 N.E. 2d

383 (1956); *Eastern Edison Co. v. Dept. of Public Util.*, 388 Mass. 292, 446 N.E. 2d 684 (1983); *Pike Cty. Light & Power v. Pennsylvania*, 465 A. 2d 735 (Pa. Cmwlth. 1983); *Washington Gas Light Co. v. Public Serv. Comm'n*, 452 A. 2d 375 (D.C. App. 1982), *cert. denied*, 462 U.S. 1107, 77 L.Ed. 2d 1334 (1983). "Otherwise, a State utilities commission could review the reasonableness of the FERC-filed wholesale rate in a proceeding establishing retail rates, in violation of the Federal Power Act." *Eastern Edison Co. v. Dept. of Public Util.*, 388 Mass. at 300, 446 N.E. 2d at 689; *Northern States Power Co. v. Minnesota P.U.C.*, 344 N.W. 2d 374 (Minn.), *cert. denied, Humphrey v. North States Power Co.*, 467 U.S. 1256, 82 L.Ed. 2d 850 (1984); *Northern States Power Co. v. Hagen*, 314 N.W. 2d 32 (N.D. 1981); *Office of Public Counsellor v. Indiana & Michigan Electric Co.*, 416 N.E. 2d 161 (Ind. App. 1961). *See also Northern Gas Co. v. Kansas Comm'n*, 372 U.S. 84, 9 L.Ed. 2d 601. *See generally*, 16 A.L.R. 4th 454, § 3(b).

Nantahala and Alcoa rely heavily upon the foregoing line of cases in support of their arguments that the utilization of the roll-in in the instant case violates the Supremacy Clause of the United States Constitution because it is inconsistent with federal jurisdiction over the NFA and the 1971 Apportionment Agreement. The companies contend, in effect, that the Commission's failure to base Nantahala's demand and energy related costs on the quantity and design of entitlements assigned to Nantahala on a stand-alone basis under these agreements is tantamount to a disallowance of costs actually borne by Nantahala and as such constitutes an impermissible, indirect intrusion into the federal regulatory domain. We reject the companies' various federal preemption arguments for two reasons: (1) their reliance upon the *"Narragansett-Northern States"* line of authority to establish a Supremacy Clause violation is misplaced and (2) their arguments rest upon the faulty premise that FERC deemed both the NFA and the 1971 Apportionment Agreement to be fair and reasonable to Nantahala, when in fact it expressly ruled that the latter agreement was "unfair" and refused to permit Nantahala to base its requested wholesale rate increase upon the costs incurred thereunder.

The rule requiring state commissions to "treat" costs based upon FERC-filed rates as reasonably incurred operating expenses, thus preventing the automatic disallowance of these costs, has not

been held to preclude state authority to determine whether these costs should be automatically passed through to retail consumers in the form of higher rates. For example, in the *Narragansett* case itself, the Rhode Island Supreme Court concluded that although the state utilities commission had to consider the cost of electricity to the local distributing company based upon its supplier's federally filed wholesale rate as an actual operating expense, it was not required to adjust Narragansett's retail rates to reflect the increased wholesale costs under its PPCA (Purchased Power Cost Adjustment) provisions. The court reasoned that in view of the state utilities commission's broad discretion over the operation of the PPCA under the applicable state statutes and the PPCA provisions, the commission was free to "treat the proposed rate increase as it treats other filings for charged rates under [state statute] and investigate the overall financial structure of Narragansett to determine whether the company has experienced savings in other areas which might offset the increased price for power." 119 R.I. at 568, 381 A. 2d at 1363.

The Colorado Public Utilities Commission and the Colorado Supreme Court have stated even more explicitly that state commissions have the authority to determine that certain FERC-regulated wholesale costs are not incurred for the benefit of retail customers and therefore need not be passed on to retail customers in their rate schedules. In *In Re Western Slope Gas Co.*, 31 P.U.R. 4th 93 (Colo. PUC 1979), *aff'd, Public Serv. Co. of Colo. v. Public Utils. Comm'n of Colo.*, 644 P. 2d 933, a natural gas utility sought to pass through the costs of its wholesale gas purchases in retail rates by means of purchased gas adjustment clauses. These costs, including surcharges to cover expenses of the Gas Research Institute ("GRI"), a research and development firm supported by the natural gas industry, were regulated by FERC. The Colorado Commission conceded that it was obligated to treat these costs as reasonably incurred operating expenses. However, the commission refused to allow the costs to be flowed through automatically to retail customers, stating that under *Narragansett*, it was free to determine whether those costs should be reflected in retail rates. 31 P.U.R. 4th at 107. The Colorado commission questioned the propriety of forcing retail customers to bear the expense due to their inability to exercise control over the expenditure of GRI

funds and because most of the benefits would flow to the gas utilities themselves and to other related private interests.

The Colorado Supreme Court upheld the commission's decision that these GRI expenses need not be passed through automatically to consumers. The court concluded that although FERC-regulated GRI expenses must be treated as reasonable and prudent operating expenses, the state commission had the authority to scrutinize such costs in a general rate case "to balance the interests of the utility investors and the ultimate consumers in arriving at a just and reasonable rate. . . ." 644 P. 2d at 941. The Colorado Supreme Court specifically recognized the Colorado commission's concern that GRI costs benefit a utility and its shareholders far more than the utility's customers. *Id.* at 941, n.10. The court concluded its opinion by stating, "[s]o long as the PUC considers the GRI adjustment charge as a reasonably incurred operating expense of a local distribution company, as it is legally required to do, its decision to refrain from automatically passing such charges on to the ultimate consumers falls within its administrative discretion." *Id.* at 942.

In *Washington Gas Light Co. v. Public Serv. Comm'n,* 452 A. 2d 375, the District of Columbia Court of Appeals faced the same question considered in *Public Serv. Co. of Colorado.* That is, whether increases including GRI expenses reflected in a utility's FERC-regulated wholesale gas costs should be passed through to retail customers in the form of a rate increase. The local commission had disallowed the increased GRI charges as reasonable operating expenses on the grounds that FERC's authority to approve these charges was the subject of an appeal pending at the time of the commission's decision and so the costs attributed thereto were not a "measurable and certain expense." 452 A. 2d at 385. The court reversed the commission's refusal to allow the increased GRI charges to be reflected in retail rates based upon its own independent inquiry into the reasonableness of the GRI charges on the grounds that the commission was without authority to disregard a FERC order which had not been stayed during proceedings for review and was therefore in full force and effect. *Id.* at 386.

However, in the course of its discussion, the court made it quite clear that it remained within the local commission's authori-

ty to determine that the expenses should not automatically be passed through to retail customers.

> FERC's jurisdiction [does not extend] to the issue of whether increased wholesale costs shall be passed through to retail customers by the local utility. The determination of the extent to which wholesale costs should be reflected in local utility rates lies exclusively with local utility commissions. *See* [*Narragansett*].

*Id.* at 385, n.15. *Accord Pike Cty. Light & Power v. Pennsylvania*, 465 A. 2d 735, 738 (FERC's jurisdiction extends to the setting of rates for out-of-state parent utility to charge local electric utility at wholesale; however, state utility commission has exclusive jurisdiction, as a matter of retail rate making, to determine whether it was just and reasonable for local utility to incur the parent's rates and charges as an expense of operation in light of available alternatives); *Kansas-Nebraska Natural Gas Co., Inc. v. State Corporation Commission*, 4 Kan. App. 2d 674, 610 P. 2d 121 (1980) (FERC's regulation of an advance payment contract with an affiliate does not preclude state public service commission's scrutiny of the agreement to determine, not whether the agreement was reasonable, but whether it was *required* for service to the local rate payers). *See also Eastern Edison Co. v. Dept. of Public Util.*, 388 Mass. 292, 446 N.E. 2d 684 (*Narragansett* and *Public Service Co. of Colorado* discussed with approval although holdings distinguished on the grounds that the Massachusetts statutes require automatic flow-through of all reasonably incurred fuel and purchased power expenses; Massachusetts commission had no authority to consider factors other than the companies' fuel costs).

Thus, several cases in the *Narragansett* line expressly recognize that a state commission retains the discretion to do exactly what the Commission has done in the instant case: determine that certain of a utility's costs were effectively incurred for the benefit of its shareholder, not its retail consumers, and therefore should be borne by the shareholder, and not by the utility's retail rate payers. The cases upon which Nantahala and Alcoa place principal reliance, *Northern States Power Co. v. Hagen*, 314 N.W. 2d 32, the related case of *Northern States Power Co. v. Minnesota P.U.C.*, 344 N.W. 2d 374, and *Office of*

*Public Counsellor v. Indiana and Michigan Electric Co.*, 416 N.E. 2d 161, do not lead to a different conclusion.

Both *Northern States* cases involved an agreement which allocated losses incurred by an interstate utility enterprise operating in Minnesota and Wisconsin, when the Tyrone Nuclear Power Project (to be located in Wisconsin) was abandoned. The parties to the agreement, Northern States Power (NSP), a Minnesota corporation, and its wholly-owned subsidiary, Northern States Power-Wisconsin (NSP-W), a Wisconsin corporation, served, respectively, electric customers in four states, with NSP serving Minnesota, North Dakota and South Dakota and NSP-W serving only Wisconsin. Although NSP and NSP-W both originally owned an interest in Tyrone, NSP transferred its share in the project to NSP-W to comply with Wisconsin law. The transfer did not effect any change in the planned use of the project to serve the single system's various customers. NSP and NSP-W operated under the aforementioned Coordinating Agreement (CA), filed with FERC, by which they shared the total system cost of power generation in a ratio roughly proportionate to the ultimate use by the customers of each. The companies filed an amendment to the CA which was designed to allocate Tyrone abandonment costs under the same allocation formula by which the companies' wholesale rates are computed. FERC ultimately approved the amendment to the CA. Thereafter, NSP sought to "pass through" the Tyrone losses to its retail rate payers in its respective service areas, claiming that FERC's approval of the amended CA resulted in the establishment of an interstate wholesale rate which state commissions were preempted from reviewing for the purpose of retail rate making. However, both the North Dakota Public Service Commission and the Minnesota Public Utilities Commission rejected NSP's arguments that FERC approval of the amended CA automatically required the state commissions to allow NSP to treat its share of the Tyrone losses as a reasonable operating expense to be borne by NSP's North Dakota and Minnesota retail rate payers. The supreme courts of both states reversed the orders of their respective state commissions disallowing the Tyrone-related costs on the ground that the reasonableness of a formula wholesale rate filed and approved by FERC cannot be relitigated in a retail rate proceeding before a state utilities commission.

In *Northern States Power Co. v. Hagen,* the North Dakota court noted that NSP is required by the FERC order to pay a fixed wholesale rate for electricity to NSP-W which includes the amortization of the Tyrone losses. 314 N.W. 2d at 37. The court reasoned that since the North Dakota Public Service Commission had no direct jurisdiction over the interstate wholesale rates, "it would undermine the supremacy clause and the preemption doctrine for the PSC to indirectly assert jurisdiction over the wholesale rates by investigating the reasonableness of underlying [wholesale] costs in a proceeding involving retail rates." *Id.* at 38. The court concluded by stating that for purposes of fixing intrastate rates, the PSC must treat costs incurred under NSP's filed interstate wholesale rates as reasonable operating expenses. The Supreme Court of Minnesota, when faced with the identical question in *Northern States Power Co. v. Minnesota P.U.C.,* came to the identical conclusion and held that the Minnesota Public Utilities Commission was required to treat the Tyrone-related costs incurred under the FERC-approved wholesale rate formula as expenses for power purchased in determining retail rates. 344 N.W. 2d at 382.

It is thus evident that the *Northern States* cases are clearly distinguishable from the instant case in that they both involved the direct disallowance by the respective state commissions of wholesale costs approved by FERC in the exercise of its exclusive rate making authority. As we have previously stated, the Commission did not disallow any of the system costs incurred by both Nantahala and Tapoco under the NFA and 1971 Apportionment Agreement in determining the aggregate rate base and operating expenses of the rolled-in system. Rather, *all costs* attributed to Nantahala and Tapoco were *recognized and allowed* by the roll-in; the difference between "book" costs and "reasonable" costs resulting from the Commission's discretionary determination that only a certain percentage of Nantahala's book costs were incurred in serving the combined system's intrastate retail customers.

For similar reasons, we find the companies' reliance upon *Office of Public Counsellor v. Indiana & Michigan Electric Co.* to be misplaced. Again, the challenged action by the state public service commission in that case was the disallowance of a particular purchased power expense incurred by the local Indiana utility, Indiana & Michigan Electric Co. (I&M), under an interstate,

wholesale power agreement with its wholly-owned subsidiary, Indiana & Michigan Power Co. (IMP). IMP's principal assets are two nuclear power production units located in Michigan. IMP's total output of electric power is sold to I&M pursuant to a FERC-regulated power agreement which provides that I&M is entitled to all of the energy generated by IMP units, and in return, I&M is obligated to compensate IMP for all costs of production and purchase power, including a return on equity. The Public Service Commission of Indiana determined that the property of the Michigan subsidiary was "used and useful" in serving the customers of the parent local utility and should therefore be included in its rate base.

In reversing that decision, the Indiana court placed great emphasis on the fact that the contract by which the parent purchased the electricity from the subsidiary, which was subject to the exclusive jurisdiction of the FERC, included a provision specifically allowing the subsidiary a return on its equity so that a "fair rate of return under the contract is computed by the FERC." *Office of Public Counsellor*, 416 N.E. 2d at 164. Thus, the court concluded that for the state commission to include the subsidiary's assets in the parent's rate base would permit the state commission to determine a cost of service and rate of return for the subsidiary *other than* the FERC established rate and would constitute an impermissible collateral attack on the authority of the FERC.

> The FERC and the Commission do not share concurrent jurisdiction with regard to the proper rate of return on IMP assets. Rather, the FERC has exclusive jurisdiction over the regulation of wholesale interstate power sales. Any attempt by the Commission to assign a rate of return attributable to IMP's cost of power clearly encroaches upon the FERC's duties and powers.

*Id.* at 165.

Nantahala relies on the Indiana decision in support of its argument that the Commission's "attempt to roll-together Nantahala and Tapoco and allocate a lower level of costs and expenses to Nantahala than Nantahala actually incurs under the NFA and 1971 Apportionment Agreement constitutes an intrusion upon FERC jurisdiction over those agreements, similar in

nature to the discredited 'roll-in' of I&M and IMP by the Indiana Commission." We do not agree. Again, the roll-in of Nantahala and Tapoco resulted in no disallowance or alteration of FERC-approved costs, expenses or rates of return. Nantahala's retail rates could be lowered because a lesser quantum of higher cost Nantahala energy has been averaged with a higher quantum of lower cost Tapoco energy. As a result, the average cost of roll-in energy is lower than the cost of Nantahala-only energy. Moreover, it is obvious that the "roll-in" attempted by the Indiana commission entailed a far more direct intrusion into FERC's regulatory domain in the form of a redetermination of the FERC-established rate of return for IMP's property, which fell exclusively under FERC's jurisdiction by the very terms of the interstate power agreement. Here, FERC has no authority, either exclusive or concurrent, to determine Nantahala's rate of return on its assets or the costs of service associated with providing Nantahala's intrastate retail customers with electricity. Rather, these determinations fall within the exclusive rate making jurisdiction of the North Carolina Utilities Commission.

Indeed, state commissions have been held to expressly retain, under the "filed rate" doctrine, the authority to decline to automatically reflect operating expenses incurred under FERC-regulated rate schedules or contracts in the structure of intrastate retail rates where, for example, the state commission determines (1) that increases in FERC-approved charges in one area of the utility's operations were not offset by economies in other areas (*Narragansett*); (2) that certain FERC-regulated costs were not, either in whole or in part, primarily incurred for the benefit of retail rate payers, but rather for the benefit of the utility's investors (*Public Serv. Co. of Colo.; Washington Gas Light Co.*); (3) that in light of available alternatives, certain FERC-approved expenses charged by a parent to the local utility were not reasonably attributable to the costs of serving local rate payers (*Pike Cty. Light & Power*); and (4) that certain FERC-regulated payments between parent and subsidiary were not required for service to the local rate payers (*Kansas-Nebraska Natural Gas Co.*).

In this case, the Commission, in carrying out its duty to determine what are reasonable and just rates for Nantahala's intrastate retail customers to pay for electric service, made a

searching examination of "all material facts of record," as it is required to do by N.C.G.S. § 62-133(d), including but not limited to, the effect of the FERC-filed power supply contracts on Nantahala's costs of service. It also considered the entire historical development of the Nantahala-Tapoco electric system and the intercorporate allocation of the costs and benefits associated therewith.

The Commission's extensive and detailed findings of fact taken as a whole effectively demonstrate that certain portions of the operating expenses Nantahala incurs under the NFA and 1971 Apportionment Agreement were not incurred for the benefit of Nantahala's retail rate payers, were not required for their service and were not offset by compensating economies or benefits in other areas of the utility's operations. In addition, the Commission determined that Nantahala's parent Alcoa, which is also the single largest customer of the combined system, had so dominated Nantahala that the utility was unable to act either in its own self-interest or in the interests of its public customers and that through its domination, Alcoa had received substantial concealed benefits, by means of the contractual and intercorporate structure of the "Alcoa power system," to the corresponding detriment of Nantahala's ability to render service at reasonable and just rates to its public customers. In this regard, the Commission determined that one of the most fundamental of the concealed benefits flowing to Alcoa under the NFA was the trading away of hydroelectric capacity suitable for serving a public load, at a time of sustained growth in that load, in return for entitlements structured to be of far more value for aluminum smelting than for public service.

Accordingly, the Commission determined that to the extent that Alcoa had caused Nantahala to trade capacity and energy suitable and usable for serving its public load, the costs associated with that trade-off would be borne by Alcoa and not by the retail rate payers who lost the benefit of these resources and facilities of Nantahala through intercorporate transactions over which they had no control. This determination lies well within the sphere of state regulatory authority delineated in the *Narragansett-Northern States* line of cases relied upon by the companies in support of their preemption arguments.

[15]   Moreover, none of the cases relied upon by the companies dealt with the particular situation presented by the facts in this case. In effect, the Commission has recognized that two affiliated North Carolina public utilities, Nantahala and Tapoco, both of whom are controlled by their parent-customer Alcoa, itself a North Carolina statutory public utility, were in substance providing a joint service to retail customers in North Carolina, as well as to Alcoa, although the public service in North Carolina was labeled as service from Nantahala alone. By means of the roll-in, the Commission set the "Nantahala" retail rates by combining the financial data of the two affiliates into a unified rate base, and determined on a conventional load responsibility basis what portion of the rolled-in system's costs should be borne by the non-Alcoa customers, to produce the same billing rates as would result from an explicitly joint service at lawful, nondiscriminatory rates. Thus, it disregarded only the fiction of Tapoco as a separate utility system serving only Alcoa, in order to ensure that the joint Nantahala-Tapoco service to North Carolina retail customers was provided at just and reasonable rates. Insofar as the Commission determined that Alcoa as corporate parent and private industrial customer had benefited at the expense of the public load from the corporate and power supply arrangements it imposed upon its subsidiaries, it was well within its regulatory authority to decide that the costs associated with those benefits would not be borne by the public consumers in the form of higher retail rates, but would be borne by the company's customer and sole shareholder, Alcoa.

In practice, the Commission's roll-in methodology accepted Nantahala's and Tapoco's entitlements under the NFA and 1971 Apportionment Agreement, and Nantahala's supplementary purchases from TVA, as elements of the combined Nantahala-Tapoco cost of service. The Commission then determined that it was inappropriate to allow Nantahala to collect all of its revenue requirements from its public customers on the theory that it was a stand-alone company, because Nantahala's "stand-alone" costs under the corporate and contractual arrangements were not incurred for their benefit, but as a result of Alcoa's corporate dominance for Alcoa's benefit. The Commission's finding of Alcoa domination, to the extent it is based on findings of concealed benefits to Alcoa from the NFA and 1971 Apportionment Agree-

ment, is not the same as a finding that those agreements were unjust and unreasonable as wholesale rate schedules or contracts affecting wholesale rates. Rather, it is a finding that to the extent that Alcoa, rather than Nantahala and its customers, benefited from those agreements, Alcoa should bear the corresponding costs (the difference between Nantahala's actual retail collections and the costs that reasonably should be borne by its retail customers).

[16] In short, contrary to the companies' assertions, the "filed rate" doctrine does not require that the Commission, in determining the proper costs to Nantahala's retail customers for the service provided to them, use demand and energy factors based upon the proportion of entitlements allocated to Nantahala alone under the NFA and 1971 Apportionment Agreement. Thus, we are unpersuaded by the arguments of Nantahala and Alcoa that this action on the part of the Commission directly or indirectly interferes with FERC's exclusive regulatory authority under the Federal Power Act.

2.

We are equally unpersuaded that the order conflicts with specific FERC actions taken with respect to the NFA and 1971 Apportionment Agreement. In fact, we find the Commission's rate making methodology to be consistent with FERC's own actions in the parallel wholesale rate case, *Nantahala Power and Light Co.*, Opin. No. 139, 19 F.E.R.C. ¶ 61,152 (1982) and Opin. No. 139-A, 20 F.E.R.C. ¶ 61,430, *affirmed on appeal, Nantahala Power and Light Co. v. FERC*, 727 F. 2d 1342.

The consolidated proceeding before the FERC involved a 1976 rate increase request filed by Nantahala and a 1978 complaint filed pursuant to Section 306 of the Federal Power Act by three of Nantahala's wholesale customers. Nantahala sought an annual rate increase based upon the test period ending 31 December 1975, effective for the period of 1 October 1976 to 1 March 1981. The customers alleged that the three companies, Alcoa, Nantahala and Tapoco, were in violation of the Federal Power Act by diverting, for the benefit and private use of Alcoa, hydroelectric power and facilities dedicated to public service. The customers argued that Alcoa had used the separate corporate identities of Nantahala and Tapoco to frustrate the purposes of the Federal Power Act, that the corporate structure and

resulting power supply agreements were unfair to Nantahala, and that the situation could be remedied by either a roll-in of Nantahala and Tapoco or by reformation of the power supply agreements to reflect a more fair and reasonable allocation of power and energy to Nantahala. Although the Administrative Law Judge rejected the single entity theory of the customers, and therefore their proposed roll-in remedy, he expressly found that the allocation of entitlements to Nantahala under the 1971 Apportionment Agreement was unfair. *See* 15 F.E.R.C. ¶ 63,014.

The ALJ concluded that it would be unjust to require Nantahala's wholesale customers to bear their proportionate share of the purchased power costs associated with the 1971 Apportionment Agreement and the Nantahala-TVA supplemental purchase contract. Instead, he determined that the rates should be set *as if* the 1971 Agreement allocated the NFA entitlements in a manner proposed by the FERC staff. Inasmuch as the rates computed on this basis were lower than the rates charged on the basis of Nantahala's book costs under those agreements, Nantahala was ordered to refund its customers the extra revenue it had collected to pay for the unnecessary TVA purchases. The ALJ also determined that Nantahala's PPAC was unlawful and that the 1971 Apportionment Agreement was a contract affecting rates and charges under Section 205(c) of the Federal Power Act, which should have been filed when made. However, the ALJ declined to impose sanctions for Nantahala's failure to timely file the agreement.

In Opinion No. 139, the FERC affirmed the ALJ's order in all material respects. *Nantahala Power and Light Company*, 19 F.E.R.C. ¶ 61,152. Once again, examination of the relevant power transactions and power supply agreements was undertaken primarily to resolve the "central question [of] whether a preponderance of the evidence supports a finding that Alcoa has used the separate corporate identities of Nantahala and Tapoco to frustrate the purposes of the Federal Power Act." *Id.* at p. 61,276. Although the FERC answered the question thus posed in the negative, and therefore rejected the customers' related contention that the two companies operate as an integrated system whose rates should be determined on a rolled-in basis, it expressly recognized that the North Carolina Utilities Commission has and may reach a different conclusion under state law on both the

status of Tapoco as a North Carolina public utility, *id.* at p. 61,277, n.21, and on the question of rolled-in costing, *see* 20 F.E.R.C. ¶ 61,430.[21]

The FERC briefly examined the circumstances surrounding the OFA and the NFA and concluded that the two agreements were the result of "arms length bargaining" and that "[t]he above history of the OFA and NFA indicates no intent on the part of any of the parties to ignore the needs of Nantahala's public service customers or deprive them of energy at just and reasonable rates." 19 F.E.R.C. ¶ 61,152 at p. 61,278. Continuing, the FERC stated: "The apportionment agreements are another matter. . . . *The alleged fairness of the 1971 Agreement is not supported by the record.* The 1963 Agreement gave Nantahala considerably greater benefits than does the 1971 Agreement, and there is no indication in the record as to why Nantahala, without consideration, gave up those benefits." *Id.* at pp. 61,278-79. (Emphasis added.)

In affirming the decision of the ALJ, the FERC determined that Nantahala should have received a greater share of the NFA entitlements and that a disproportionate share had been assigned to Tapoco. To remedy this inequity for rate making purposes, FERC adopted the staff's calculation of a fair share of entitlements for Nantahala based upon its actual relative contribution to the total net combined generation of the two companies' plants which is turned over to TVA under the NFA (22.50%) and then determined that Nantahala should have received 22.50% (or 404 million) of the 1,800 million kwh under the 1971 Apportionment Agreement. Since Nantahala had received only 360 million kwh under the 1971 Agreement, FERC reasoned that Nantahala had purchased from TVA 44 million kwh of energy more than it should have, and that these excessive purchases should not have been reflected in Nantahala's wholesale rates. Therefore, the FERC ordered that "Nantahala shall be required to refund, with interest, any amounts collected in excess of those which would

---

21. In its order denying rehearing (Opinion No. 139-A), FERC stated: "We recognize that the North Carolina Utilities Commission (NCUC), based on a similar record, reached a different conclusion concerning rolled-in costing. However, the question of whether to treat various entities as an integrated system for rate making purposes is not a purely factual question, but also rests on criteria which each rate making authority may deem relevant." *Id.* at p. 61,869.

have been payable by customers had Nantahala received entitlements as described in the preceding paragraphs." *Id.* at p. 61,280.

In its order denying the rehearing requested by all parties, 20 F.E.R.C. ¶ 61,430, FERC rejected the claims of Alcoa and Nantahala that Opinion No. 139 actually reallocated the NFA entitlements and that it would result in the confiscation of Nantahala's property by setting rates below Nantahala's actual costs. FERC explained that its order merely set rates *as though* a portion of the interruptible entitlements were allocated to Nantahala:

> *In determining just and reasonable rates in Opinion No. 139, the Commission did not choose to reform the 1971 Apportionment Agreement and was not concerned with the mechanics of how entitlements of energy from TVA are allocated to each party, as long as each party receives its fair share of energy based on that party's contribution of actual energy turned over to TVA.* The mechanics of the proportions of both primary and secondary energy available from TVA rests with the parties. Our concern is that each party receive its proper entitlement. *Nantahala entered into a 1971 contract which we find unfair. As a result, the company had to make purchases from TVA which otherwise would not have had to be made. Nantahala must bear the consequences of its acts and refund rates collected to recover the costs of the excess purchases.*

20 F.E.R.C. ¶ 61,430 at p. 61,871. The practical effect of FERC's rate making methodology was the allocation to Alcoa of the "excess" costs Nantahala was forced to incur under the 1971 Agreement.

On appeal taken from the FERC's orders, the Fourth Circuit Court of Appeals held that: (1) FERC's finding that the 1971 Apportionment Agreement was unfair to Nantahala was supported by substantial evidence, and (2) the decision of FERC that a "roll-in" or consolidation of Nantahala and Tapoco for rate making purposes was *not necessary* in this instance was also supported by substantial evidence. *Nantahala Power and Light Co. v. FERC,* 727 F. 2d 1342. With respect to the latter point, the court recognized that although the evidence *did suggest* the propriety of a roll-in, the decision to order a roll-in rests within the discre-

tion of the agency charged with rate making responsibility. *Id.* at 1348. As to FERC's determination that the NFA was not unfair to Nantahala, the court adverted to the fact that "substantial weight in the NFA went to Alcoa's needs," but reasoned that that fact alone "is not conclusive proof that Alcoa sacrificed the Customers' interests to that of the Alcoa aluminum operations. It should be expected that more emphasis would be given to Alcoa's requirements than Nantahala's given the fact that Tapoco is much bigger than Nantahala, and in the early years of the NFA, even some of Nantahala's power and energy was sold to Alcoa." *Id.* at 1349.

We find a number of points particularly noteworthy with regard to the federal regulatory actions discussed above. First, FERC's entire examination of the factual issues common to both the wholesale and retail rate cases was undertaken in an effort to resolve legal issues not before the Commission and vice versa. FERC's examination of the corporate structure of the Alcoa power system and the various intercorporate power transactions and agreements at issue was undertaken primarily in an effort to determine whether Alcoa had used the separate corporate identities of Nantahala and Tapoco to frustrate the purposes of the Federal Power Act, and having answered that question in the negative, FERC then declined to order the remedy of a roll-in.

[17] Contrary to the arguments of Nantahala and Alcoa, we conclude that FERC's analysis of the corporate structure and the various intercorporate power transactions and agreements at issue, and its finding that the evidence before it did not support the conclusion that Alcoa had used the separate corporate identities of Nantahala and Tapoco to frustrate the purposes of the Federal Power Act, does not preempt the Commission from determining that the evidence before it supports the conclusion that Alcoa had dominated Nantahala in such a manner as to require relief for Nantahala's retail customers under North Carolina law. Nor does FERC's having declined to order a roll-in of Nantahala and Tapoco for rate making purposes preempt the Commission from implementing such a rate making methodology under *its discretionary authority* in setting intrastate retail rates. Both the FERC and the Fourth Circuit Court of Appeals recognized that the decision to implement a "roll-in" (1) is based upon factors each regulatory body deems appropriate to the case before it; (2) rests within the discretion of the agency charged with such rate mak-

ing authority; and (3) is a matter upon which state and federal regulatory agencies may differ without the determination of the one necessarily binding the actions of the other.

We first observe that a fundamental factor in the differing treatment given by the federal and state regulatory bodies with respect to the NFA and the 1971 Apportionment Agreement arises out of their differing conclusions as to whether Nantahala is to be treated as a stand-alone company or as an integral unit in a single integrated and coordinated power system. The Commission's rejection of the companies' proposal to base Nantahala's energy and demand related costs on the entitlements it received under the contracts was based, in large part, on its findings that these entitlements were apportioned to Nantahala on the hypothetical and false assumption that Nantahala was developed and operated as a stand-alone utility company. No action taken by FERC may be said to preempt the Commission from rejecting a cost allocation formula based upon a factual premise that it has in turn properly rejected in the exercise of its rate making authority.

Moreover, with respect to FERC's treatment of the contracts themselves, it cannot be said that the findings of the Commission undermine an unequivocal FERC endorsement of the NFA and the 1971 Apportionment Agreement. FERC Opinion Nos. 139 and 139-A are far less inclusive in scope and approving in nature than the companies imply.

FERC did not, as both Alcoa and Nantahala repeatedly assert, find the NFA to be "just and reasonable," it merely determined that the contract was negotiated at "arms-length" and without the "intent" to "ignore" the needs of Nantahala's public customers. These findings are not tantamount to a determination that the contract equally benefits Nantahala's rate payers and Alcoa, or that its terms were required for or structured to be of benefit in service to those rate payers, which are matters the Commission was properly concerned with. More pointedly, and contrary to the assertions of Nantahala that FERC fully and unconditionally "deemed fair" the provisions of the 1971 Apportionment Agreement, FERC expressly found that agreement to be unfair to Nantahala and expressly refused to base Nantahala's rates to its wholesale customers upon the entitlements assigned to Nantahala under that agreement.

In fact, in setting those rates, FERC utilized a rate making methodology similar in principle to that implemented by the Commission — that is, FERC set Nantahala's wholesale rates on the lower level of energy related costs FERC determined Nantahala *should have* incurred given the relative contribution of its plants to the net generation Nantahala and Tapoco jointly turn over to TVA under the NFA. These determinations and the remedial rate making methodology employed by FERC were, in turn, fully affirmed by the Fourth Circuit Court of Appeals. It is therefore clear that the Commission's findings with respect to detriments Nantahala suffered by the terms of the 1971 Apportionment Agreement harmonize rather than conflict with findings by the FERC that the agreement was unfair to Nantahala.

The Commission's examination of the intercorporate agreements was undertaken in an effort to determine whether Nantahala and Tapoco function as a single, integrated electric system under North Carolina law and to determine what portion of the costs incurred by the "rolled-together" system under those contracts went to providing intrastate retail service to Nantahala's jurisdictional customers. Because the Commission determined that Nantahala incurred costs under the NFA and 1971 Apportionment Agreement that were, in effect, not required to serve its public customers and that it suffered substantial detriments thereunder, it declined to base Nantahala's demand and energy cost factors on the quantity and design of NFA entitlements Nantahala receives under the 1971 Apportionment Agreement.

The Commission, *in setting retail rates*, is no more bound to blindly apply specific rate schedules filed with and accepted by FERC, than is the FERC *in setting wholesale rates* — as opposed to *regulating* those specified rate schedules. The fact that the Commission chose a different rate making methodology than FERC to alleviate perceived inequities to Nantahala's retail customers and in so doing effectively allocated a greater proportion of system-wide costs to Alcoa (Tapoco) does not constitute a basis for rejecting the Commission's methods. State public service commissions need not follow FERC wholesale rate making methodologies; North Carolina regulatory policy, based upon factors appropriate to local utility regulation, may differ from FERC policy without necessarily coming into conflict with it. *See Public Systems v. FERC*, 709 F. 2d 73, 84 (D.C. Cir. 1983).

In view of these factors, and in light of our foregoing discussion of the respective spheres of federal and state rate making authority, we completely reject the various arguments presented by Alcoa and Nantahala on the question of federal preemption. These arguments are based, *inter alia*, upon the twin faulty premises that FERC has actually and directly approved the allocation scheme set up in the 1971 Apportionment Agreement and that the Commission's roll-in methodology impermissibly alters the costs associated with that contract and allocated to Nantahala. We have carefully examined the evidence of record, the actual mechanics of the roll-in and cost allocation performed by the Commission, and the relevant authorities on the question of federal preemption and conclude that the Commission has not crossed over the "bright line" between state and federal regulatory jurisdiction and intruded upon the federal domain, either directly or indirectly, in fixing Nantahala's retail rates in this proceeding.

B.

[18] The companies also argue that the Commission's order grants an unconstitutional preference to Nantahala's North Carolina customers over Tapoco's Tennessee customer (Alcoa) and impermissibly shifts the economic benefit of Tapoco power to Nantahala in violation of the limitation on state power implicit in the Commerce Clause of the United States Constitution (art. I, § 8, cl. 3) under the Supreme Court's decision in the *NEPCO* case, *New England Power Co. v. New Hampshire*, 455 U.S. 331, 71 L.Ed. 2d 188. We agree with the companies' contention that *NEPCO* establishes that a state utilities commission may not grant its citizens a preferred right to the benefit of hydroelectric energy generated by a utility in that state solely to gain an economic advantage over the utility's out-of-state customers, and that the granting of such a preferred benefit, regardless of how it is effectuated, places a direct and substantial burden on interstate commerce in violation of the Commerce Clause. However, we do not agree that the rule announced in *NEPCO* invalidates the action of the Commission in this case.

In *NEPCO*, hydroelectric power was produced in New Hampshire by the New England Power Company (NEPCO) and transferred to an out-of-state consortium of companies which served

six states and operated a power pool which included NEPCO. NEPCO then bought power from the pool, based on its pro rata share of the total average cost of power in the pool. This arrangement appreciably increased NEPCO's intrastate costs of service because its own hydro-generated power is cheaper to produce than most of the other generating sources in the consortium. The New Hampshire Commission, acting pursuant to a specific New Hampshire statute, terminated NEPCO's right to export its hydroelectric energy, and ordered the company to make arrangements to sell the previously exported hydroelectric energy to customers within the state. As the Supreme Court noted, although the precise contours of the New Hampshire commission's order were unclear in that it did not require the physical severance of NEPCO's connections with the power pool, it appeared to require NEPCO to sell electricity to New Hampshire utilities at special rates adjusted to reflect the savings attributable to the exclusive use of low-cost hydroelectric generation. *New England Power Co.*, 455 U.S. at 336, 71 L.Ed. 2d at 193. The commission's staff economist proposed that NEPCO effectuate the ban by allocating the economic benefit of the low-cost hydroelectric power to New Hampshire customers through "billing mechanisms" which would reserve the savings resulting from hydroelectric generation exclusively for in-state customers. *See id.* at n. 3.

On appeal, the Supreme Court of New Hampshire rejected the arguments of NEPCO and its out-of-state customers that the order was preempted by Parts I and II of the Federal Power Act and that it imposed impermissible burdens on interstate commerce. The United States Supreme Court reversed, holding that the New Hampshire commission's order attempted to restrict the flow of privately owned and produced electricity in interstate commerce in a manner inconsistent with the Commerce Clause of the United States Constitution (art. I, § 8, cl. 3) and that Section 201(b) of the Federal Power Act, 16 U.S.C. § 824(b) (the "savings clause") does not provide an affirmative grant of authority to the state to do so.

In rejecting the New Hampshire court's ruling, the Supreme Court explained its prior decisions under the implied limitation on state power in the Commerce Clause.

Our cases have consistently held that the Commerce Clause of the Constitution, Art. I, Sec. 8, cl. 3, precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom. (Citations omitted.) Only recently, . . . we reiterated that "[t]hese cases stand for the basic principle that a 'State is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the State'." (Citations omitted.)

*New England Power Co.*, 455 U.S. at 338, 71 L.Ed. 2d at 194-95. Applying this anti-protectionist rule to the actions of the New Hampshire commission, the Court, with little trouble, concluded:

The order of the New Hampshire Commission, prohibiting New England Power from selling its hydroelectric energy outside the State of New Hampshire, is precisely the sort of protectionist regulation that the Commerce Clause declares off-limits to the states. The Commission has made clear that its order is designed to gain an economic advantage for New Hampshire citizens at the expense of New England Power's customers in neighboring states. Moreover, it cannot be disputed that the Commission's "exportation ban" places direct and substantial burdens on transactions in interstate commerce. . . . Such state-imposed burdens cannot be squared with the Commerce Clause when they serve only to advance "simple economic protectionism." . . . (Citations omitted.)

*Id.* at 339, 71 L.Ed. 2d at 195. Thus, in *NEPCO*, the Supreme Court held invalid not only a state utility commission order that prohibits that export of hydroelectric generation from one state to another, but also an order which *exclusively* reserves to the citizens of the producing state the full economic benefit of such hydroelectric power.

However, unlike the action of the New Hampshire commission, the roll-in performed by the Commission in this case does *not* purport to prohibit the exportation of energy produced within North Carolina, nor does it divert the flow of Tapoco's power to

Nantahala. More importantly, the roll-in methodology used by the Commission does not exclusively reserve to the citizens of North Carolina the entire economic benefit of the unified system's low-cost in-state hydroelectric generation.

As we have stated, the purpose of the roll-in employed by the Commission was the determination of the costs of service for the combined Nantahala-Tapoco system and the allocation of those costs as between the intrastate retail customers in North Carolina and the out-of-state industrial customer (Alcoa) in Tennessee. The practice of rolling-together accounting data and allocating costs between jurisdictional and non-jurisdictional service is common throughout the United States and is no different than the rate making techniques employed by the Commission in setting intrastate retail rates for other companies, such as Duke Power or Carolina Power & Light, which serve customers in more than one state. *Cf. Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 89 L.Ed. 1206; *Central Kansas Power Co. v. State Corporation Commission*, 221 Kan. 505, 561 P. 2d 779. The roll-in merely assures that Nantahala's in-state retail customers are not overcharged in order to subsidize a non-jurisdictional customer and that their rates accurately reflect the costs of facilities used in serving their demands upon the system.

In contrast to the action taken by the New Hampshire commission, the North Carolina Utilities Commission accepted the continuation and operation of all existing power supply agreements between and among the companies and TVA, and addressed neither the dispatch or transmission of electricity nor the actual division of energy and demand entitlements between Nantahala and Tapoco. Both Nantahala and Tapoco continued to deliver the output of their generating facilities to TVA and to receive power in exchange for resale. Under the order, Tapoco continues to deliver its return power to Alcoa and Nantahala continues to sell its share to its intrastate customers.

To support their analysis that the roll-in methodology used by the Commission constitutes an undue burden on interstate commerce under the *NEPCO* decision, the companies rely almost exclusively on one statement contained in the fifty-seven page order of the Commission. The statement is to the effect that the intervenors' proposed allocation methodology (later adopted by

the Commission), *assumed* that the North Carolina public load had a "first call on the total electric energy output of the combined Nantahala-Tapoco system." The companies essentially contend that this statement shows that the Commission was engaging in the same sort of admittedly protectionist behavior as the New Hampshire commission in *NEPCO*.

Although the argument has a certain surface appeal, it fails upon closer examination. Here, the Commission characterized the allocation methodology as premised upon a "first call" concept at the very outset of its discussion of the relative merits of the respective jurisdictional cost allocation methodologies proposed by the intervenors and the companies. However, the Commission went on to devote approximately thirty pages of its order to an analysis of (1) how the power supply agreements, *inter alia*, limited and rearranged the combined system's "demand" and "energy" availability to the detriment of Nantahala and corresponding benefit to Alcoa; (2) the various ways in which the companies' use of the apportionment of NFA demand and energy entitlements as a basis for the allocation of demand and energy costs would result in Nantahala's retail customers bearing costs properly allocable to Alcoa's use of Nantahala's resources; and (3) the preferable features of the intervenors' cost allocation methodology, which is based upon actual system capability and actual jurisdictional load responsibility for costs associated with supplying the system's entire load. The allocation factors ultimately used by the Commission do not allocate capacity and energy *availability* or *usage* between the combined system's jurisdictional and non-jurisdictional customers, but rather allocate "demand" and "energy" *costs* between the respective loads.

Alcoa concedes that no "dollar costs" incurred by Nantahala under the NFA and 1971 Apportionment Agreement are eliminated by the Commission's roll-in, but argues that the roll-in favors Nantahala's North Carolina customers by relieving them of all costs that TVA "charges" for the Fontana exchange and shifting those costs to the Tennessee load of Alcoa by means of the jurisdictional cost allocation methodology. Under the companies' proposed allocation formula, Nantahala would be assigned a percentage of demand and energy related costs based upon the demand and energy entitlements it receives under the power supply contracts. This percentage was somewhat higher than the per-

centage of costs developed by the Commission on the basis of demand and energy costs related to actual system capability and customer load demand under the intervenors' allocation methodology. Accordingly, Alcoa argues that in assigning Nantahala a "lower" percentage of costs than Nantahala "incurs" under the contracts, the Commission granted a preference for the in-state customers over the out-of-state customer.

Obviously, Alcoa's argument completely ignores the findings of the Commission that Alcoa had traded benefits usable and required by Nantahala for its public load in return for entitlements mainly usable and required by Alcoa's aluminum operations and so had already gained substantial benefits at the expense of Nantahala's public customers. Contrary to the assertions of Alcoa, intra-system retail costs of service were not allocated by the NFA and 1971 Apportionment Agreement and therefore the Commission was not bound to use the demand and energy entitlements in computing Nantahala's demand and energy related costs. The roll-in did not relieve Nantahala of all costs associated with the Fontana exchange in contravention of federal authority over those contracts, it merely determined which portion of those costs Nantahala was entitled to recoup by means of charges to its retail customers.

Despite the Commission's initial characterization, the rates actually set for Nantahala do no more than reflect the proportion of system costs of service fairly attributable to the provision of intrastate retail service. Nowhere does the Commission's discussion or application of the roll-in methodology actually implement a "first call" concept. The Commission has not granted North Carolina customers a preference to the economic benefits of hydroelectric energy generated in North Carolina at the expense of Alcoa in Tennessee; it merely eliminated from Nantahala's existing rate structure preferences and inequities which were effectuated in the past by basing Nantahala's rates on the fiction that it was a stand-alone company. This traditional exercise of its rate making authority is simply not proscribed by the rule established in *NEPCO*, or in other commerce clause cases.

It is well-settled in modern commerce clause jurisprudence that the existence of a commerce clause violation depends, in any case, upon "the nature of the state regulation involved, the objec-

tive of the state, and the effect of the regulation upon the national interest in the commerce." *Illinois Natural Gas Co. v. Central Illinois Pub. Serv. Co.*, 314 U.S. 498, 505, 86 L.Ed. 371, 376. The Supreme Court recently reformulated the basic test to be applied as follows:

> Where [a] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. (Citation omitted.) If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church*, 397 U.S. 137, 142, 25 L.Ed. 2d 174, 178 (1970).

In *Arkansas Elec. Coop. Corp. v. Arkansas Public Serv. Comm'n*, 461 U.S. 375, 76 L.Ed. 2d 1, the Court applied the *Bruce Church* test to the question of whether state public service commission *regulation* of wholesale electric rates charged by a rural power cooperative to its member retail distributors was forbidden by the Commerce Clause of the United States Constitution. The Court upheld such "even-handed" regulation, reasoning that (1) economic protectionism is not implicated by the traditional rate making functions of the state public service commissions;[22] (2) state regulation of wholesale rates charged by a rural power cooperative is well within the scope of "legitimate local public interest," particularly where the cooperative's basic operation consists of supplying power from generating facilities located within the state to member cooperatives, despite the fact that the cooperative is also tied into an interstate power grid; and (3) the effects on interstate commerce of state regulation of wholesale rates the cooperative charges its members are only incidental, so

---

22. *See also Kansas-Nebraska Natural Gas Co. v. City of St. Edward*, 234 F. 2d 436, 440 (8th Cir. 1956); *Zucker v. Bell Tel. Co. of Penn.*, 37 F. Supp. 748, 757 (E.D. Pa. 1974), *aff'd*, 510 F. 2d 971, *cert. denied*, 422 U.S. 1027, 45 L.Ed. 2d 684 (1975).

that the burden imposed on such commerce is not clearly excessive in relation to the putative local benefits.

In passing, the *Arkansas Electric* Court observed that despite the fact that most retail utilities receive a portion of the power they sell from out-of-state,

> [T]he national fabric does not seem to have been seriously disturbed by leaving regulation of retail utility rates largely to the States. Similarly, it is true that regulation of the prices AECC [the cooperative] charges to its members may have some effect on the price structure of the interstate grid of which AECC is a part. But, again, we find it difficult to distinguish AECC in this respect from most relatively large utilities which sell power both directly to the public and to other utilities.

461 U.S. at 395, 76 L.Ed. 2d at 17. Thus, it is clear that in the ordinary case, and absent acts of pure economic protectionism, state regulatory action affecting both jurisdictional and non-jurisdictional customers that imposes only incidental effects upon interstate commerce will not be found to offend the Commerce Clause of the United States Constitution.

Again, the roll-in, as employed by the Commission, does no more than establish the overall cost of operation of a single, unified Nantahala-Tapoco system and allocates the proper portion of those costs to North Carolina retail customers for the purpose of fixing just and reasonable rates for Nantahala. Such even-handed and traditional rate making operations do not implicate the national concern with "economic protectionism" discussed in the *Bruce Church* case. Moreover, the setting of retail electric rates for Nantahala's customers is clearly a legitimate North Carolina interest with a significant impact in this state. Not a word of the contracts or agreements properly regulated by FERC has been changed, and the fact that the price charged by Nantahala to its retail customers may have some *de minimis*, incidental effect on the price structure of the interstate "grid" of which Nantahala is a part is not clearly excessive in relation to the substantial public interest in the establishment of just and reasonable electric rates for ultimate North Carolina consumers. *See Arkansas Elec. Coop. Corp. v. Arkansas Public Serv. Comm'n*, 461 U.S. 375, 76 L.Ed. 2d 1. Accordingly, we conclude that the Commission's order does not

impose an undue burden on interstate commerce and is not, therefore, prohibited by the Commerce Clause of the United States Constitution.

We take this opportunity to note that an amicus curiae brief has been submitted in this appeal on behalf of the State of Tennessee and one of its agencies, the Tennessee Department of Economic and Community Development. The State of Tennessee is concerned that any increase in power costs at Alcoa's Tennessee facilities resulting from the Commission's order will create the danger of Alcoa's curtailment of production, with consequent layoffs of many local residents there. The State joins in the position of the companies (Alcoa, Tapoco) that the Commission's order interferes with FERC's exclusive jurisdiction to regulate the way in which energy is allocated and sold in interstate commerce and in the companies' argument that the roll-in order has the practical effect of allocating the power output and the economic benefit of Tapoco's operations to Nantahala in contravention of both federal authority and the federal constitution. The legal issues adverted to in the amicus brief are, of course, addressed in our discussion of the arguments presented by the companies themselves. We are fully cognizant of the broader concerns expressed by the State of Tennessee; however, we find no impermissible preferences or reallocation of resources to be embodied in the Commission's order. Rather, we conclude that the order grants precisely the relief which the State of Tennessee requests in its brief, that is, the order "ensure[s] all affected persons and entities of fair treatment in the allocation of power resources."

## C.

Both Nantahala and Alcoa challenge the rate reduction and refund obligation imposed by the Commission for the locked-in period of this docket (1977-1981). Nantahala argues that implementation of the roll-in methodology causes it to suffer a revenue shortfall which affects its financial stability and amounts to confiscation of its properties in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and art. I, § 19 of the North Carolina Constitution (the "law of the land" provision). Alcoa attacks both the Commission's authority to impose liability upon it for Nantahala's refund obligation and the results of that imposition as confiscatory under the federal con-

stitution. We find no merit in any of the companies' arguments concerning the rate reduction or refund obligation.

1.

As indicated in Part I of this opinion, Nantahala initiated this proceeding in 1976 to establish new rates based upon the 1975 test year data so as to increase its charges to North Carolina retail customers by $1,830,791. On 14 June 1977, the Commission issued an order in Docket No. E-13, Sub 29, permitting Nantahala to put into effect revised rates so as to produce $1,598,918 in additional gross revenues. This rate increase was based upon the assumption, later and properly rejected by the Commission, that Nantahala was a stand-alone company, that its stand-alone reasonable expenses, including interest on its outstanding debt, were $9,827,514, and that its stand-alone authorized gross revenues were $11,067,000. Under the roll-in methodology used in the remanded proceedings, Docket No. E-13, Sub 29 (Remanded), Nantahala is authorized, through its rates, to collect revenues in the amount of $9,032,000 (exclusive of purchased power costs), while Nantahala's rolled-in reasonable expenses are determined to be $8,322,000. The refund imposed of $2,035,000 annually, was based upon the difference between the revenues being collected under the 14 June 1977 order in the amount of $11,067,000 and the revenues authorized in the 2 September 1981 order in the amount of $9,032,000. In other words, the refund obligation is the difference in amount between Nantahala's actual rate collections between June 1977 and August 1981, and what those collections would have been under the rolled-in rates, plus interest.

a.

[19] Nantahala contends that the roll-in sets revenues for the utility which are below its "actual" or "book" expenses and thus requires it to operate at a loss. The company arrives at its revenue shortfall conclusion by subtracting its rolled-in authorized revenues from the expenses authorized in the 1977 order on the premise that Nantahala was a stand-alone company. That is, by subtracting the $9,032,000 in gross revenues authorized under the roll-in from the $9,827,514 in reasonable expenses determined for the 1975 test year on the stand-alone premise, Nantahala arrives at an approximate $800,000 "revenue shortfall." Nantahala uses the same methodology in comparing rolled-in authorized revenues

to stand-alone authorized revenues under the 1977 order in support of its argument that the approximately $2 million annual reduction in revenues from the previously established level will deplete the utility of earnings with which to pay an equity return to its shareholder or to furnish capital for plant expansions and new service connections as its load grows. It is Nantahala's contention that the Commission, on remand, did not determine that the expenses it had earlier found reasonable would not actually be incurred by Nantahala, or that the losses thus engendered would be ameliorated by the roll-in, and that the ultimate result of the roll-in will be Nantahala's financial insolvency.

The obvious flaw in Nantahala's "revenue shortfall" argument lies in the company's failure to compare authorized rolled-in revenues to authorized rolled-in expenses. In the order appealed from, Finding of Fact No. 17 authorizes Nantahala, through its rates, to collect revenues in the amount of $9,032,000 (exclusive of purchased power costs) while Finding of Fact No. 14 recognizes Nantahala's reasonable expenses to be $8,322,000. The difference between the two figures represents profit. Consequently, Nantahala is permitted to earn a proper income over and above the rolled-in expenses that the Commission has determined were reasonably incurred in the provision of service to Nantahala's retail customers.

The fact that Nantahala claims it *actually* has incurred a higher level of expenses under the various inter-corporate agreements among itself, its affiliates and TVA is not dispositive; it is for the Commission, and not the company, to determine what portion of those total expenses are to be reflected in the retail rates charged Nantahala's North Carolina customers. It must be remembered that this is a general rate case, and that under N.C. G.S. Chapter 62, the Commission must fix such rates "as shall be fair to both the public utility and to the consumer." N.C.G.S. § 62-133(a). While the Commission is to fix rates that will enable the utility *by sound management* to pay all of its costs of operation and have left a fair return upon the fair value of its properties, it is not required to guarantee the return requested by the utility where the facts and circumstances warrant otherwise. *Utilities Comm. v. Telephone Co.*, 285 N.C. 671, 208 S.E. 2d 681. As noted earlier, the primary purpose of Chapter 62 is to assure the public of adequate service at a reasonable charge; the provi-

sions of this chapter of the General Statutes designed to assure the utility of adequate revenues do not take precedence over, but "are in the nature of corollaries to the basic proposition that the public is entitled to adequate service at reasonable rates. . . ." *Id.* at 680, 208 S.E. 2d at 687. Furthermore, as this Court noted in *Utilities Comm. v. Telephone Co.*, the question of whether rates prescribed under Chapter 62 are so unreasonable and unjust to the company and its stockholders, and so amount to an unconstitutional confiscation of a utility's property necessarily "involves an inquiry as to what is reasonable and just for the public. . . . The public cannot properly be subject to unreasonable rates in order simply that stockholders may earn dividends." 285 N.C. at 682, 208 S.E. 2d at 688, *quoting Covington & Lexington Turnpike Road Co. v. Sandford*, 164 U.S. 578, 596-97, 41 L.Ed. 560, 566 (1896).

Having found that Nantahala's parent/customer Alcoa had already received substantial concealed benefits at the expense of Nantahala's retail rate payers under the NFA and 1971 Apportionment Agreement, the Commission was entitled to weigh that benefit in balancing the interests of Nantahala's rate payers and the utility's sole shareholder, Alcoa. In view of the Commission's determination that unsound or "absentee" management decisions on the part of Nantahala, and parental domination on the part of Alcoa, left the utility with insufficient resources to meet its steadily increasing public load and lacking in contractual power supply arrangements tailored to meet its public service needs at reasonable prices, it was well within the Commission's rate making authority to shift the onus of those managerial shortcomings from the pockets of Nantahala's retail rate payers to the corporate offices of the "Alcoa power system." In short, we reject Nantahala's arguments that the rolled-in rates cause it to operate at a loss and in so doing confiscate its property.

b.

In essence, the Commission set Nantahala's rates and ordered refunds so as to return to Nantahala's retail customers the benefits which the Commission found had been unfairly diverted to Alcoa by means of Alcoa's domination of Nantahala. The principal amount of the refund obligation imposed on Nantahala is $18,962,000. By December 1983, that figure had grown to

$25,568,433. Nantahala's entire net worth as of 31 December 1983 was $15,700,000. Thus, the full extent of the costs unfairly imposed upon Nantahala's rate payers under the 1977 order was substantially greater than Nantahala itself could afford to return; the economic benefits in question had already been flowed-through to Alcoa. Therefore, to prevent the frustration of its ability to effectively protect Nantahala's customers, the Commission ordered Alcoa, over whom the Commission had previously asserted jurisdiction as a statutory public utility pursuant to N.C. G.S. § 62-3(23)(c), to pay Nantahala's refund obligations to the extent that Nantahala itself is unable to do so and continue to render adequate service. Thus, Nantahala is not left bereft of resources with which to meet its obligations.

Nantahala, however, contends that its *potential* refund obligation coupled with the rate reduction prevented the utility from attracting either debt or equity financing which will be needed to meet both its service obligation and its anticipated need to expand its facilities as growth in demand on its system occurs. Nantahala observes that the Commission's order places the refund obligation on Nantahala whether or not Alcoa can be forced to contribute, so that if Alcoa is determined not to be liable for these refunds, Nantahala will be obligated to refund the entire amount. The utility implies in its brief that this situation has placed a "chill" on its credit rating. In addition, Nantahala points out that Alcoa contends that it bears no refund liability and has stated that it will make payments "only after exhaustion of all federal and state judicial remedies and legal rights." On this basis, Nantahala argues that the requirement that it make refund payments to customers far in excess of its net worth or what it could obtain in complete liquidation of its assets also results in an unconstitutional confiscation of its property. Because Nantahala's argument concerning the refund obligation turns upon the determination of Alcoa's refund liability, we will now address the challenges Alcoa presents to the Commission's order holding it responsible for so much of the refund obligation as Nantahala is itself unable to pay.

### 2.

Alcoa has abandoned its argument that it is not a statutory public utility under N.C.G.S. § 62-3(23)(c), as found by the Commis-

sion and affirmed by the Court of Appeals. However, the company now argues that the Commission lacks the authority to impose any refund obligation upon Alcoa on this basis and, in any event, lacks the authority to charge Alcoa with the obligation to refund any revenues collected by Nantahala prior to 3 October 1980, the date on which the Commission ruled that Alcoa was a statutory public utility. We conclude that the Commission acted well within its regulatory authority in imposing the obligation upon Alcoa to pay any part of the refund obligation for the entire locked-in period of this docket that Nantahala is itself unable to pay.

Alcoa's challenge to the Commission's basic authority to order it to pay any portion of Nantahala's refund obligation may be summarized as follows: (A) Alcoa's status as a public utility under N.C.G.S. § 62-3(23)(c) does not, in itself, give the Commission a basis for imposing liability on it for Nantahala's refund; (B) there is no legal or factual basis for the Commission to reach that result by either "piercing the corporate veil" between Alcoa and Nantahala or by applying the "no profits to affiliates" rule; and (C) federal regulation of the companies and transactions at issue prohibits piercing of the corporate veil. None of these contentions has any merit.

a.

[20] Initially, we note that in a general rate case, the Commission is empowered to fix rates for *any* public utility subject to the provisions of Chapter 62. Ordering refunds is an inherent part of the rate making function of the Commission. *See Utilities Comm. v. Edmisten, Atty. General,* 291 N.C. 451, 232 S.E. 2d 184 (refunds to customers ordered to remedy excessive utility charges arising out of improperly approved fuel cost adjustments in retail rates). Moreover, pursuant to N.C.G.S. § 62-30, the Commission is vested with broad authority to insure the effective regulation of public utilities in North Carolina, including "all such . . . powers and duties as may be necessary or incident to the proper discharge of its duties."

N.C.G.S. § 62-3(23)(c) denominates the parent of a public utility to be, itself, a public utility to the extent "that such affiliation has an effect on the rates or service of such public utility." Alcoa first argues that this statutory provision is "merely jurisdictional" and permits the Commission to "assert" its regulatory authority over

the parent corporation, but fails to provide a basis for remedial action should the affiliation be found to have a detrimental effect on the subsidiary. Next, Alcoa maintains that no other provision of the General Statutes gives the Commission such remedial jurisdiction over a statutory public utility, so that the Commission lacked a legal basis for holding Alcoa liable for Nantahala's refund obligation. We disagree.

Under Alcoa's interpretation of N.C.G.S. § 62-3(23)(c) it is difficult to conceive of what the "assertion" of such an empty regulatory authority would consist of. The very language of this provision indicates that it must have been the purpose of the legislature to empower the Commission to hold the corporate parent or affiliate of a public utility financially accountable for any adverse effects of that affiliation on the subsidiary's rates or service as a necessary adjunct to the discharge of its statutory duties under N.C.G.S. § 62-30. Furthermore, Alcoa's reading of N.C.G.S. § 62-3(23)(c) is wholly at odds with the general powers and duties granted the Commission under Chapter 62 of the General Statutes.[23]

It is beyond dispute that Nantahala's financial stability and hence its ability to serve the public depends on Alcoa's ultimate legal responsibility to stand behind the refund obligation. The broad grants of authority to the Commission to ensure the effective regulation of Nantahala and the full protection of Nantahala's customers would be rendered nugatory if, upon a finding that its parent's affiliation had severely and detrimentally affected Nantahala's rates and ability to effectively provide service in its franchise area, the Commission were powerless to order remedial action against the parent corporation. Therefore, we reject Alcoa's restrictive interpretation of the purpose of N.C.G.S. § 62-3(23)(c) and the scope of the Commission's statutory powers.

---

23. For example, N.C.G.S. § 62-42(a)(5) authorizes the Commission to enter orders directing a public utility to do ". . . any other act necessary to secure reasonably adequate service or facilities and reasonably and adequately to serve the public convenience and necessity. . . "; subsection (b) permits an order to be directed to "two or more public utilities"; and N.C.G.S. § 62-32 authorizes the compelling of a public utility to render reasonable service at reasonable rates.

b.

The provision of electric service and the development of the hydroelectric resources of North Carolina are enterprises in which the public has a special interest, and which are accordingly subject to special duties and regulation. N.C.G.S. § 62-2; *Public Service Co. v. Power Co.*, 179 N.C. 18, 101 S.E. 2d 593 (1919); *North Carolina Public Service Co. v. Southern Power Co.*, 282 F. 837 (4th Cir. 1922), *cert. denied*, 263 U.S. 508, 68 L.Ed. 413 (1924). When a public utility is affiliated with other corporations, it is often necessary to look beyond corporate form to determine the actual scope of the public service enterprise in question, in order to prevent evasion of the obligations imposed on that public service enterprise. *See generally* Berle, *The Theory of Enterprise Entity*, 47 Col. L. Rev. 343, 343-45, 348-52 (1947). This Court has repeatedly recognized the propriety of "piercing the corporate veil" in the context of utility regulation. In *Utilities Comm. v. Morgan, Attorney General*, 277 N.C. 255, 177 S.E. 2d 405 (1970), *aff'd on rehearing on other grounds*, 278 N.C. 235, 179 S.E. 2d 419 (1971), Justice Lake, writing for the Court, stated:

> It is well established that the doctrine of the corporate entity may not be used as a means for defeating the public interest and circumventing public policy. . . . In order to prevent such a result, a parent corporation and its wholly-owned subsidiaries may be treated as one. (Citations omitted.)

277 N.C. at 272, 177 S.E. 2d at 416. *Accord Utilities Commission v. Intervenor Residents*, 305 N.C. 62, 286 S.E. 2d 770; *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705.[24] *See generally* 64 Am. Jur. 2d, Public Utilities, § 202 (1972); 16 A.L.R. 4th 454, § 4. Indeed, the inherent authority of the Commission to

---

24. In the *Morgan, Intervenor Residents* and *Telephone Company* cases this Court has recognized that the Commission should closely scrutinize transactions between a public utility and an *unregulated* affiliate, in order to prevent either the utility enterprise from effectively earning a greater profit than the Commission had determined to be reasonable, or from concealing or diverting profits from the public utility to the affiliate. Surely the Commission has no less authority to regulate the results of transactions between a jurisdictional or statutory public utility and its affiliated operating public utility than it has to regulate transactions between an unregulated affiliate and a public utility. We therefore reject, in passing, Alcoa's argument that the Commission could not also rely on the "no profits to affiliates" rule to hold it liable for Nantahala's refund obligation.

pierce the corporate veil between a public utility and its parent corporation in order to prevent the evasion of effective regulation was implicitly recognized in an early commercial rate discrimination case involving Nantahala and its parent/customer Alcoa. *Utilities Commission v. Mead Corp.*, 238 N.C. 451, 78 S.E. 2d 290 (Barnhill, J., concurring) (Nantahala may not structure its rates so as to accord its parent Alcoa an unreasonably favorable rate).

Therefore, once the Commission determined that Alcoa was a statutory public utility under N.C.G.S. § 62-3(23)(c), it could rely upon the doctrine of "piercing the corporate veil" between Nantahala and its parent to hold Alcoa financially responsible for Nantahala's refund obligation to the extent its affiliation had adversely affected Nantahala's rates as "necessary or incident" to the proper discharge of its regulatory duties under Chapter 62. N.C.G.S. § 62-30. Accordingly, we reject Alcoa's argument that there is no statutory or legal basis for its refund liability.

[21] Alcoa next maintains that "as a matter of law" there is no factual basis in the record before the Commission for piercing the corporate veil between it and Nantahala. Alcoa's argument may be summarized as follows: (1) North Carolina law requires a finding of corporate domination utilized by the parent to commit fraud or injustice with respect to the transaction attacked; (2) the Commission's determinations are based solely on the fact of Alcoa's 100 percent stock ownership of Nantahala and its conclusion that the NFA and 1971 Apportionment Agreement were negotiated so as to benefit Alcoa at the expense of Nantahala's customers, thereby leaving Nantahala an "empty shell"; (3) stock ownership, without more, is no basis for piercing the corporate veil and the "empty shell" characterization cannot stand as a basis for domination or injury to the rate payer because both the NFA and 1971 Agreement "have been thoroughly regulated (and approved) by FERC"; and (4) a state commission is preempted from determining that the Nantahala-Alcoa relationship resulted in fraudulent wholesale rate schedules once these rate schedules have been determined to be reasonable by FERC. Although these contentions have a certain logical appeal, they are patently lacking in merit as a matter of both law and fact.

In its order reducing rates and imposing the refund, the Commission found as a fact that:

Alcoa has so dominated certain transactions and agreements affecting its wholly owned subsidiary Nantahala that Nantahala has been left but an empty shell, unable to act in its own self interest, let alone in the interest of its public utility customers in North Carolina.

In the concluding portion of the Commission's extensive discussion of evidence demonstrating Alcoa's control over the design, development and operation of Nantahala from its inception, the Commission stated:

The Commission must conclude that Alcoa has so dominated these transactions and agreements affecting its wholly owned subsidiary Nantahala that Nantahala has been left but an empty shell, unable to act in its own self interest, let alone in the interest of its public utility customers in North Carolina. Alcoa's domination of Nantahala in these transactions has resulted in Nantahala's collecting, through its base rates, excess revenue from its customers in the amount of approximately $2,035,000 a year since June 14, 1977. Moreover, this inequity is further magnified by the fact that Nantahala has collected significantly additional excess revenues through operation of its Purchased Power Adjustment Clause.

First, it is apparent that there is nothing in the Commission's order which indicates that "fraud" was either an express or implied concern of the Commission. Rather, detrimental domination forms the basis of Alcoa's refund obligation. Next, Alcoa misconceives the need to demonstrate "fraud" in order to pierce the corporate veil between affiliated companies that comprise a single enterprise, whether that enterprise be a public utility or an unregulated business concern. Although we have previously acknowledged the propriety of disregarding separate corporate identities where a parent is found to have used its subsidiary as a mere "instrumentality" for the commission of fraud upon some third party, this Court has never limited the doctrine of piercing the corporate veil to the situation of fraud alone. In *Huski-Bilt, Inc. v. Trust Co.*, 271 N.C. 662, 157 S.E. 2d 352 (1967), the very case Alcoa relies upon in its brief, we stated the three elements which must be proved under the "instrumentality rule" as follows:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such *control* must have been *used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights*; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. (Emphasis added.)

*Id.* at 670-71, 157 S.E. 2d at 358, *quoting Lowendahl v. Baltimore & O. R. Co.*, 247 A.D. 144, 157, 287 N.Y.S. 62, 76, *aff'd*, 272 N.Y. 360, 6 N.E. 2d 56 (1936). Clearly, despite the fact that the second element *includes* control and domination of the subsidiary or affiliate for the commission of some "fraud," it is by no means limited thereto and in fact, expressly includes domination for the commission of some unspecified "wrong," to "perpetrate the violation of a statutory or other positive legal duty," *or* an act in "contravention" of the complainant's "legal rights."

In fact, our courts have pierced the corporate veil between two corporations, or between a corporation and its sole shareholder(s), to prevent the frustration of public policy in numerous cases where fraud was not involved. *See, e.g., Waff Brothers, Inc. v. Bank*, 289 N.C. 198, 221 S.E. 2d 273 (1976) (to prevent a judgment debtor's meritorious claim from being defeated); *Henderson v. Finance Co.*, 273 N.C. 253, 160 S.E. 2d 39 (1968) (to prevent a finance company from evading the usury laws); and *Freeman v. Development Co.*, 25 N.C. App. 56, 212 S.E. 2d 190 (1975) (to enable recovery on meritorious contract and quasi-contract claims). Most recently, this Court held that the corporate veil between affiliated corporations will be pierced to prevent the owner of a rental property to escape liability for the tortious conduct of its affiliated operating company. *Glenn v. Wagner*, 313 N.C. 450, 329 S.E. 2d 326 (1985).

Significantly, in *Glenn v. Wagner*, we *relaxed* the showing to be made by the party seeking to extend liability for corporate

obligations beyond the confines of a corporation's separate entity by holding that in certain cases involving affiliated corporations (as distinct from parent and subsidiary corporations), the domination sufficient to pierce the corporate veil need not be limited to the particular transaction attacked. Rather, the separate corporate entity would be disregarded in those cases in which one affiliated corporation is shown to be "without a separate and distinct corporate identity and is operated as a mere shell, created to perform a function for an affiliated corporation or its common shareholders" without the necessity of proving that the control was also exercised over the *particular* transaction attacked. 313 N.C. at 457, 329 S.E. 2d at 331.

In reaching this result, Chief Justice Branch, writing for the Court, emphasized the fact that the theory of liability under the instrumentality rule is essentially an equitable doctrine.

> Its purpose is to place the burden of the loss upon the party who should be responsible. Focus is upon the reality, not form, upon the operation of the corporation, and upon the defendant's relationship to that operation. It is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of factors which, when taken together with an element of injustice or abuse of corporate privilege, suggest that the corporate entity attacked had "no separate mind, will or existence of its own" and was therefore the "mere instrumentality or tool" of the dominant corporation.

*Id.* at 458, 329 S.E. 2d at 332. *Glenn v. Wagner* merely reiterated our earlier rule permitting the corporate veil between a parent and subsidiary corporation to be pierced where the parent has dominated the subsidiary and the subsidiary is "a shield for [the parent's] activities in violation of the declared public policy or statute of the State, *or* for the purpose of fraud. . . ." *Waff Brothers*, 289 N.C. at 210, 221 S.E. 2d at 280. (Emphasis added.)

Moreover, even if Alcoa were correct as to the other elements necessary to pierce the corporate veil under North Carolina law, the evidence supporting the Commission's imposition of refund liability upon Alcoa more than met the most restrictive of the various tests for inter-corporate liability—the so-called "*Lowendahl*" test—as articulated in *Huski-Bilt* and *Ac-*

*ceptance Corp. v. Spencer*, 268 N.C. 1, 149 S.E. 2d 570 (1966). As we indicated in Part I, C, 3 of this opinion, there is ample evidence of record of Alcoa's financial and managerial control over Nantahala from the time of its inception up until the present day, and plenary evidence demonstrating that this control extended to the ultimate operating and accounting policies of its subsidiary.

The entire historical pattern of Nantahala's development is replete with instances of the manner in which Alcoa dominated the development, sale and operation of Nantahala's hydroelectric resources and facilities, and subordinated these resources to what Alcoa considered to be the paramount needs of its aluminum smelting and fabrication operations in Alcoa, Tennessee. For example, Nantahala added generating capacity, vastly in excess of the amounts required to service its public load, for the express purpose of meeting Alcoa's expanding production needs prior to and during the war years at mid-century. Yet, in the last thirty years, Alcoa has caused Nantahala to remain inert in terms of obtaining additional capacity, either through development of additional generating facilities or through long-term purchase power agreements with others tailored to Nantahala's particular needs, as Alcoa's electricity requirements have leveled off, despite substantial constant growth in Nantahala's public load. As we observed earlier, Alcoa's unified development of the hydroelectric resources of its public utility subsidiaries was undertaken in the paramount interest of obtaining low-cost hydroelectric power for itself. Or, as more succinctly stated by Justice Barnhill in *Utilities Commission v. Mead Corp.*, 238 N.C. at 467-68, 78 S.E. 2d at 302:

> If they [the Commission] will only cut through the form to the substance, they will find just another hydroelectric power producing agency of Alcoa, retailing just enough of its production — less than 20% — to permit it to pose as a *quasi*-public corporation with the right to use the water power resources of this State, exercise the power of eminent domain, and enjoy the other monopolistic privileges accorded a public utility while it was, in fact, created and exists primarily to serve its master which seeks and must have low-cost hydroelectric power.

Justice Barnhill's 1953 observation that historically Nantahala has been no more than "another hydroelectric power producing agency of Alcoa" was fully borne out by the evidence before the Commission in 1981, as the Commission properly so found.

Furthermore, the evidence with respect to Alcoa's complete domination of Nantahala's "policy and business practice in respect to the transaction attacked," as found by the Commission, is both direct and overwhelming.

The three basic power supply contracts affecting Nantahala's rates are the 1941 Original Fontana Agreement, the 1962 New Fontana Agreement and the 1971 Nantahala-Tapoco Apportionment Agreement. Each of these contracts was, in whole or part, in effect during the 1975 test year. Although Nantahala was not even a party to the OFA, it gave to TVA the right of control of its energy production and water storage and turned over to TVA, through Alcoa, land, constituting the site for the massive Fontana Project. In return, Alcoa received 11,000 MW of energy for 20 years and its subsidiaries received power and energy entitlements dependent upon the level of generation controlled by TVA. The Commission found that the OFA still conveys significant benefits to Alcoa. Pursuant to the NFA, to which Nantahala was a *signatory* but *not a negotiating party*, Nantahala and Tapoco agreed to turn over their energy production to TVA in return for 218,300 kw annual assured energy. The Commission found and concluded that the evidence clearly demonstrates that the NFA was tailored to meet Alcoa's aluminum production needs without consideration of Nantahala's public service needs in western North Carolina.

From 1963 to 1971 Nantahala received its portion of the return entitlements under the 1963 Alcoa-Nantahala Apportionment Agreement. Under that agreement, Nantahala was provided 360 million kwh minimum production, plus Nantahala's actual production in excess of that figure, and additionally, Alcoa paid to Nantahala $89,200 annually for 25,600,000 kwh of energy received from TVA for TVA's use of Nantahala's flood control and storage rights. In 1971, with Nantahala facing the need to service an increasing public load, Alcoa employee George Popovich undertook the development of an apportionment formula by which Nantahala and Tapoco would contractually share the TVA entitlement

of 218,300 kw annual assured energy. The Popovich formula was incorporated into the 1971 Agreement between Nantahala and Tapoco, with Alcoa's employee Popovich representing the interests of *both* companies at the bargaining table. Under the 1971 Agreement, Nantahala rather than retaining or even increasing its allocation, was deprived of 66 million kwh average energy production annually in comparison to its 1963 Agreement with Alcoa. Since the production allowance in the TVA return entitlements was jointly shared by Nantahala and Tapoco under the NFA, the 66 million kwh detriment to Nantahala constituted a benefit to Tapoco that was passed on to Alcoa. Furthermore, the 1971 Agreement credited Nantahala with an assigned generating capacity of 54,300 kw, whereas its actual dependable generating capacity was determined to be 81,800 kw. Since the capacity allowance in the TVA return entitlements was also jointly shared by Nantahala and Tapoco under the NFA, any capacity needs of Nantahala between its assigned and its actual capacity represented an expense to Nantahala and, thus, a saving to Tapoco that was passed on to Alcoa as a concealed benefit.

In addition, under the 1963 Agreement, Nantahala received credit for relinquishing control of its flood control and storage rights to TVA, in the form of an annual payment of $89,200 from Alcoa. Despite the fact that the NFA included in the TVA return entitlement a reimbursement by TVA for the right to operate Nantahala's projects, the 1971 Agreement gave no credit to Nantahala for that reimbursement, and thus the reimbursement represented a savings to Tapoco that was passed on to Alcoa. Although the loss of the right to control the storage and flow of water for Nantahala's facilities constituted a loss of considerable value for which Nantahala was entitled to compensation, Nantahala received neither payments nor entitlements in consideration for relinquishment of these valuable rights. Additionally, the value to Tapoco of TVA's upstream Fontana Dam was not figured into the apportionment.

Singularly lacking in the foregoing review is any evidence of the separate mind, will or existence of Nantahala as a corporation with its own identity. The Commission properly found that Nantahala and Tapoco were designed and operated as a single system and that by virtue of the terms of the Fontana Agreements, Nantahala is effectively precluded from exercising a separate will

regarding energy production. Moreover, no Nantahala employee has yet been identified who dealt with other parties at arm's length concerning the utilization of its generating resources for supplying power for Nantahala's public service obligations. To the contrary, and as found by the Commission, "Alcoa's dominance is obviously and frequently documented in the results of various arrangements it has caused Nantahala and Tapoco to enter into."

In summary, the evidence of record shows that the Fontana Agreements and the 1971 Apportionment Agreement resulted in direct inequities to Nantahala and concealed benefits to Alcoa. The situation was further aggravated because the TVA return entitlements in the NFA were entirely designed to meet Alcoa's aluminum production needs and were not suitable for Nantahala's public service needs. Nantahala had energy production capacity and it had peaking capacity from its own generating stations, yet Nantahala gave up that energy production capacity and that peaking capacity with the result that it had to buy higher cost power from TVA to meet its peaking responsibilities and its energy production responsibilities. The totality of this evidence shows convincingly that Alcoa has controlled the policy and business practice of Nantahala's energy production through a series of contractual arrangements orchestrated by Alcoa primarily to serve its own best interests.

The evidence as to Alcoa's use of its control over Nantahala to commit the wrong, or violation of duty complained of by the intervenors, was equally substantial. Fundamentally, the record shows that Nantahala continually failed to protect its rights in its dealings with Alcoa and Tapoco concerning the power supply vital to fulfilling its public service responsibilities. For example, the NFA is silent as to any interest of Nantahala in receiving an assured portion of the return entitlements given by TVA in exchange for receiving the entire output of the Nantahala-Tapoco generating resources, except to state that the rights and benefits to Alcoa may be allocated as Alcoa, Tapoco and Nantahala see fit. The silence as to Nantahala's interest is understandable only in light of the fact that during the year 1962 Nantahala had no reason to bargain at arm's length for power suited to its public service load because the attempt to sell its distribution system to Duke Power Company was pending and had in fact received initial approval by the Commission. Alcoa's own internal documents

indicate that should the sale have not been completed by the effective date of the NFA, TVA would *temporarily* increase the power available to the Alcoa system in an amount sufficient to meet Nantahala's needs, thus implying that the NFA was itself in no manner intended to provide Nantahala with a 20 year power supply suitable for a growing public load. However, no fundamental changes in the terms of the NFA exchange were made following this Court's reversal of the prior order of the Commission approving the sale to Duke. The circumstances surrounding execution of the NFA ultimately required Nantahala to deal separately with Alcoa, outside the NFA, for recognition of its interests.

Again, this arrangement demonstrates that although Alcoa bargained with TVA concerning the value of Nantahala's generating resources as part of a unified utility system, the structure of the NFA return entitlements suited Alcoa, not Nantahala. Later, by the terms of the 1971 Apportionment Agreement, Nantahala effectively waived certain valuable contractual rights it had been accorded under the 1963 Agreement with Alcoa *and* simultaneously received a lesser share of the TVA entitlements at a precise point in time when its load was quickly outstripping its ability to serve under the terms of the NFA exchange. The 1971 Agreement represents more than a failure of consideration to Nantahala; there was diminution of past consideration in contravention of Nantahala's legal rights.

Nantahala is a public utility with a franchise to serve the electrical needs of most of six western North Carolina counties and, in the test year, served upward of 30,000 customers. In return for the various quasi-monopolistic privileges Nantahala receives as a public utility, Nantahala has a duty to serve its customers without concealment of excessive rates. *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705. By virtue of the domination of Alcoa, Nantahala was found to have been passing concealed benefits on to Alcoa which has resulted in excessive rates to its customers. This constitutes unjust action by Alcoa in contravention of Nantahala's legal rights and obligations. That this domination and unjust action in contravention of Nantahala's rights and obligations proximately caused the injury and loss complained of is, therefore, self-evident.

c.

[22] Alcoa does not directly challenge the evidentiary support for the Commission's findings and conclusions. Rather, Alcoa argues that "federal regulation and approval of the New Fontana Agreement is conclusive evidence that Alcoa does not dominate or control Nantahala through that Agreement" and "also bars a determination of either fraud or injustice to Nantahala's customers." Again, the Commission did not, and need not, find "fraud" in the agreements in order to hold Alcoa responsible for the refund obligation. Therefore, we need not address Alcoa's argument that the Commission is preempted from finding fraud in FERC-approved rate schedules. *See also* Part II, A, *supra.* In essence, Alcoa's remaining arguments boil down to the proposition that extensive prior investigation and regulation of the activities of Alcoa and Nantahala by both state and federal regulatory agencies precludes the Commission as a matter of law from finding either domination or injustice in the Alcoa-Nantahala relationship.

In light of the record of Alcoa's repeated and largely successful efforts over the last 40 years to evade, avoid and preclude federal and state regulatory oversight of its subsidiaries' energy producing operations and the various intercorporate power supply agreements between and among them and TVA, we find Alcoa's argument both factually and legally insupportable.[25] Alcoa has failed to demonstrate that any aspect of federal regulatory action with respect to Nantahala and Tapoco preempts the Commission's findings and conclusions with respect to piercing the corporate veil between itself and its public utility subsidiary.[26] It must be remembered that the Commission is charged with the regulation of public service enterprises, which require special State oversight to protect consumers from abuses of their quasi-monopoly power, in order to ensure fairness to the public. N.C. G.S. § 62-2, -30. *Manufacturing Co. v. Aluminum Co.*, 207 N.C. 52, 175 S.E. 2d 698. The Commission's oversight jurisdiction with regard to Nantahala's intrastate retail rates is exclusive, and its determination that Alcoa was legally responsible for Nantahala's excessive intrastate retail rates rests well within the realm of

25. *See* Discussion Part I, B, *supra.*

26. *See* Discussion Part II, A, *supra.*

regulatory control reserved to the states under the Federal Power Act. 16 U.S.C. § 824(b).

In summary, there is ample evidence in the record of Alcoa's financial and managerial control over Nantahala from the time of its inception, and the use of that control to impose upon Nantahala contracts in Alcoa's interest rather than in the interest of Nantahala, amounting to complete domination of policy and business practice "so that the corporate entity as to [these] transaction[s] had at the time no separate mind, will or existence of its own. . . ." *Huski-Bilt*, 271 N.C. at 671, 157 S.E. 2d at 358; *Acceptance Corp.*, 268 N.C. at 9, 149 S.E. 2d at 576. Furthermore, because Alcoa's domination resulted in the sacrifice of a public utility's resources to the needs of a private industrial concern, Alcoa's control may indeed be said to have been used to commit wrong or to perpetrate the violation of a statutory duty owed Nantahala's customers. *Id.* Finally, the aforesaid control and breach of duty may clearly be said to have proximately caused the injury complained of, *id.*, that is, higher rates for Nantahala's customers. We therefore reject Alcoa's argument that no factual or legal basis exists for the Commission to "pierce the corporate veil" between itself and Nantahala.

d.

In its final arguments concerning the refund obligation, Alcoa maintains (1) that it was "surprised" at being declared a public utility and that it cannot be required to pay refunds based upon Nantahala's overcollections prior to 30 October 1980, the date on which it "became" a public utility; and (2) that the refund obligation is confiscatory.

1.

[23] The mere statement of Alcoa's first contention reveals the underlying fallacy of the argument: Alcoa did not "become" a North Carolina statutory public utility in 1980. This date marks the advent of no new North Carolina law expanding the definition for the first time. Nor does it mark any dramatic change in Alcoa's relationship with its subsidiaries such that the designation "public utility" was *then* appropriate for the first time. Instead, 30 October 1980 merely marks that date of the Commission's determination that, based upon Alcoa's ownership of Nan-

tahala's stock (a fact existing since 1929) and on the basis of the various intercorporate transactions and agreements, dating back at least to 1941, Alcoa satisfied the criteria for public utility status under N.C.G.S. § 62-3(23)(c). In essence, Alcoa was found to have been a "public utility" having an effect on Nantahala's rates and service for many years. Based upon this finding, and upon the Commission's findings of detrimental domination, Alcoa can properly be held to pay any refunds Nantahala is ordered to pay in this proceeding, but is unable to satisfy out of its own financial resources. Inasmuch as Alcoa is not asked to pay refunds attributable to any past period (that is, prior to the 1977 rate increase), the concept of retroactive rate making is not implicated by the refund obligation ordered.

2.

[24]   We also reject Alcoa's argument that the result of the Commission's order is a confiscation of its property under the rule established in *FPC v. Hope Gas Co.*, 320 U.S. 591, 88 L.Ed. 333 (1944) (the fixing of just and reasonable rates involves a balancing of the investor and the consumer interests; the investor's interests include a rate of return sufficient to produce revenue for operating expenses, service on debt and stock dividends). While it is true that Nantahala has neither supplied Alcoa with power nor paid a dividend to Alcoa since early 1979, these facts do not render the rates established confiscatory under the circumstances of this case. The Commission's order does no more than strike a fair and reasonable balance between the long-neglected interests of Nantahala's customers and the corporate parent whose self-interest has been so long and so well served through intercorporate domination and control. Thus, we find no merit in the arguments presented by either Nantahala or Alcoa with respect to confiscation of their property.

Finally, with respect to Alcoa's liability for Nantahala's refund obligation, we must point out that Alcoa itself has repeatedly undertaken in the past to warrant or otherwise back up its subsidiaries' performance obligations. In both Fontana Agreements, Alcoa warranted that it was backing up or securing the performance of its subsidiaries (including Nantahala) in carrying out the coordination and exchange agreements with TVA. These undertakings by Alcoa certainly undercut Alcoa's intimations that

it was surprised in any manner by being held responsible for the obligations of its wholly-owned subsidiary on the basis of its parental impact upon Nantahala's rates and service.

3.

[25] Nantahala presents one final set of arguments concerning the extent of the refund obligation. First, Nantahala contends that it cannot be required to refund revenue collected prior to 6 March 1979, because this revenue was derived from rates approved by the Commission which were not subject to being refunded prior to the Court of Appeals' reversal of the Commission's approval of the 1977 rates in Docket No. E-13, Sub 29. 6 March 1979 is the filing date of the Court of Appeals decision in *Utilities Comm. v. Edmisten, Atty. General,* 40 N.C. App. 109, 252 S.E. 2d 516, *aff'd in part and rev'd in part,* 299 N.C. 432, 263 S.E. 2d 583. Next, Nantahala contends that if it is responsible for all refunds dating to June 1977; it can only be required to refund the excess of its collected revenue over the revenue allowed in its most recently approved prior rate case, which would be in Docket No. E-13, Sub 23. We find no merit in either of these contentions.

a.

Briefly, by order of the Commission dated 14 June 1977, Nantahala was authorized to put new and increased rates into effect. This order was appealed to the Court of Appeals in the aforementioned case. That court reversed and remanded the order, stating:

> The order of the Commission dated 14 June 1977 authorizing increased rates for Nantahala and approving a new purchased power cost adjustment clause is vacated and set aside.

40 N.C. App. at 119, 252 S.E. 2d at 522. The effect of that decision, if left standing, would have been to require an immediate refund of the increased rate collections as of 6 March 1979. Subsequently, this Court stated:

> The Commission's order of 14 June 1977 authorizing an increase in Nantahala's rates was vacated by the Court of Appeals. The effect of the Court of Appeals' decision was stayed, however, by this Court's issuance of a writ of supersedeas pending the outcome of this appeal. Although

that writ is hereby dissolved, we believe that essential fairness to all the parties is best served by allowing the increased rates to remain in effect, conditioned upon Nantahala's guarantee that it will in the future *refund to its customers any overcharges should the new rates ultimately be determined excessive.* Accordingly, we reverse the Court of Appeals' setting aside of the order of 14 June 1977 and direct the Commission to obtain adequate assurances of Nantahala's willingness and continued ability *to refund such overcharges as may ultimately result from imposition of the 1977 rate schedule.* (Emphasis added.)

299 N.C. at 444, 263 S.E. 2d at 592.

Upon remand to the Commission, the Commission ordered Nantahala to file an undertaking to refund, stating that:

[T]he Supreme Court has given this Commission a clear mandate to obtain adequate assurances of Nantahala's willingness and continued ability to refund such overcharges as may ultimately result from the imposition of the 1977 rate schedule. . . .

Thereupon, Nantahala filed an undertaking, wherein Nantahala agreed:

[T]o refund in a manner to be prescribed by the Commission the amount, if any, found to be owing to its customers should the rates approved by the order of 14 June 1977 be ultimately determined to be excessive. . . .

In its 2 September 1981 Order Reducing Rates and Requiring Refund, the Commission directed Nantahala to make a full and complete refund of all overcollections charged after 14 June 1977, when the higher rates had been put into effect. This order of the Commission is no different in substance from the order to refund overcharges collected under excessive rates which are ultimately disapproved as mandated by our decision in *Utilities Comm. v. Edmisten, Atty. General,* 291 N.C. 451, 232 S.E. 2d 184. In that case, an order of the Commission permitting Duke Power Company (and also CP&L and VEPCO) to collect a surcharge was disapproved on appeal. We stated:

[T]his matter is remanded to the Court of Appeals for the entry of a judgment by it remanding the matter to the Commis-

sion for the entry of an order by the Commission vacating its order authorizing the surcharge and directing Duke to make the appropriate refunds to its customers on account of revenues unlawfully collected from them pursuant to the surcharge.

*Id.* at 474, 232 S.E. 2d at 198.

Nantahala contends that refunds may not be ordered for pre-1979 overcollections because these occurred under rates approved by the Commission on 14 June 1977 which were not subject to any undertaking to refund until 6 March 1979, when the Court of Appeals vacated the 1977 order. Nantahala, relying upon *Utilities Comm. v. City of Durham,* 282 N.C. 308, 193 S.E. 2d 95 (1972), *Utilities Comm. v. Edmisten, Atty. General,* 291 N.C. 451, 232 S.E. 2d 926 and *Utilities Comm. v. Edmisten, Attorney General,* 294 N.C. 598, 242 S.E. 2d 862 (1978), argues that only rates that were imposed unlawfully or were permitted to go into effect, subject to an undertaking to refund, may be refunded. Nantahala further contends that because the subject rates were initially approved by the Commission, they are automatically deemed "just and reasonable" under N.C.G.S. § 62-132; therefore, they cannot be considered "unlawful" for purposes of requiring a refund at a later date. This, Nantahala contends, would constitute "retroactive" rate making, in excess of the Commission's authority, because N.C.G.S. § 62-132 permits the Commission to award refunds only where rates that it *allows* to go into effect, as opposed to rates which it *approves,* are later determined to be unreasonable. Next, Nantahala argues that it did not execute an undertaking to refund regarding the 1977 rates until after 6 March 1979, so that only overcollections after that date may be refunded under the line of cases cited above.

Nantahala's argument, although not without logical appeal, confuses the issue with respect to the refund ordered in this case. As Nantahala itself observed in its brief, both *Edmisten* cases cited above discussed the authority of the Commission under N.C.G.S. § 62-132[27] to award refunds to rate payers, where a utili-

---

27. N.C.G.S. § 62-132 provides:

"The rates established under this Chapter by the Commission shall be deemed just and reasonable, and any rate charged by any public utility different from

ty collects rates *different and higher than those approved by the Commission.* This statute and the cases cited by Nantahala have no applicability to the situation under discussion. Here, excessive rates, initially but erroneously approved by the Commission, were permitted to remain in effect pending the ultimate resolution of the contested factual issue concerning the appropriate rate making methodology to utilize when fixing Nantahala's retail rates. N.C.G.S. § 62-132 cannot be relied upon to transmute an excessive rate into a "just and reasonable" rate by virtue of labeling such rates as rates "established by the Commission." Therefore, the distinction recognized under that statute with respect to the need for an undertaking to refund before refunds may be ordered on the basis of revenue collected under "established" rates has absolutely no bearing on the extent of Nantahala's refund obligation.

Moreover, it is elementary that the Commission's approval of any rate is always subject to judicial review. It is equally well-settled that rates or charges fixed by an order of the Commission are to be considered just and reasonable unless and until they are changed or modified on appeal or by the further action of the Commission itself. *In re Utilities Co.*, 179 N.C. 151, 101 S.E. 619 (1919). *See also R.R. v. R.R.*, 173 N.C. 413, 92 S.E. 150 (1917). Thus, the 1977 rates were only *presumed* to have been lawfully approved by the Commission until the 1977 order was reviewed by our appellate courts. When, upon appellate review *and* further action by the Commission itself, the 1977 rates were determined to be excessive, Nantahala's rate payers became entitled to recover *all* overcharges collected pursuant thereto. The various dates upon which appellate decisions were entered in this case have ab-

---

those so established shall be deemed unjust and unreasonable. Provided, however, that upon petition filed by any interested person, and a hearing thereon, if the Commission shall find the rates or charges collected to be other than the rates established by the Commission, and to be unjust, unreasonable, discriminatory or preferential, the Commission may enter an order awarding such petitioner and all other persons in the same class a sum equal to the difference between such unjust, unreasonable, discriminatory or preferential rates or charges and the rates or charges found by the Commission to be just and reasonable, nondiscriminatory and nonpreferential, to the extent that such rates or charges were collected within two years prior to the filing of such petition."

solutely no bearing upon the temporal extent of Nantahala's refund obligation.

The premise underlying such a refund obligation is that rates which are found to be excessive are then *considered* to have been illegal from the outset and are not considered to have become illegal only as of the date on which the appellate court has found them to be so. *See Louisville & N. R. Co. v. Greenbriar Distillery Co.*, 170 Ky. 775, 187 S.W. 296 (1916). The Commission's order with respect to the temporal extent of the refund obligation is, therefore, compatible with the mandate of this Court in *Edmisten* and well within the Commission's inherent authority to order a public utility to refund monies which were overcollected from its customers under excessive and unlawful rates. *See* N.C.G.S. §§ 62-30, -130, -132; *Utilities Comm. v. Edmisten, Atty. General*, 291 N.C. 451, 232 S.E. 2d 184.

In answer to the additional point raised by Nantahala in this regard, we hold that the concept of "retroactive rate making" has no application in the instant proceeding. The rates ultimately fixed and the refund ordered by the Commission in the Sub 29 (Remanded) proceeding were not collectible for past service, but for service rendered in the locked-in period of this docket.

b.

[26] Finally, Nantahala challenges the Commission's action in measuring the excess revenue collected by the rates set under the roll-in rather than upon any excess revenue collected over and above what would have been collected under Nantahala's prior rate schedule, established in Docket No. E-13, Sub 23. While it is true that the rates ultimately established by the Commission in the Sub 29 (Remanded) proceeding were actually lower than the rates which Nantahala had in effect prior to 14 June 1977 by virtue of its earlier rate case (Sub 23), this fact is irrelevant to the amount of excess revenues which Nantahala's customers are entitled to receive under the rates properly established in the Sub 29 (Remanded) proceeding.

The Sub 23 rates were effectively superseded by the 1977 rates. Had the Court of Appeals decision in the original appeal from the Sub 29 proceeding been permitted to stand without appeal, the effect would have been dismissal of the Sub 29 rate in-

crease request and the Sub 23 rates would, indeed, have been effectively reinstated. However, when this Court permitted the 1977 rates to remain in effect and remanded the case for further consideration, the Sub 29 proceeding was effectively continued until such time as the Commission modified its 14 June 1977 order and reduced Nantahala's rates. At no point in time were the Sub 23 rates "resurrected." Therefore, its refund obligation may not be measured against Nantahala's earlier, superseded rates, but must be calculated on the basis of overcharges actually levied and collected from the retail rate payers during the entire 1977-1981 period.

D.

[27] Finally, both Alcoa and Nantahala challenge the Commission's order on the grounds that the Commission failed to make independent findings of fact as to the propriety of the roll-in device in fixing Nantahala's rates. The companies primarily base their argument on certain phrases contained in the Commission's 2 September 1981 order referring to statements contained in this Court's opinion in *Edmisten*, 299 N.C. 432, 263 S.E. 2d 583, as "findings." Nantahala contends that the Commission has thereby shown that it has either improperly taken this Court's observations or concerns as facts binding upon it or has chosen to disregard substantial quantities of evidence that roll-in is inappropriate and that the NFA and 1971 Apportionment Agreement do not convey hidden benefits to Alcoa. Alcoa approaches the issue somewhat differently. It contends that the remanded hearing as to its status and liability for the refund obligation was not truly "*de novo*" because the Commission accorded an improper presumption of validity to findings made in the prior Sub 29 hearing and to purported "findings" contained in our decision in *Edmisten*. Alcoa argues that the effect of this was to improperly shift the burden of proof onto Alcoa to rebut or disprove findings established in a case to which Alcoa was not then a party, in violation of Alcoa's due process right to be heard on all issues affecting it.

Although we fully agree with the Court of Appeals that the Commission's use of such phraseology is "unfortunate," we completely reject the companies' arguments that the findings actually made by the Commission on all issues addressed in the remanded

proceedings were anything less than fully independent and fully supported by substantial, if not overwhelming, evidence of record. In *Edmisten*, we remanded the matter to the Commission for the purpose of considering the propriety of treating Nantahala and Tapoco as a single utility enterprise and determining whether Nantahala's customers would benefit by application of a rolled-in rate making methodology. As we indicated in Part I, A of this opinion, our discussion of these factual issues was limited to the purposes of demonstrating the legal basis for reversal of the 1977 order — failure to accord more than minimal consideration to material facts of record bearing upon the determination of reasonable rates for Nantahala — and the legal significance of evidence indicating that Nantahala had structured its economic affairs so as to afford an unfair preference to its parent Alcoa at the detriment of its intrastate retail rate payers.

This Court in *Edmisten* did not, as it indeed could not, "find facts"; that duty is imposed solely on the Commission. N.C.G.S. § 62-94; *Utilities Comm. v. Coach Co.*, 260 N.C. 43, 132 S.E. 2d 249 (1963). In addition, the weight of the evidence presented is also for the Commission, and not the court, to decide. *Utilities Comm. v. City of Durham*, 282 N.C. 308, 193 S.E. 2d 95. Even a cursory reading of the 1981 order shows that the Commission's references to this Court's opinion are included in an evident effort to demonstrate that, upon remand, and in keeping with the directive of this Court, adequate consideration was given to the material facts of record highlighted by this Court in its opinion. Moreover, the clearest proof of the Commission's exercise of its independent judgment in gathering and weighing evidence that dealt with the roll-in question and the issue of Alcoa's liability for its subsidiary's refund lies in the extensive and detailed discussion of the Evidence and Conclusions for Findings of Fact Nos. 4, 5, 6, 7 and 21. This discussion embraces almost one-fourth of the nearly sixty page order reducing rates and ordering refund payments. It is clearly based upon the many volumes of testimony taken and scores of exhibits received upon remand, and not upon any observations of this Court.

Nantahala's argument concerning the Commission's factual findings amounts to little more than a disagreement with the *result* reached by the Commission as to whether a roll-in should be performed and which jurisdictional cost allocation methodology

would most accurately reflect the cost of service attributable to Nantahala's intrastate retail customers. Although there was evidence of record which would perhaps support the position taken by Nantahala with respect to the roll-in, that does not entitle Nantahala to a reversal of the order. The test upon appeal from a determination of the Commission is whether the Commission's findings of fact are supported by competent, material and substantial evidence in view of the entire record. N.C.G.S. § 62-94 (b)(5). Nantahala does not even attempt to argue that the challenged findings are not supported by substantial evidence and we have no difficulty in holding that they are. Nantahala merely argues that the Commission has "ignored" evidence to the contrary.

Although the Commission must consider and determine controverted questions by making findings of fact and conclusions of law, and set forth the reasons and bases therefor "upon all the material issues of fact, law, or discretion," N.C.G.S. § 62-79(a)(1), it need not comment upon every single fact or item of evidence presented by the parties. Accordingly, we find no merit in any of Nantahala's arguments concerning the findings of fact supporting the Commission's rate reduction and refund order. Rather, we conclude that the Commission, after careful consideration of all the evidence presented upon remand, adequately weighed and discussed all the material issues of fact raised thereby and properly reached its own independent decision as to the propriety of and necessity for the roll-in and the method for implementing it.

Alcoa's argument that the Commission denied it a fair hearing by relying on "fact finding" by this Court and findings made by the Commission in the Sub 29 hearing is based almost exclusively on a single paragraph in the Commission's order, which states:

> These findings by the Supreme Court, that Nantahala and Tapoco constitute a single, integrated electric system and should be treated as one system for rate-maing purpose [sic], have been carefully considered by the Commission for purposes of this proceeding. However, since Alcoa and Tapoco were not parties to the original proceeding that led to the June 14, 1977 Order, the Commission has allowed them and Nantahala to introduce evidence in the remand proceeding to challenge the findings of the Supreme Court.

Alcoa argues that the foregoing statement indicates that the Commission improperly shifted the burden of proof and that its requirement that Alcoa disprove "findings" from a prior hearing at which it was not even present influenced the Commission's ultimate determinations concerning Alcoa's liability. Alcoa reasons that had it been accorded a proper *de novo* hearing, the result could well have been different; therefore, the Commission's order should be reversed. We do not agree.

The paragraph relied upon by Alcoa in its argument follows a discussion by the Commission of certain conclusions by this Court in *Edmisten* as to the existence, sufficiency, and legal significance of evidence adduced in the Sub 29 proceeding which indicated that Nantahala and Tapoco were designed and operated as a single system and ought therefore be treated as such for rate making purposes under a roll-in device or methodology. Immediately following the quoted paragraph is a lengthy recital of the evidence supporting the Commission's conclusion that the Nantahala and Tapoco electric facilities *do* constitute a single, integrated system, are operated as such and are coordinated as such with the TVA system, and its further conclusion that the two companies' financial data should be rolled-in for rate making purposes as this would benefit Nantahala's customers. The mere fact that the Commission's ultimate findings and conclusions regarding the roll-in are consonant with this Court's earlier discussion of certain aspects of the original evidence does not invalidate the entire Sub 29 (Remanded) proceedings or order. Nothing in the record before us indicates that the Commission improperly placed a burden on Alcoa or otherwise denied it a fair hearing. In fact, at the remanded hearing, the Commission permitted all participants the right to present any appropriate evidence on the relevant issues and to cross-examine all witnesses. The Commission never stated that Alcoa had "failed to rebut" any presumptions or to carry any particular "burden of proof," and the evidence was more than sufficient for the Commission to have reached the conclusion that it did as to Alcoa's liability without the benefit of any presumptions or other procedural devices. Under the circumstances of this case, the Commission's unfortunate use of the phrase "findings by the Supreme Court" does not itself warrant reversal of the Commission's order.

We also reject Alcoa's argument that it did not receive a true *de novo* hearing on all issues affecting its status and liability as a statutory public utility and that this constitutes reversible error. The record reveals that upon remand, the Commission recognized the right of both Tapoco and Alcoa to be heard *de novo* on such issues as affected them and upon which they desired *de novo* consideration of evidence. Specifically, the Commission ordered:

> Tapoco and Alcoa are entitled to be heard, *de novo* on the prior record compiled in the proceeding, but only as the further consideration of such evidence affects them. Such *de novo* hearing includes cross-examination and the right to offer evidence on their own behalf which addresses matters previously addressed. Since the prior record in this case is lengthy, and since many of the issues already determined will not affect Tapoco and Alcoa, it will be incumbent upon the Respondents to specify in advance of the hearing the issues on which they desire to be heard. The Commission can appreciate that until the Intervenors and Public Staff have stated their positions, Respondents may not know on what issues they desire to be heard *de novo*. The Commission may schedule a pre-hearing conference after all direct testimony has been prefiled in order to resolve some of these problems.

During the remanded hearings, the Commission accepted various portions of the original hearing without change by any party, such as the capital structure, embedded cost of debt, proper equity, and overall rates of return established for Nantahala in the 14 June 1977 order. No party offered any evidence upon those aspects of the case. However, as to the contested issues of public utility status, the propriety of the roll-in and the jurisdictional cost allocation method to be used, all parties, including Nantahala, Alcoa and Tapoco, were permitted to present such evidence as they desired.

All three companies, Nantahala, Alcoa and Tapoco, introduced testimony and extensively cross-examined the intervenors' witnesses. At no time did the Commission deny a request by Alcoa or Tapoco to put on evidence or cross-examine witnesses from the first set of hearings with respect to particular facts. Although not expressly directed to do so by this Court, the Com-

mission in effect afforded all parties a *de novo* hearing with respect to *any issue* properly raised by them. In every material respect, the remanded proceedings were conducted as *de novo* hearings on both the jurisdictional and substantive issues involved in this case. Any matters not expressly redetermined from the original hearing were matters which were not in controversy and which were, if anything, favorable to Nantahala, and therefore to Alcoa. Accordingly, we reject Alcoa's assertion that the "hearing below was an arbitrary and capricious drama," in which its due process right to be heard on all issues affecting it was not respected. To the contrary, we conclude that all parties received a full and fair hearing at all stages of the original and remanded proceedings and that the Commission's order was, in all respects, based upon fully independent and well substantiated findings of fact and conclusions of law.

III.

We have carefully reviewed the lengthy record compiled in this proceeding, the many and complex arguments presented by the parties and the amici curiae, and the relevant authorities cited by the parties in their briefs and those later submitted to this Court as additional authority. For the reasons stated in Parts I and II of this opinion, we conclude that the Utilities Commission has properly decided all factual and discretionary issues related to the roll-in, rate reduction and refund obligation based upon competent, relevant and substantial evidence in view of the entire record. We further conclude that the order reducing rates and requiring refunds for Nantahala's intrastate retail rate payers is free from any statutory or constitutional infirmity.

Specifically, we hold that: (1) the Commission correctly determined that Tapoco is a public utility in North Carolina, subject to its regulatory authority and jurisdiction; (2) the Commission's order has in no way contravened the terms and conditions of Tapoco's federal license to operate hydroelectric plants in North Carolina and Tennessee and the Commission is not, therefore, preempted from implementing the roll-in by virtue of Part I of the Federal Power Act and the Supremacy Clause of the United States Constitution; (3) the Commission properly determined that a roll-in for rate making purposes was mandated in the case of Nantahala and Tapoco on the grounds that (a) Nantahala has

not been designed, developed and operated as a stand-alone electric system, (b) the Nantahala and Tapoco electric facilities constitute a single integrated electric system, and (c) the two corporate affiliates should be treated as a single utility system for rate making purposes, in view of their historical development, actual operating conditions and the fact that Nantahala's customer cost responsibility cannot be accurately determined using a "stand-alone" model; (4) the Commission correctly determined that Alcoa is a North Carolina public utility under the provisions of N.C.G.S. § 62-3(23)(c) by virtue of the substantial and ultimately detrimental impact Alcoa's affiliation has had upon Nantahala's rates; (5) the roll-in methodology utilized by the Commission is not barred under the Supremacy Clause of the United States Constitution (a) either by virtue of Part II of the Federal Power Act or (b) by virtue of federal regulatory action in a parallel wholesale rate case; (6) utilization of the roll-in does not grant a preference to Nantahala's North Carolina customers and does not impermissibly interfere with interstate commerce in violation of the Commerce Clause of the United States Constitution; (7) application of the roll-in methodology as developed by the Commission, with its resulting reduction in retail rates and refund obligation, does not impermissibly impair Nantahala's ability to earn a proper rate of return on its investment and does not amount to a confiscation of its properties; (8) the Commission acted well within its regulatory and rate making authority in imposing the obligation upon Nantahala's parent Alcoa to pay any portion of the refund obligation for the entire locked-in period of Docket No. E-13, Sub 29 (Remanded) as Nantahala is financially unable to make; (9) prior federal and state regulation of Nantahala and Alcoa, the various transactions and the agreements affecting Nantahala's power supply does not prohibit or preempt the Commission from piercing the corporate veil between Alcoa and its wholly-owned subsidiary to hold Alcoa financially responsible for Nantahala's refund obligation; (10) the results obtained under the roll-in do not amount to a confiscation of Alcoa's property; (11) the Commission properly ordered Nantahala to refund to its North Carolina retail customers all revenue collected under the rates approved by the Commission Order issued 14 June 1977, to the extent that said rates produced revenue in excess of the level of rates approved in the Sub 29 (Remanded) proceedings and Order issued 2 September 1981; and (12) all parties received a full and fair hearing at all

stages of the original and remanded proceedings and the Commission's order is, in all respects, based upon fully independent and well substantiated findings of fact and conclusions of law.

For the foregoing reasons, the decision of the Court of Appeals upholding the Commission's order reducing Nantahala's retail rates and requiring refunds to its North Carolina retail customers is

Affirmed.

Justice VAUGHN did not participate in the consideration or decision of this case.